IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING

PATRICK D. LEGGETT;
KATHERINE F. LEGGETT;
GEORGE D. MCKAIN, by his
attorney in fact, ANITA
KATHRYN MCKAIN GREER;
and ADELE S. MCDOUGAL,

                Plaintiffs,

v.                                      Civil Action No. 1:13-cv-0004 FPS
                                      Honorable Frederick P. Stamp, Jr.

EQT PRODUCTION COMPANY,
a Pennsylvania corporation;
EQT CORPORATION,
a Pennsylvania corporation;
EQT ENERGY, LLC, a
Delaware limited liability company;
EQT INVESTMENTS HOLDINGS, LLC, a
Delaware limited liability company; and
EQT GATHERING, LLC, a
Delaware limited liability company,

                Defendants.

**PLAINTIFFS' MOTION TO COMPEL ALL DEFENDANTS
TO ANSWER INTERROGATORIES, PRODUCE DOCUMENTS
AND PRODUCE F.R.C.P. 30(b)(6) DESIGNEES FOR DEPOSITION**

Plaintiffs, Patrick D. Leggett, Katherine F. Leggett, George D. McKain, by his Attorney

in Fact Anita Kathryn McKain Greer, and Adel McDougal, by counsel, pursuant to Rule 37 of

the Federal Rules of Civil Procedure, respectfully move this Court for an order compelling each

of the Defendants, EQT Production Company, EQT Corporation, EQT Energy, LLC, EQT

Investments Holdings, LLC and EQT Gathering, LLC, to answer and respond to Plaintiffs' First

Set of Interrogatories and Requests for Production as set forth below and for the reasons as set

forth below.  Plaintiffs further respectfully move this Court for an Order compelling each of the

Defendants to produce 30(b)(6) designated agents for depositions in this action for the same reasons.

## IA.    INTRODUCTION AND BACKGROUND

This is a civil action requesting the Court to certify a class action to recover for the plaintiffs and the putative class royalties due them under their leases, all as set forth in the Amended Complaint in this case.

Plaintiffs' allege in their Amended Complaint that Defendants have taken and continue to take unauthorized deductions, reduce Plaintiffs' royalty payments, overcharge Plaintiffs for the deductions that they are charging, and otherwise reduce Plaintiffs' royalty on volume and/or price. Plaintiffs' royalty statements show that deductions are being taken from their royalties. Plaintiffs allege that Defendants have charged Plaintiffs with costs and charges which were unreasonably excessive which amounted at times to as much as approximately 25% to 30% of the total amount of royalty due to the Plaintiffs. Plaintiffs further allege, upon information and belief, that Defendants have converted and continue to convert Plaintiffs' natural gas to liquids and Defendants sell the liquids without compensating Plaintiffs. Plaintiffs' allege that these charges, deductions and failures to pay are in violation of West Virginia law. *See, i.e., Estate of Tawney v. Columbia Natural Resources, LLC,* 633 S.E.2d 22 (W.Va. 2006); *Wellman v. Energy Resources, Inc.,* 557 S.E.2d 254 (W.Va. 2001).

The discovery, the data, documents and testimony requested would demonstrate the methodology the Defendants use for determining the amount of gas produced from their properties, the amounts deducted, what the deductions were based upon, how the volume and deductions were calculated and whether Plaintiffs were paid for liquids.

### B.     Discovery Requested

The answers and responses that were provided to this discovery were evasive and incomplete.  Plaintiffs therefore met and conferred with Defendants in good faith many times to resolve plaintiffs' discovery requests.  After Plaintiffs learned of additional facts about the Defendants' concerted actions with their affiliated companies, Plaintiffs, on May 9, 2014, amended their Complaint.  Plaintiffs then served amended discovery on all EQT Defendants on August 14, 2014.  (**Exhibit 2**).  Despite Plaintiffs' stipulations to allow EQT Defendants additional time to respond, and despite EQT Defendants' repeated assurances that their answers and responses would be forthcoming:  none of the EQT Defendants have objected to or responded to Plaintiffs' amended First Set of Requests for Production; neither EQT Production Company nor EQT Gathering, LLC, have objected to or responded to Plaintiffs' amended First Set of Interrogatories; EQT Corporation filed an objection to Plaintiffs' amended First Set of Interrogatories and declined to answer them; and EQT Investments Holdings, LLC, and EQT Energy, LLC, have filed answers to Plaintiffs' amended First Set of Interrogatories that are evasive and incomplete.[1]

Importantly, Plaintiffs also noticed and served Federal Rule of Civil Procedure Rule 30(b)(6) deposition notices requiring Defendants to produce corporate designees to testify concerning the issues related to this lawsuit, which required designee(s) to be produced on January 15, 2015, and on January 16, 2015.  In addition, Plaintiffs requested that the Defendants produce documents pursuant to F.R.C.P. 34.  Plaintiffs' counsel convened with a court reporter

---

[1] Defendants represented that one Defendant, Midstream Partners, was not involved in any respect with the gathering, distribution and charges made and had no documents pertaining to same.  Defendants' counsel requested Plaintiffs to dismiss Midstream with the right to re-name them should evidence demonstrate their involvement. Plaintiffs, attempting to cooperate in discovery,  obliged with the understanding that Plaintiffs would join them later without Defendants' objection if they were discovered to have any bearing on the issues in this case.

on the 15th and Defendants produced no one.  Plaintiffs contacted Defendants' counsel who advised that Defendants were not going to produce any designee on those days.  Plaintiffs' counsel again met and conferred with defense counsel on January 20, 2015, and counsel agreed that they would not be able to reach an agreement.

Inasmuch as EQT Corporation, EQT Production Company, EQT Investments Holdings, LLC, EQT Energy, LLC, and EQT Gathering, LLC have all failed to object or respond to Plaintiffs' amended First Set of Requests for Production, Plaintiffs respectfully request this Court to enter an Order compelling each of these Defendants to fully respond to Plaintiffs' discovery, without objection, within two weeks from entry of this Order pursuant to Local Rule 33.01(c). Inasmuch as EQT Production Company and EQT Gathering, LLC have failed to object to or answer Plaintiffs' amended First Set of Interrogatories, Plaintiffs respectfully request this Court to enter an Order compelling each of these Defendants to fully respond to Plaintiffs' discovery, without objection, within two weeks from entry of this Order pursuant to Local Rule 33.01(c). Inasmuch as EQT Corporation's objection to Plaintiffs' amended First Set of Interrogatories was baseless, it failed to answer Plaintiffs' amended discovery requests, and its answers previous answers were evasive and incomplete, Plaintiffs respectfully request this Court to enter an Order compelling these Defendants to fully respond to Plaintiffs' discovery, without objection, within two weeks from entry of this Order pursuant to Local Rule 33.01(c).  Inasmuch as EQT Investments Holdings, LLC, and EQT Energy, LLC's answers to Plaintiffs' amended First Set of Interrogatories were evasive and incomplete, Plaintiffs respectfully request this Court to enter an Order compelling this Defendant to fully respond to Plaintiffs' discovery, without objection, within two weeks from entry of this Order pursuant to Local Rule 33.01(c).  Finally, Plaintiffs respectfully request this Court to enter an Order compelling EQT Defendants to produce 30(b)(6)

witnesses as noticed, with the requested productions, without objection within 30 days from entry of such order.

Plaintiffs provide support for this Motion in detail below, including specific information and documents sought from the EQT Defendants and the actions of those Defendants to prevent Plaintiffs from discovering the information and documents pertinent to this action.

**C.**    **EQT Defendants & Their Discovery Responses**

**1.**    **EQT Corporation** -- EQT Corporation did not object or respond to Plaintiffs' amended First Set of Requests for Production.  (**Exhibit 2**).  It objected to Plaintiffs' amended First Set of Interrogatories as follows:

> On November 26, 2013, EQT Corp. responded to Interrogatories from Plaintiffs in this action that totaled, including all discrete subparts, more than 40 allowed per party pursuant to LR Civ P 26.01 (c)(4).  Moreover, the instant set of interrogatories is substantially identical to the set previously answered.  EQT Corp. therefore objects to the instant set of interrogatories, and declines to answer them.  In the event, however, that it is determined that EQT Corp. is obligated to answer these interrogatories, EQT Corp. reserves the right to assert additional, specific objections to them.

**Exhibit 1.**

In its <u>prior</u> answers and responses, EQT Corporation generally objected to each interrogatory of the Plaintiffs claiming "to the extent that it implies that it is in the business of production, gathering, transportation, or processing of gas in West Virginia.  EQT has never owned the gas leases at issue in this litigation, nor has it ever operated any wells at issue in this litigation.  Upon information and belief, all the information to be produced related to the wells and leases at issue is maintained in the ordinary course of business by EQT Production Company or some other affiliated entity, not EQT Corporation." It also generally objected to each of Plaintiffs' interrogatories based upon "the implication in Plaintiffs' discovery requests that EQT, EQT Production Company, or any other affiliated entities are one and the same.  EQT further

objects to the extent Plaintiffs' discovery requests seek information or documents of any of EQT's subsidiaries or affiliated entities; EQT's responses are limited to information and documents developed and maintained in the ordinary course of its business, and not that of any subsidiaries or affiliated entities."

Plaintiffs' previous Interrogatory No. 1 sought information relating to the royalty owners in West Virginia to which EQT (EQT/EQT Production Company) has a duty to pay royalties, the royalties paid, the amount of money received for the sale of the royalty owner's gas and by-products, and how the royalties were calculated.  EQT Corporation objected and answered that the interrogatory "is inapplicable to EQT because EQT has never owned the gas leases at issue in this litigation, nor has it ever operated any wells at issue in this litigation.  Notwithstanding that objection, and in an attempt to be responsive, EQT states, upon information and belief, that all the information to be produced related to the leases and wells at issue is maintained in the normal course of business by EQT Production Company, not EQT Corporation."

Plaintiffs' Interrogatory Nos.  3 & 4 sought the gross amount of revenues received by EQT on a monthly basis for transportation, gathering and processing fees and charges or any other charges to the Plaintiffs and the class they sought to represent, who was charged, what were they charged, and why.  EQT Corporation objected and answered:  "EQT has never owned the gas leases at issue in this litigation, nor has it ever operated any wells at issue in this litigation.  Accordingly, it has never charged Plaintiffs for any transportation, gathering, or processing fees or charges and therefore has received no revenues as a result thereof."

EQT objected to the remainder of Plaintiffs' substantive interrogatories on the same or similar bases--either EQT Corporation does not impose or assess any gathering, transportation, or processing fees or charges or any other charges to Plaintiffs, or they do not and have not

6

produced any gas under any leases in the State of West Virginia.  Notwithstanding these objections it stated that either EQT Production Company or other affiliated or subsidiary entities maintain the records, not EQT Corporation.  These interrogatories sought information relating to gathering, transportation, processing fees, and any other charges deducted from Plaintiffs' royalties, the authorization of such charges, persons knowledgeable of such charges and persons consulted regarding such charges; revenue generated from the imposition of such charges; depreciation on the infrastructure used in gathering and transporting natural gas in West Virginia; actual costs to transport and gather gas from wellhead to gathering or collection points for subsequent distribution and/or sale; the volume of gas produced under oils and gas leases in West Virginia; the identity of persons with knowledge of facts pertaining to this action; metering and maintenance of wells and the identity of persons who read meters and maintained wells; and information relating to the computer database software system used by EQT and the formula used in its database to calculate royalties.

Plaintiffs' <u>amended</u> First Set of Interrogatories asked for additional information such as:

19.     Please state the following in regard to your company/corporation and each defendant company/corporation which is associated with the other:
  a.     The state and date of incorporation.
  b.     The stated purpose of the corporation.
  c.     Any name changes since (a) above, and the date of each.
  d.     The initial incorporators and directors and the person upon whom process can be served.
  e.     The office or principal business location and address at the time of (a) above, and any changes thereof to present.
  f.     A list of the directors and officers of the corporation from 2006 to the present and their home and business addresses.
  g.     Whether it is a parent or a subsidiary of any other corporation or company.  If so, state the name and address of such company or corporation and the relationship that exists between them.
  h.     If not a wholly owned subsidiary, state whether it is a division, branch, or name under which business is done by another company or corporation.  If so, identify the relationship and the company or corporation so involved.

     i.      Whether it is a privately or publicly held corporation.

     j.      Whether the stock of the corporation is limited in any way as to ownership.  If so, please state such limitations.

     k.     Whether any of the officers or directors (current and those serving in the last seven years) are serving or have served as an officer or director of any other corporation or company.  If so, state each such person's name, all titles or positions and dates held of all such other companies or corporations with which he or they are or have been so affiliated.

     l.      Whether the corporation is still an active corporation.  If not, state when it ceased operations and the mode or method it used to cease operations.  If articles of dissolution have been filed or dissolved by court order, identify the place, court and date of such dissolution.

     m.    The primary business and all business engaged in by your corporation and the state or states within which it engages in business.

21.     State whether any of the following companies and corporations are in any way associated with the other:   EQT Production Company; EQT Corporation; EQT Energy, LLC; EQT Investments Holdings, LLC; EQT Gathering, LLC; and EQT Midstream Partners, LP.  If so:

     a.     Identify and describe all contracts which you have with all other defendants and what type, sort or kind of relationship or association exists.

     b.     Identify any and all documents that would reflect or show such relationship or association and the location and custodian thereof.

22.     State the name of the company which paid the salary and wages or commissions of officers and directors of the following:   EQT Production Company; EQT Corporation; EQT Energy, LLC; EQT Investments Holdings, LLC; EQT Gathering, LLC; and EQT Midstream Partners, LP.  Also state the following:

     a.     The bank name, address and account number from which the salary and wages or commissions of said officers and directors were paid and whose name the account was in.

     b.     The names and addresses of the persons authorized to sign the bank accounts identified above.

23.     State whether you file your own tax returns or whether they consolidated or filed together with any other defendant?  If they are consolidated, who consolidates them and under what name are they submitted?  Supply this information for the years 2006 to the present.

24.     State the amount contained at year end in your company or corporation's capital accounts for the years 2006 to the present.

   25. Identify who is responsible for the general bookkeeping Of EQT Energy, LLC; EQT Investments Holdings, LLC; EQT Gathering, LLC; and EQT Midstream Partners, LP, and state whether separate books are maintained or whether a joint accounting method is used, and further identify the company and person(s) who does the bookkeeping.

EQT Corporation did not answer any of these Interrogatories.

  **2.**  **EQT Production Company** -- did not respond or object to either Plaintiffs' amended First Set of Interrogatories or their amended Requests for Production.

  **3. & 4.** **EQT Investments Holdings, LLC & EQT Energy, LLC** -- Neither EQT Investments Holdings, LLC nor EQT Energy, LLC objected or responded to Plaintiffs' amended First Set of Requests for Production.  These two Defendants are grouped together inasmuch as their answers, with a few exceptions, are the same.  Further, their answers to Plaintiffs' amended First Set of Interrogatories are evasive and incomplete as set forth below.

  Plaintiffs asked the following interrogatories with respect to the calculation and accounting of Plaintiffs' royalties:

   1. From the period December 1, 2006 to the present, state the name and address of each plaintiff and each person who has and/or has had a royalty interest in oil or gas derived from ownership of oil and gas rights to property located in the State of West Virginia, and which EQT has a duty to pay royalties for said oil and/or gas, and for each person state the following:

    a. The name and location of the property, lease, and well.

    b. The period which the person received royalties and the amounts thereof for each pay period.

    c. The name of the person, firm and/or company or corporation to whom you sold the natural gas from said well and state whether you have any ownership interest directly or indirectly in said purchasers of the natural gas.

    d. The amount of each deduction from the royalty due and the basis for each deduction, including an explanation as to the contractual or other reasons EQT deducted any sum from royalty, and state the manner in which each deduction was calculated at the time the deduction was applied to each payment.

    e. Explain how, when and the method used for each deduction to each person.

f.      Identify the person, firm and/or company or corporation that made the decision to make the deduction and describe how to calculate each deduction previously identified.

g.      For each payment to each person and for each pay period, state the following:

(i)     The sale price of the gas received by EQT or any of its parent, subsidiary or sister corporations for each of the pay periods, and the name and address of the person, firm or corporation to whom the gas was sold.

(ii)    State whether the gas was assigned for resale to any other person, firm or corporation and, if so, state the name and address of the assignee, the amount EQT received for the assignment, and state whether you have an ownership interest in said assignee.

(iii)   State whether you determined the fair market value of the gas for each person for each pay period and, if so, state the fair market value of the gas for each person for each pay period, and the basis for the amount you established as the fair market value.

(iv)    State whether you paid each person the fair market value you established or described in (iii) above.  If you did not, explain why you did not.

(v)     State whether you determined the price you paid each person for each pay period based upon the amount gas was selling for at the time it was transported from the wellhead or whether you determined the price at some later time.  If you determined the price at a later time, state for each person for each pay period the date on which the price, either actual or fair market value, was based.

h.      For each payment to each person identified above and for each pay period, state the following:

(i)     The amount of money or benefit you or any person, firm or corporation which you own any part of received from the sale of byproduct of the processing of the natural gas produced from each property.

(ii)    The identity of the person, firm or corporation who processed the natural gas.

(iii)   The amount they received for any such byproduct of the processing of the natural gas and explain any formula or other means of determining the benefits or money you received for the byproduct.

(iv)    Identify all products, including, but not limited to, liquid by products that were removed from the natural gas prior to the natural gas entering the interstate pipeline or other points of sale.

(v)     Identify by geographical location and maps all processing

10

points for natural gas produced from said properties.

(vi)     State whether you paid the lessors any money derived from the sale of any of the above byproducts in any manner whatsoever and, if so, how was it calculated.

2.      State the gross amount of revenues received by EQT on a monthly basis for transportation, gathering and processing fees and charges or any other charges to plaintiffs from December 1, 2006 to the present; the number and identity by name and address of each Plaintiff/Lessor who was charged; list the date and occasions that the Plaintiff/Lessor was charged and identify specifically what Plaintiffs/Lessors were charged for and why; and also identify the specific person, firm and corporation that defendant paid money to for each deduction.

3.      State and explain in detail the exact method used to determine the amount that each Plaintiff/Lessor is charged for gathering, transportation and processing fees and charges of any kind, or any other charges, which were deducted from royalty payments to each of the Plaintiffs/Lessors identified above since December 1, 2006.

4.      Identify the persons most knowledgeable regarding (a) the EQT gathering, transportation and processing fees and charges or any other charges to Plaintiffs/Lessors, which were deducted from royalty payments to Plaintiffs/Lessors since December 1, 2006; and (b) the amount of and value and receipts for the byproduct liquids removed from the natural gas prior to introducing to the interstate pipeline.

5.      State the net amount of revenue generated on a monthly basis from gathering, transportation and processing fees and charges or any other charges to Plaintiffs/Lessors, which were deducted from royalty payments to Plaintiffs/Lessors since December 1, 2006.

6.      State the amount of depreciation taken on an annual basis since December 1, 2006 for all infrastructure which was used to transport natural gas for gathering and  transportation within the State of West Virginia for which EQT imposed a gathering, transportation and processing fee or charge of any kind, or any other charges, to Plaintiffs/Lessors.

7.      State the amount of internal costs, including labor, accounting, and miscellaneous charges taken on an annual basis since December 1, 2006 for all infrastructure which was used to transport natural gas for gathering and transportation within the State of West Virginia for which EQT imposed a gathering, transportation and processing fee or charge of any kind, or any other charges, to Plaintiffs/Lessors.

8.      State EQT's actual total cost and separately its net cost, in total dollars and also per dekatherm and per mcf, and the manner or formula used to determine such net cost to transport and gather gas from the wellhead to gathering

or collection points for subsequent distribution and/or sale to purchasers from each of the Plaintiffs/Lessors and list each specific item which was included in the cost accounting for said deductions.

9.      State the volume of gas that EQT has produced under its oil and gas leases within the State of West Virginia, in dekatherms and mcf, for each year, beginning December 1, 2006.

10.     State the names and addresses of each person, including expert or rebuttal witness, whom you intend to call as a witness in the trial of this case, and for each expert witness also state:

  a. The subject matter his/her testimony and the basis of his/her opinion;

  b. The substance of the facts and opinions to be offered and identify all other witnesses (including address and telephone number), or documents which he/she will rely upon.

11.     Identify all exhibits and/or other visual aids which you intend to use, whether to be introduced into evidence or a demonstrative aid, at the trial of this civil action.

12.     For the period December 1, 2006 to the present, provide the following information:

  a. The location of the metering device or devices utilized for each well.

  b. The name of the person or persons who made the decision to utilize that type of meter.

  c. The name of the person or persons who had the responsibility to read, interpret, calculate and/or integrate the charts from said meters for purposes of determining the production from each well and the amount paid for the gas production to Plaintiffs/Lessors.

  d. The person or persons who had the responsibility to read each meter, maintain each meter, remove the charts, and record any and all logs and records with respect to each chart and meter.

  e. Whether the meter was ever turned off and when.

  f. Whether there were independent entities hired to provide readings from the charts for production figures.

13.     For the period December 1, 2006 to the present, identify the name and description of each computer database software system used by EQT and the person or employee who is otherwise most knowledgeable concerning it.

14.     With regard to the answer to the preceding interrogatory, identify the name and description of each database used in these computer software systems.

15.     Identify the name, description and data type of all of the fields in these computer databases used by EQT.

16.     Identify the relationship between the fields, databases and systems.

17.     Identify the computerized formula as it is used in the database to calculating the royalties.

18.     Identify how the formula is coded in the source code of the computer database software systems.

With respect to Interrogatory No. 1, EQT Investments Holdings, LLC, and EQT Energy, LLC answered that this interrogatory is not applicable to them and that the information is in the possession of EQT Production Company.  EQT Energy, LLC further answered that it purchases gas from EQT but cannot state what, if any, gas it purchases from Plaintiffs' leases because the gas it purchases is comingled and not separately identifiable.

With respect to Interrogatory No. 2, EQT Investments Holdings, LLC, and EQT Energy, LLC answered that this interrogatory was not applicable to them because they do not own the gas leases at issues, operate wells or "charge Plaintiffs" for transportation, gathering or processing.

With respect to Interrogatory No. 3, EQT Investments Holdings and EQT Energy, LLC answered "Plaintiffs are not charged for gathering, transportation, and processing fees and charges of any kind, or any other charges, nor are such charges deducted from royalty payments made to each of the Plaintiffs since December 1, 2006."

With respect to Interrogatory No. 4,  EQT Investments Holdings answers that since Plaintiffs are not charged gathering, transportation and processing fees, no one at EQT Investments Holdings is knowledgeable regarding such deductions, charges or fees, and that there is no one there who is knowledgeable with respect to byproduct liquids removed from the natural gas.  EQT Energy answers that EQT Production is not charged for any gathering, transportation and processing fees that EQT Energy incurs and that such fees are not, upon information and belief, deducted from Plaintiffs' royalty payments, and no one at EQT Energy is knowledgeable regarding deductions of any such charges or fees.  "With respect to any charges

13

or fees that are assessed to EQT Energy by EQT Gathering, LLC, the person most knowledgeable is Jimmy Sue Smith."  Mr. Smith is also the most knowledgeable person with respect to the amount of, value and receipts for byproduct liquids.

With respect to No. 5, EQT Investments Holdings and EQT Energy answered that they do not impose such fees or charges and receive no revenues from such fees or charges.

With respect to No. 6, EQT Investments Holdings and EQT Energy both answer that they do not impose such fees or charges to the Plaintiffs and this interrogatory is inapplicable to them. They both further state that they do not own any infrastructure used to transport natural gas within the state of West Virginia, and therefore take no depreciation on any such infrastructure.

With respect to No. 7, EQT Investments Holdings and EQT Energy both answer that they do not impose such fees or charges to the Plaintiffs and this interrogatory is inapplicable to them. They both further state that they do not own any infrastructure used to transport natural gas within the state of West Virginia, and therefore take no depreciation on any such infrastructure.

With respect to No. 8, EQT Investments Holdings answers that it does not transport or gather gas and has no responsive information.  EQT Energy answers that it purchases gas from wells produced on Plaintiffs' leased property from EQT Production Company.  The price it pays takes into account a gathering rate cost that it incurs.  The gathering costs and rates are negotiated each year between various EQT Corporate entities for the next fiscal year.  EQT Energy goes on to answer how the costs and rated are generally accounted for but do not provide any specifics or actual or net costs.

With respect to No. 9, EQT Investments Holdings and EQT Energy object to this interrogatory based upon relevancy and state that the volume of gas that EQT has produced under its oils and gas leases within the State "is not germane to any issue joined in this civil

action."  The Defendants also object that this interrogatory is overly broad since it seeks all gas leases within the State.

With respect to No. 12, EQT Investments Holdings and EQT Energy answer, upon information and belief, information responsive to this interrogatory is maintained by EQT Production Company, EQT Gathering, LLC, or other affiliated or subsidiary entities.

With respect to Nos. 13-18, EQT Investments Holdings and EQT Energy answer that they do not maintain any database for the payment of royalties to Plaintiffs.

EQT Energy, LLC and EQT Investments Holdings, LLC produced limited documents in response to Interrogatory No. 19, which included a corporate organizational chart dated July 22, 2013 and the incorporation and name change documents of the Defendants and a list of corporate officers and directors without any address information.  The relationships between the EQT companies were not answered or explained.  EQT Energy also stated that additional organizational charts will be provided, but they have not been provided, and, based upon the meeting between counsel, they are not expected to be provided.

In response to No. 21, EQT Energy, LLC and EQT Investments Holdings, LLC, answered that they were in "some way" associated with the other EQT entities.  EQT Energy referred to a gas sales contract with EQT Production that was previously produced in this action, and also admitted to having a contractual relationship with EQT Gathering.  Both of these Defendants stated that they would produce additional charts and documents to reflect their relationships, but they have not been provided, and, based upon the meeting between counsel, they are not expected to be provided.

In response to No. 22, EQT Energy, LLC and EQT Investments Holdings, LLC, objected to providing any answer to this interrogatory answering that it "seeks information that is

irrelevant, will be inadmissible at trial, and is not reasonably calculated to lead to the discovery of admissible evidence."

In response to Interrogatory No, 24, EQT Energy, LLC and EQT Investments Holdings, LLC, objected to providing any answer to this interrogatory answering that it "seeks information that is irrelevant, will be inadmissible at trial, and is not reasonably calculated to lead to the discovery of admissible evidence."

    **5.**     **EQT Gathering, LLC** -- EQT Gathering, LLC did not respond or object to either Plaintiffs' amended First Set of Interrogatories or their amended Requests for Production.

## II.    <u>ARGUMENT</u>

### A.    EQT Corporation and All Defendants Have The Information and/or It Is Under Their Control

It is apparent from the EQT Defendants' prior answers and responses, their lack of answers and responses to Plaintiffs' amended discovery requests, and their actions in other cases that Defendants are purposefully attempting to hide discovery that Plaintiffs are entitled to under the Federal Rules of Civil Procedure.  Discovery is not a game of "*hide the ball*" until your opponent is forced to take you to task on inappropriate or baseless objections.  "Our system of discovery was designed to increase the likelihood that justice will be served in each case, not to promote principals of gamesmanship and deception in which the person who hides the ball most effectively wins the case." *Abrahamsen v. Trans-State Express,* 92 F.3d 425, 428-249 (6th Cir. Ohio 1996) (Defendant's truck company and driver appealed judge's granting plaintiff's motion for relief from a judgment, and *sua sponte* entering judgment for plaintiffs in negligence action where defendant withheld discovery. Affirming the order, the court of appeals held that defense counsel's failure to disclose defendant truck driver's admission of liability, and his failure to prevent defendant truck driver from perjuring himself, warranted relief from the jury's

apportionment of liability and the entry of judgment holding defendants 100 percent liable for the accident). *See also Kleen Prods., LLC v. Packaging Corp. of Am.,* 2013 U.S.Dist. LEXIS 3016, 17-18 (N.D.Ill. January 9, 2013) ("To parse the meaning of 'job descriptions' in the way GP does is to encourage every future litigant before this Court and others to hide the ball in discovery based on the thinnest distinctions of what a document is called rather than what content it contains."). Case law is replete that attorneys and parties have a duty to make their responses "accurate and complete." *Johnson v. Cook County Bureau of Health Servs.,* 2010 U.S. Dist. LEXIS 22670, at *14, 2010 WL 893092 (N.D.Ill. March 11, 2010)(awarding sanctions for a defendant's evasive answers based on prevarications and noting "[d]iscovery is not a game of hide-and-seek."). "The very integrity of the civil justice system depends on compliance with the discovery rules. Discovery cannot be a game of hide-and-seek.... When discovery requests are made by a party, the party to whom the request is made has an obligation to respond accurately and fully." *Hogue v. Fruehauf Corporation,* 151 F.R.D. 635, 639 (C.D.Ill.1993).

At the outset, EQT Corporation objected that it had already answered one set of discovery (prior to the amendment of Plaintiffs' Complaint) that contained more than the 40 allowed per party pursuant to Rule 26.01(c)(4) and that they were substantially identical to this set. However, there are interrogatories in the amended set that were not in the prior set of Interrogatories that EQT Corporation did not answer, including interrogatories dealing with alter ego and royalty calculations. Further, EQT Corporation's answers were essentially the same for each of the questions asked in the previous set. In response to Plaintiffs' previous interrogatories, EQT Corporation either expressly or impliedly answered, for each question, that the interrogatories were not applicable to EQT Corporation. EQT Corporation did not provide any substantive answers to the previous set of interrogatories. Therefore, compelling EQT to

answer Plaintiffs' interrogatories would not violate the purposes of Rule 26.01(c)(4) relating to the time and expense involved in answering interrogatories and to interrogatories being used as a form of harassment. *See Herdlein Techs., Inc. v. Century Contractors, Inc*., 147 F.R.D. 103, 104 (W.D.N.C. 1993)

Further, while a few of Plaintiffs' previous interrogatories included subparts, all subparts are logically or factually related to the primary question.  "Interrogatory subparts are to be counted as one interrogatory if they are logically and factually subsumed within and necessarily related to the primary question.  Thus subparts of interrogatories which are simply designed to obtain additional details concerning the general theme presented in the primary interrogatories will not be counted as separate requests." *Hoover v. Trent,* 2008 WL 2308079, at *2 (N.D.W.Va. 2008), citing 10A Fed. Proc., L.Ed. § 26:537 (April 2008).  All subparts of Plaintiffs' previous interrogatories satisfy this rule.[2]

Moreover, EQT Corporation's objections and responses to Plaintiffs' prior discovery are baseless.  Plaintiffs have learned that EQT Corporation owns and controls each of the EQT Defendants and operates as one entity with the Defendants being mere units or departments, with one legal department representing all of them.  In its prior responses, it claimed that it had no knowledge or information to provide the Plaintiffs.  It referred Plaintiffs to other EQT affiliates such as EQT Production or those who were not yet named Defendants.  Its other affiliates, EQT Production Company and EQT Gathering, LLC did not object or respond to Plaintiffs' amended First Set of Interrogatories or their amended Requests for Production.  EQT Investments

---

[2] Plaintiff also notes that even if Plaintiffs' previous interrogatories and subparts did exceed the 40 provided for under Local Rule 26.01 (c)(4), EQT Corporation nonetheless responded to those interrogatories without objecting on this basis and without seeking a protective order.  "'The responding party must object (*to the Court*) to the number of interrogatories before responding in order to rely on this rule'" and if it does not the objection is waived. *Capacchione v. Charlotte-Mecklenburg Schools, et al.,* 182 F.R.D. 486 W.D.N.C. 1998) quoting *Herdlein Techs., Inc. v. Century Contractors, Inc*., 147 F.R.D. 103, 104 (W.D.N.C. 1993)(emphasis added).

Holdings, LLC and EQT Energy, LLC, claimed they had no responsive information or documents to many of Plaintiffs' interrogatories and requests, or baselessly claimed the interrogatories and requests were irrelevant or overly broad and unduly burdensome. EQT Defendants are "hiding the ball" with regard to Plaintiffs' discovery requests.

In its prior answers and responses, EQT Corporation claimed to lack any knowledge of the information and documents sought by Plaintiffs. It objected to Plaintiffs' discovery "to the extent that it implies that it is in the business of production, gathering, transportation, or processing of gas in West Virginia and claimed that any such information and documents were in the possession of other EQT entities. EQT Corporation and EQT Production both objected to Plaintiffs' discovery based on the implication that EQT Corporation, EQT Production and other affiliated companies were one and the same. However, the limited discovery obtained here, as well as public statements and admissions show that EQT Corporation owns and controls each of the EQT Defendants. It operates as one entity with the other EQT Defendants being mere segments.

The limited documents produced in this case show that EQT Corporation owns 100% of the other EQT Defendants. See **Exhibit 3.** They also show that EQT Corporation and the other EQT Defendants share many of the same officers and executives. **Exhibit 4**. For example, John Bergonzi, James E. Crockard, III, Phillip G. Elliot, Daniel A. Greenblatt, Nicolette King Yohe, Jean F. Marks, and Kimberly L. Sachse have served as officers for all of the Defendants. **Id**.

The documents show that EQT Corporation, formerly Equitable Resources, Inc., was the sole member of EQT Investments Holdings, LLC, and caused its incorporation. **Exhibit 5**. In December 2006, Jean F. Marks, the Assistant Corporate Secretary of Equitable Resources, caused the formation of EQT Investments Holdings, LLC, and elected John A. Bergonzi, James

E. Crockard, III, and Kenneth J. Kubacki as managers. **Id**.  On December 12, 2006, EQT

Investments Holdings, LLC held an "Organizational Meeting of Managers" and elected the

following officers:

>John A. Bergonzi—President
>James E. Crockard, III—Senior Vice President
>Kenneth J. Kubacki—Vice President
>Clara A. Paschitti—Treasurer and Assistant Secretary
>Jean F. Marks—Secretary
>Kimberly Boyes—Assistant Secretary
>Violet D. Huber—Assistant Secretary
>Zhe Amy Lee—Assistant Secretary
>Penny L. Miller—Assistant Secretary
>Kimberly L. Sachse—Assistant Secretary
>Lisa R. Willis—Assistant Secretary
>Diana Ford—Assistant Secretary
>Daniel A. Greenblatt—Assistant Secretary
>Thomas E. Quinlan—Assistant Secretary

**Id**.  Jean F. Marks, the Assistant Corporate Secretary of Equitable Resources (EQT Corporation)

was elected as Assistant Secretary.  Jean F. Marks also served as an officer of EQT Investment

Holdings, LLC, EQT Production Company, EQT Energy, LLC, and EQT Gathering, LLC.

**Exhibit 4**.  Kimberly L. Sachse, Daniel Greenblatt and Thomas E. Quinlan also held offices in

EQT Corporation, EQT Investment Holdings, LLC, EQT Production Company, EQT Energy,

LLC, and EQT Gathering, LLC. **Id**.

In 1997, Audrey C. Moeller, Corporate Secretary of 420 Energy Investments, Inc.

executed a Certificate of ERI Linden, LLC. **Exhibit 6**.  420 Energy Investments, Inc. was the

sole incorporator of ERI Linden, LLC. **Id**.  420 Energy Investments, Inc. was 100% owned by

Equitable Resources, Inc., now EQT Corporation. **Id**.  Mr. Moeller amended the Certificate in

1998 to "Equitable Energy, LLC."  **Id**.  In 2009, the name of the company was amended to "EQT

Energy, LLC" by Randall L. Crawford. **Id**.  Mr. Moeller was an officer of EQT Production, EQT

Energy, LLC, EQT Gathering, LLC, and other wholly owned subsidiaries. **Exhibits 4 & 6**.  Mr.

Crawford, in recent years, has served as an officer for EQT Corporation, EQT Energy, LLC and EQT Gathering, LLC. **Exhibit 4**.

Documents produced here also show that Philip P. Conti, Murray S. Gerber and Gregory R. Spence were officers of Equitable Energy, LLC (now EQT Energy, LLC) in November 2000. **Exhibit 6**.[3]   In 2000, Mr. Conti was Vice President, Finance and Treasurer of Equitable Resources, Inc. (EQT Corporation). **Exhibit 6**. Mr. Gerber was the President and CEO of Equitable Resources, Inc. **Exhibit 6**.  Mr. Spence was Senior VP and Chief Administrative Officer of Equitable Resources, Inc. **Exhibit 6**.  Mr. Conti and Mr. Gerber, in recent years, served as officers for EQT Corporation, EQT Production Company, EQT Energy, LLC, and EQT Gathering, LLC. **Exhibit 4**.  Mr. Spense has likewise served as an officer of EQT Production Company, EQT Energy, LLC, and EQT Gathering, LLC. **Id**.

The organizational chart produced by Defendants shows that EQT Corporation owns 100% of the other EQT Defendants (**Exhibit 3**) and the chart attached as **Exhibit 7**, "EQT's Participation in the Value Chain" and its "Company Profile" located on EQT Corporations' website, www.eqt.com, shows how EQT Corporation actually operates its subsidiaries, including the other Defendants here, as departments or segments of one corporation in its participation "in the value chain."  EQT Corporation operates the website and the other EQT Defendants do not have separate websites for their respective segments of the business.  EQT Corporation publicly announces to its investors and others that "EQT Corporation (NYSE:EQT) conducts its business through two business segments:   EQT Production and EQT Midstream." **Exhibit 9,**

---

[3] Also attached is **Exhibit 8** documents showing Mr. Conti and Mr. Gerber's EQT Corporation Compensation.   This information can also be obtained from EQT Corporation's financial statements.

www.eqt.com.  "EQT Corporation is an integrated company with emphasis on Appalachian area natural gas production, gathering, and transmission." **Id**.

EQT Corporation explains at www.eqt.com, under "Land Leasing," that the "*Land departments for EQT production and midstream business units* negotiate with property owners and those who own the mineral right to develop long-term mutually beneficial relationships." **Exhibit 10** (emphasis added).  It explains that "EQT and the property owner must first enter a contractual relationship in the form of a lease or right-of-way agreement."  It states that the lease or right-of-way agreement "establishes the relationship between the owner and EQT." **Id**.  It refers to EQT Production as its "fastest growing business *unit*." **Exhibit 11** (emphasis added).  With respect to gathering, EQT states that it not only produces gas but also develops and operates gathering and processing infrastructure in the Appalachian Basin. *See* **Exhibit 12**.  It expressly states: "Through a network of gathering pipes, EQT collects natural gas from wellheads across the Appalachian region and moves it to third-party processing facilities." **Id**.

With respect to EQT Energy, EQT Corporation explains at www.eqt.com that "EQT Energy, a division of EQT Midstream, provides commercial and asset management to EQT Production and manages a portfolio of other physical and contractual assets." **Exhibit 13**.

According to the U.S. Securities and Exchange Commission Filing Detail and the Business Organization Detail for the West Virginia Secretary of State, each of the EQT Defendants here, with the exception of EQT Investments Holdings, LLC, lists their business and mailing addresses at 623 Liberty Avenue, Suite 1700, Pittsburg, Pennsylvania 15222.  They also list the same telephone number:  (412) 553-5700. **Exhibit 15**.  EQT Corporation also admitted in its answers to interrogatories here that it files consolidated financial statements on behalf of all its subsidiaries including Defendants here. **Exhibit 16**.

Based on EQT Corporations' job listing description for "Supervisor, Land and Lease Records," **Exhibit 16,** EQT Corporation, despite its discovery answers and objections contending that it "has never owned the gas leases at issue in this litigation, nor has it ever operated any wells at issue in this litigation," and, "upon information and belief, all of the information to be produced related to the wells and leases at issue is maintained in the ordinary course of business by EQT Production Company or some other affiliated entity, not EQT Corporation," it states it employs persons to review leases and monitor their entry into the Enertia lease management system, hire and trains lease analysts, ensure proper performance under leases, calculate and schedule shut in payments, calculate weekly obligation payments, ensure all files including leases, rights-of-way and other records are properly indexed, and review responses to complex royalty owner or landowner inquiries, among other things.

Based upon its "Code of Business Conduct and Ethics, **Exhibit 17,** EQT Corporation employs and controls all of the employees, mangers and officers of not only EQT Corporation, but also the employees, managers and officers of its subsidiaries--the Defendants here.  Further, EQT Corporation "will take appropriate remedial action against any personnel or business partner whose actions are found to violate this Code," including "including immediate termination of employment or business relationship." **Id**.  "All personnel and business partners are expected to follow all Company environmental, health and safety policies and procedures," as well as other equal opportunity and office procedures. **Id**.  EQT Corporation and subsidiary employees, managers and officers are required to "Always make business decisions that are in the best interest of EQT." **Id**.  These persons are also prohibited from, "without the appropriate prior approval," working for or receiving payments for services "from any business that:  i) does or seeks to do business with EQT or ; ii) is in competition with EQT. **Id**.  Prior to taking any

outside employment, employees, managers and officers of EQT Corporation and its subsidiaries "must file an Outside Employment Form with the Company." **Id**. These persons also "may not own (other than less than 1% of any class of publicly traded securities), either directly or indirectly, an interest in a business that does or seeks to do business with or is in competition with EQT, without prior written approval from the Company." **Id**. "You have the obligation to notify the Company if you or someone else close to you acquires or divest mineral rights within the Company's operational footprint.  Also before entering into an oil or gas production lease or selling mineral rights, you must offer the Company the opportunity to lease or acquire such land or mineral rights in terms that are equivalent to those you otherwise plan to sign." **Id**.

With regard to civic, industrial, professional volunteer, or charitable work, "your outside activities may materially detract from or interfere with your EQT responsibilities or pose reputational risks to EQT.  As such, you must disclose in writing your involvement in outside activities which may create an actual or apparent conflict to your supervisor and your Human Resources representative." **Id**.

With respect to political involvement:  "You must always make it clear that your views and actions are your own and not those of the Company;"  "you should never initiate a lobbying contact at the federal, state or local level without prior approval from a member of the compliance network;" "never pressure another employee, customer or business partner to contribute to, support or oppose any political candidate, political party or the EQT PAC;" "seek approval from a member of the Compliance Network before running for political office;" and "do not solicit contributions or distribute political literature during work hours unless the activity is approved by a member of the Compliance Network." **Id**.

24

With respect to safeguarding EQT's assets, "company assets include but are not limited to our drill sites, pipeline infrastructure, compressor stations, office locations, equipment, computers, files, documents and inventory," and "intellectual property and confidential and propriety information." **Id**.  EQT Corporation's Code of Business Conduct and Ethics also directs employees, managers and officers to its "Company Policies." **Id**

It is also significant to note *EQT Corporation v. Akers*, 2013 WL 1652203 (W.D.Pa. April 5, 2013).  In that case, EQT brought an action against a former employee to enforce a non-complete agreement.  The former employee, Akers, was employed by and contracted with EQT Corporation, but he actually worked for and was an officer of Midstream Operations.  EQT's allegations and the facts in the case show that EQT hired Akers and promoted him to Senior Vice President, Midstream Operations, making him responsible for "managing and operating EQT's entire Midstream pipeline and compression system." *Id.* **Exhibit 18.**

Additionally, in the *Securities Certificate of Equitable Gas Company, LLC for the issuance of a long term promissory note in a principal amount of $338,204,728*, Docket No. S-2102-2295982, the Pennsylvania Public Utility Commission entered an Order on May 10, 2012, and found as follows:

> Equitable [Gas Company, LLC] (utility code 121100) is a Pennsylvania limited liability company, with principal offices at 225 North Shore Drive, Pittsburg, PA 15212.
> ****
> Equitable is wholly-owned by Distribution Holdco, LLC, a Delaware limited liability company, which, in turn, is wholly-owned by EQT Corporation, a Pennsylvania corporation.  EQT Corporation is the parent company of the EQT family of companies including EQT Capital Corporation.
>
> EQT Capital Corporation is a Delaware corporation that is wholly owned by EQT Investments Holdings, LLC, a Delaware limited liability company, which, in turn, is wholly owned by EQT Corporation.  EQT Capital Corporation is a special purpose finance subsidiary that provides financing to the various EQT Corporation subsidiaries in order to support the operational and capital needs of those subsidiaries.

25

**Exhibit 19**.  These findings tend to show that EQT Corporation finances its subsidiaries.

Additionally, the Ryder Scott Company conducted a reserves audit of EQT Corporation's "Estimated Future Reserves and Income Attributable to Certain Leaseholds and Royalty Interests" to ensure EQT's compliance with SEC Parameters as of December 31, 2011 for public release of a statement of EQT's estimated future reserves and income. **Exhibit 20**.  The estimated reserves shown in the audit represent EQT Corporation's "net reserves attributable to the leasehold and royalty interests in certain properties owned by EQT as of December 31, 2011." The properties reviewed were located in Kentucky, Pennsylvania, Virginia, and West Virginia.  These properties accounted for 100% of the total net proved liquid hydrocarbon reserves and 100% of the total net proved gas reserves of EQT Corporation.  According to its audit, EQT Corporation furnished it with EQT's a detailed study of the properties in which EQT owns an interest, operating costs based upon the operating expense reports of EQT Corporation that included those costs directly applicable to the leases or wells for the properties reviewed for the audit.  The operating costs included a portion of general and administrative costs allocated directly to the leases and wells.  EQT Corporation also furnished them material account information, records, reports, and data with respect to property interests owned, production and well tests, normal direct costs of operating the wells or leases, other costs such as gathering, transportation and/or processing fees and market data, ad valorem and production taxes, development costs, product prices and adjustments or differentials of product prices, history of wells currently in production, maps, and well logs, as well as other factual data. While EQT had all of this information to provide for an audit to allow it to make public statements about its assets, it denied having any of this information in its discovery answers and responses.

26

Further, a corporate chart and answer to an Interrogatory produced in discovery by Equitable Production Company and EQT Midstream, who were before the Public Service Commission of West Virginia on Case Nos. 11-0598-GT-C, 11-0611-GT-C, 11-0654-GT-C, 11-0695-GT-C, 11-0696-GT-C, 11-0697-GT-C, 11-0704-GT-C, and 11-0726-GT-C, evidences that "EQT Corporation's legal group" provides legal counsel to all of its subsidiaries.  The chart shows that EQT Corporation provides legal counsel for EQT Production Company, EQT Energy, LLC and EQT Gathering, LLC. **Exhibit 21**.  Notably, Steven E. Hastings, "Senior Staff Attorney" verified EQT Corporation's and EQT Production Company's Answers to Interrogatories in this action. **Exhibit 22**.

EQT Corporation also provides certain informational videos through its website, www.eqt.com.  One such video is entitled "How We Develop A Well."  That video provides that in order to develop a well, EQT will "contact a land owner and negotiate a lease agreement that will give EQT the right to drill a well on their property."

Heidi Piatt is a Supervisor in EQT Corporation's Human Resources and works in Talent Acquisition.  She can be seen at www.youtube.com/user/ImaginePgh/search?queryheidi-piatt explaining that EQT Corporation hires everyone, from field-related positions to high-end managerial jobs as well.

Murry S. Gerber, as Executive Chairman of EQT Corporation, made numerous statement regarding EQT Corporation's role in the natural gas industry including development, production and transportation of natural gas.  His statements include, but are not limited to:

"EQT is the largest natural gas producer in the East Coast;"

"EQT is the largest producer of natural gas in this region;"

"EQT finds gas and manages their operations;"

EQT has 3.4 million acres where it has the rights to drill for natural gas;

EQT spends a billion dollars a year in drilling wells and building pipelines;

EQT is drilling in Pennsylvania, West Virginia and Kentucky; and

EQT employs people in drilling wells and building pipelines.

www.youtube.com/watch?v=Wy612AnZrdo;countdown.tepper.cmu.edu/sitecore/content/tepper/ extranet/videos/snysddcvllc/qa-with-murry-gerber-executive-chairman-of–eqt-corp?autoPlay= =true;countdown.tepper.cmu.edu/sitecore/content/tepper/extranet/videos/ljgzdalkwq/gerber- makes-a-pitch-for-nartural-gas?autoPlay=true.

All of the documents and media discussed above provide evidence that EQT Corporation and the other EQT Defendants, contrary to their objections and answers to Plaintiffs' discovery, are one and the same, and that EQT and all of these Defendants are simply using a myriad of so-called subsidiaries which are mere departments of EQT Corporation to perpetrate injustice, justify wrong and inequitable conduct, and significantly, for purposes of this motion, to hide information and documents pertinent to the claims and defenses in this action.  This evidence shows, contrary to EQT Corporation's objections and answers to Plaintiffs' discovery, that EQT Corporation is in the business of production, gathering, transportation, and processing of gas in West Virginia.  It shows, contrary to EQT Corporation's objections and answers, that EQT Corporation does operate wells, and its shows that EQT Corporation does have knowledge of and does maintain documents relating to wells and leases in the ordinary course of its business and employs persons to review and maintain those records and the computer database that contains those records.  More clearly they are in control of and have the right to produce them. Equally telling is the history of and findings in *W.W. McDonald v. EQT Production Company*, which is discussed in detail below.

28

B.      The McDonald Case

EQT Defendants have objected to answering and producing discovery on deductions taken from Plaintiffs' royalties.  They specifically denied that any deductions are taken from Plaintiffs' royalties.  *W.W. McDonald v. EQT Production Company*, No. 2:11CV00418, in the United States District Court for the Southern District of West Virginia, is enlightening with respect to this objection and denial.

*McDonald* arose out of a similar dispute over royalty payments related to oil and gas well leases.  The plaintiffs in *McDonald* were the owners of land subject to the leases.  The plaintiffs contended, among other things, that West Virginia law, i.e., *Estate of Tawney v. Columbia Natural Resources, L.L.C.,* 633 S.E.2d 22 (W.Va. 2006), prohibited the defendants from deducting "post production" costs from royalty payments.

The plaintiffs in *McDonald*, like the Plaintiffs here, were required to file motions to compel in efforts to obtain discovery from the same EQT defendants (the same Defendants in this action).  According to those plaintiffs, the defendants' initial responses "consisted entirely of objections without any substantive responses."  The Southern District Court granted the plaintiffs' motion to compel.

After additional discovery was conducted and dispositive motions were filed.  These are the facts that are in the record in that case:

> During the time EQT Production has owned and operated the wells on Plaintiffs property, it has deducted certain monetary costs, prior to calculating royalty, shown as "deducts" in monthly reports to Plaintiffs.  Discovery reveals that the deductions are an estimate of the collective costs of transportation, compression, treatment, metering and other handling costs along with charges for depreciation, overhead and profit.  These estimated costs are determined on a system wide basis and allocated to all wells so that each well bears a postage stamp rate of costs, regardless of location of the individual wells to pipelines and other facilities.  In recent years these postage stamp rates have been increased annually and set by EQT Corporation, the parent company.  Notably, in 2012 EQT performed an audit and determined that actual costs were significantly less than

29

those which had been estimated and actually charged as "deducts."  For example, the audited costs for 2011 were 56 cents per dekatherm ("dth").  The rate charged for landowner's was $1.25 per dth, leaving EQT companies 26 cents per dth to cover audited depreciation and a profit of 43 cent per dth.  No adjustment in royalty has been made subsequent to this audit.

Unknown to Plaintiffs until related cases were recently litigated, EQT Production also has deducted volumes, attributable to line loss and gas usage in its systems, in calculating royalty, resulting in an estimated 9% reduction in royalty.  This estimate is made by comparing production volumes reported to the State of West Virginia, as required by law, with the volumes reported as "gross" production on Plaintiffs' royalty statements.  Again, the volume deductions are made system wide and without regard to the relative location of wells to pipelines.  The accounting reports made each month on Plaintiffs' royalty statements report volumes as "gross" production.  The fact that volumetric deductions are taken is not shown.

From 2000, when EQT Production obtained Plaintiffs' leases, to December 2004, EQT Production operated all facilities in connection with gas production, including operation of the wells, gathering and transmission lines, compressors, meters, and treatment and other facilities necessary to treat and move the gas to a sales point.  During this period EQT Production calculated Plaintiffs' royalties as follows:  first, it took the proceeds it received from sales per dth and deducted post production costs per dth to arrive at a net value per dth.  It then determined a net volume of gas from each of Plaintiffs' well be[fore] allocating volumes metered at distant sales meters back to each well.  It paid the net value per dth on each net dth of gas produced.  In general terms EQT deducts about 10% from [sic] for post production costs, and another 9% for volume deductions, so that, royalties were reduced by about 19% on average over this period.

In 2005, EQT Corporation, the parent of EQT Production, restructured its internal operations by creating at least three new entities, EQT Energy, LLC ("EQT Energy"), EQT Gathering, LLC and EQT Gathering Equity, LLC ("EQT Gathering").  Under this restructuring, EQT Production remained the production company, but instead of selling gas at the interconnect with an interstate line, it began selling Plaintiffs' gas to EQT Energy "at the wells" under gas purchase agreements at sales prices for gas determined either between these internal EQT companies or the parent EQT Corporation.  EQT Energy in turn enters "Gas Gathering Agreements" with one of the EQT Gathering entities to move the gas to an interconnect with an interstate pipeline into which EQT Energy markets and resells the gas downstream to various purchasers.  This interconnect is the point at which a sale price to a third party buyer is based.

The net effect of the restructuring to Plaintiffs is that royalty payments remain calculated exactly the same as before and the reporting to the Plaintiffs remains the same.  Despite the fact that EQT Energy purchases the gas "at the well," Plaintiffs' royalties are still calculated at the sales meter at the interconnect with the interstate pipeline where EQT Energy sells the gas to a third-party.  The post-production costs deducted are those "paid" to an EQT Gathering company, so that both the sales price and costs deducted are

determined internally by EQT companies.  The ultimate method for calculating royalty remains pretty much the same as before the restricting, that is, the postage stamp rate, or post production cost rate, is applied to all gas wells, regardless of location.  As before, EQT Production deducts about 9% of the volume produced before calculating royalty.  The fact that post-production costs and volumes have been deducted from Plaintiffs' royalties from the date of acquisition by EQT Production in 2000 to the present, in the manner described in this brief, are admitted by EQT Production and related entities.

(Document 132).

The Southern District Court, in deciding motions for summary judgment in *McDonald* expressly found:

> The undisputed facts are as follows.  EQT Production purchased the leases in February 2000.  Between February 2000 and January 1, 2005, EQT Production produced gas from the leased wells and transported it to an interstate pipeline connection where it was marketed to third parties.  During this period, EQT Production paid the costs of transporting and marketing the gas.  EQT Production passed some of these monetary costs onto the plaintiffs by charging them a flat rate per unit of gas.  The parties dispute the particular rate that was charged.  EQT Production also subtracted from the plaintiffs' royalty what the plaintiffs call "volumetric deductions."  Essentially, EQT Production paid a royalty based on the volume of gas sold at the interstate pipeline connection, rather than the volume of gas produced at the wellhead.
>
> On January 1, 2005, EQT Production reorganized into separate entities, including EQT Gathering, Inc., EQT Gathering Equity, LLC, EQT Gathering, LLC (collectively "EQT Gathering"), EQT Energy, LLC ("EQT Energy"), and EQT Corporation.  EQT Production is a subsidiary of EQT Corporation.  EQT Production is the only entity that is a party to the leases at issue.  EQT Production sells that gas at the wellhead to EQT Energy.  EQT Energy contracts with EQT Gathering to collect the gas and move it to the interstate pipeline connection, where EQT Energy sells the gas to third parties. EQT Production argues that since the 2005 reorganization, it has not deducted post-production monetary costs from royalties paid to lessors.  Instead, it pays royalties based on the price it receives from EQT Energy.  That price is a wellhead price where gas is valued "at the wellhead at an index price less gathering charges and retainage…."

(footnote omitted).

The EQT defendants in *McDonald* argued that, because EQT Production sells gas at the wellhead, and, since 2005, has taken no monetary deductions from royalties, then *Estate of Tawney v. Columbia Natural Resources, LLC,* 633 S.E.2d 22 (W.Va. 2006) did not apply to them.  The Southern District Court disagreed.  The Court concluded, among other things, that the

31

EQT defendants "cannot calculate royalties based on a sale between subsidiaries at the wellhead when the defendants later sell the gas in an open market at a higher price.  Otherwise, gas producers could always reduce royalties by spinning off portions of their business and making nominal sales at the wellhead."  Further, in order to determine a wellhead price at which EQT Production sells gas to EQT Energy, defendants essentially admitted "they continue to deduct post-production expenses.  To determine the wellhead price, the defendants use a 'work-back method' which 'involves subtracting postproduction costs that enhance the value of the gas from the interstate connection price.'"  The Court found that the defendants "cannot avoid *Tawney* by simply reorganizing their businesses and making intra-company wellhead sales," and that *Tawney's* requirements apply to royalty payments made under the defendants' work-back method after 2005.

EQT Corporation's answers and responses were also evasive.  EQT Corporation, in realty, controls and operates each of the other EQT Defendants but claims to have no knowledge of any of the processes it controls and manages.  This is despite the fact that the same legal group represents it and all of the EQT Defendants.

## C.      Relevance Of Discovery Is Not The Test

EQT Defendants also objected to a number of Plaintiffs' Interrogatories and Requests on the basis that they were overly road, burdensome, and irrelevant, or vague, without further explanation or support. The Federal Rules provide that "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." Fed.R.Civ.P. 26(b).  Relevant information need not be admissible at the trial if the

discovery appears reasonably calculated to lead to the discovery of admissible evidence. *Id.* In addition, "the discovery rules are given 'a broad and liberal treatment.' " *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Murray Sheet Metal Co. Inc.,* 967 F.2d 980, 983 (4th Cir.1992) (quoting *Hickman v. Taylor,* 329 U.S. 495, 507 (1947)). The test for relevancy under the discovery rules is necessarily broader than the test for relevancy under Rule 402 of the Federal Rules of Evidence. Fed.R.Civ.P. 26(b)(1) ( "relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."). "Parties must respond truthfully, fully and completely to discovery or explain truthfully, fully and completely why they cannot respond. Gamesmanship to evade answering as required is not allowed." *Taggart v. Damon Motor Coach*, No. 5:05CV00191, 2007 WL 152101, at *2 (N.D.W.Va. January 17, 2007) *citing Hansel v. Shell Oil Corporation,* 169 F .R.D. 303 (E.D.Pa.1996).

"All objections must be stated with specificity and any objection not raised is waived. Fed.R.Civ.P. 33(b)(4)." "Mere recitation of familiar litany that interrogatory is overly broad, burdensome, oppressive, and irrelevant does not suffice as specific objection." *Taggart v. Damon Motor Coach*, No. 5:05CV00191, 2007 WL 152101, at *5-6 (N.D.W.Va. January 17, 2007)*; Momah v. Albert Einstein Med. Ctr.,* 164 F.R.D. 412 , 417 (E.D.Pa. 1996); *Josephs v. Harris Corp*., 77 F.2d 985, 992 (3d Cir. 1982). Moreover, "it is well established law that boilerplate objections to discovery requests are disfavored in district courts within the Fourth Circuit." *A.Hak Industrial Services BV v. TechCorr USA, LLC,* No. 3:11CV74, 2013 WL 5244507, at *4 (N.D.W.Va. Sept. 18, 2013). *See also Kinetic Concepts, Inc. v. ConvaTec Inc*., 268 F.R.D. 226, 241 (M.D.N.C. May 12, 2010) (collecting cases). "A party objecting to a discovery request that is overly broad and burdensome must submit affidavits or other evidentiary proof showing

exactly why the time or expense involved in responding to the request presents an undue burden." *A.Hak Industrial Services,* at *4, *citing Alberts v. Wheeling Jesuit Univ.,* No. 5:09CV109, 2010 WL 1539852, at *8 (N.D.W.Va. Apr. 19, 2010).  Defendants' objections are unexplained and improper based upon this law.

> **D.     The Prior Class**

Defendants also refuse to produce documents prior to December 8, 2008, based upon a prior class settlement and execution of amendments to the provisions of their leases.  Plaintiffs are unsure of what documents Defendants refer to in this objection, but Defendants have produced no documents in response to these questions.

However, Defendants were setting up a fraudulent scheme in 2005, after *Tawney*, supra, in order that they could and did, after settlement, claim that they were paying the royalty owed 100% of the purchase price at the wellhead.  See *McDonald*, supra.

> **III.     CONCLUSION**

WHEREFORE, for the reasons set forth in detail above, Plaintiffs respectfully move this Court to enter an order compelling each of the Defendants to fully and truthfully, without objection, respond to Plaintiffs' First Set of Interrogatories and First Set of Requests for Production within fourteen days from entry of such order pursuant to Local Rule 33.01(c), and to produce 30(b)(6) witnesses as noticed, with the requested productions, without objection within 30 days from entry of such order and for their costs and expenses in prosecuting this motion.

> KATHERINE F. LEGGETT;
> GEORGE D. MCKAIN, by his
> attorney in fact, ANITA
> KATHRYN MCKAIN GREER;
> and ADELE S. MCDOUGAL
>
> By Counsel

<u>/s/ Marvin W.  Masters</u>
West Virginia State Bar No. 2359
Richard A. Monahan
West Virginia State Bar No. 6489
The Masters Law Firm lc
181 Summers Street
Charleston, West Virginia  25301
304-342-3106

Michael W. Carey
West Virginia State Bar No. 635
Carey, Scott, Douglas & Kessler, PLLC
707 Virginia Street East, Suite 901
Charleston, West Virginia  25301
304-345-1234

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I, Marvin W. Masters, hereby certify that on February 20, 2015, I electronically filed "Plaintiffs' Motion to Compel" with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

> David K. Hendrickson
> Carl L. Fletcher, Jr.
> Hendrickson & Long PLLC
> 214 Capitol Street
> Post Office Box 11070
> Charleston, West Virginia  25339
> daveh@handl.com
> cfletcher@handl.com
> Counsel for Defendants
>
> Michael W. Carey
> Robert E. Douglas
> Carey, Scott, Douglas & Kessler, PLLC
> 707 Virginia Street East, Suite 901
> Charleston, West Virginia  25301
> mwcarey@csdlawfirm.com
> Counsel for Adele S. McDougal

> /s/ Marvin W. Masters
> West Virginia State Bar No. 2359
> The Masters Law Firm lc
> 181 Summers Street
> Charleston, WV  25301
> 304-342-3106
> mwm@themasterslawfirm.com

F:\5\864\mo003.docx