**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**AT WHEELING**

**PATRICK D. LEGGETT,** *et al***,**
               **Plaintiffs,**

**v.**
                                 **CIVIL ACTION NO. 1:13-cv-0004 FPS**
                                 **Honorable Frederick P. Stamp, Jr.**

**EQT PRODUCTION COMPANY,** *et al***,**
               **Defendants.**

**MEMORANDUM IN SUPPORT OF DEFENDANT EQT PRODUCTION**
**COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Defendant EQT Production Company ("EQT Production") submits the following Memorandum in support of its Motion for Summary Judgment filed in the above-captioned action.

Plaintiffs' claims fail as a matter of law because they are based upon the erroneous contention that the Supreme Court of Appeals of West Virginia's decision in *Tawney v. Columbia Natural Resources*, LLC, 219 W. Va. 266, 633 S.E.2d 22 (2006), governs the payment of royalties paid to Plaintiffs pursuant to West Virginia's Flat-Rate Statute, W. Va. Code § 22-6-8.  The reasoning and holding in *Tawney* are inapposite here where the issues do not involve consideration of lease/contract terms or the application of principles of contract law, but, instead, the application and interpretation of a statute.  Plaintiffs' arguments contradict both existing case law and the express language of the statute itself.  The Flat-Rate Statute directs producers to pay a royalty "at the wellhead," and that is the point at which Plaintiffs' royalties are valued. *See* W. Va. Code § 22-6-8.

The statute's terms must be applied according to their recognized meaning and intent – the wellhead price fixes the point at which royalty is to be calculated under W. Va. Code § 22-6-

8.  Judgment in EQT Production's favor on Plaintiffs' claims in this case is further warranted because Plaintiffs have previously released any and all claims they have against Defendants. Finally, Plaintiffs have failed to establish any fraudulent conduct, negligent misrepresentation, or conduct to warrant punitive damages by EQT Production, entitling it to judgment in its favor as to Counts III (Fraud) and VI (Punitive Damages) of the Complaint as well.

## SUMMARY OF FACTS

Plaintiffs assert that they are owners of undivided oil and gas mineral interests in approximately 2,000 acres located in Doddridge County, West Virginia. *See* Complaint ¶1. Plaintiffs' predecessors-in-interest leased the rights to produce, market, and sell their oil and gas by a lease dated October 31, 1906 (the "Lease") which is recorded in the Office of the Clerk of the County Commission of Doddridge County at Deed Book 21, page 76. *Id.* Plaintiffs' Amended Complaint (the "Complaint") incorrectly states that all named Defendants are lessees under the Lease. *See* Complaint ¶¶ 14, 28. To the contrary, EQT Production is the sole lessee under the Lease at issue and the only Defendant with any obligation to pay royalties to Plaintiffs. *See* EQT Production Company's Partial Answer and Affirmative and Other Defenses at ¶ 14.

The Lease provides for the payment of a flat-rate royalty of $300.00 per annum for each producing well drilled on the leased premises. *See* Exh. A, Lease. While parts of the Lease have been amended since its execution in 1906, this flat-rate royalty language has remained the same. As discussed more fully below, W. Va. Code §22-6-8 (sometimes referred to herein as the "Flat-Rate Statute") governs the royalties at issue in this case. For the royalties at issue, EQT Production is required to pay Plaintiffs "not less than **one eighth of the total amount paid to or received by** or allowed to the owner of the working interest **at the wellhead** for the oil or gas so extracted, produced or marketed before deducting the amount to be paid to or set aside for the

owner of the oil or gas in place, on all such oil or gas to be extracted, produced or marketed from the well." *Id* (emphasis added).

On January 1, 2005, EQT Production entered into a gas purchase agreement providing for the wellhead sale of gas. That agreement applies to the gas produced from wells on the Lease at issue.  In order to ensure a fair market price *at the wellhead*, the gas purchase agreement establishes a pricing formula whereby EQT Production is paid an amount equal to the first of the month index price applicable to the interstate pipeline(s) into which the gas is delivered, less gathering-related charges, retainage, and any other agreed to charges.  *See* Exh. B, 2005 Base Contract for Sale and Purchase of Natural Gas, "Attachment 1."  Pursuant to this contract, EQT Production is paid only on gas volumes that actually reach the interstate pipeline connection.  *Id*. Although the gas purchase agreement was renegotiated in 2012, the objective pricing formula remained the same. *See* Exh. C, 2012 Base Contract for Sale and Purchase of Natural Gas.

Prior to the institution of this civil action, Plaintiffs were class members in a class action brought by natural gas owners and lessors against Equitable Production Company (now known as EQT Production Company) styled *Kay Co., et al. v. Equitable Production Company, et al.,* Civil Action No. 2:06-0612 ("Kay Co."), in the United States District Court for the Southern District of West Virginia. The matter was settled, and Plaintiffs each separately executed a release of any and all claims relating to EQT Production and its successors' alleged failure to make proper royalty payments prior to December 2008.

In the Complaint, Plaintiffs allege that EQT Production has not paid the full royalties due to them under the terms of the Lease and W. Va. Code §22-6-8.  *See* Complaint. In particular, they allege that EQT Production has not properly accounted to the Plaintiffs for the amount of royalties due them under the terms of the Lease, and that unauthorized deductions were taken

which reduced the volume and price for royalties paid to them. *See* Complaint ¶¶ 29-49.  They have asserted the following claims for relief against all of the Defendants:  Breach of Contract (Count I), Fraud (Count III), and Punitive Damages (Count VI).[1]  Plaintiffs' claims are unfounded and contrary to established law as well as the express provisions of West Virginia's Flat-Rate Statute, and Defendant EQT Production is therefore entitled to judgment in its favor as to all Plaintiffs' claims as a matter of law.

## STANDARD OF REVIEW

As this Court is well aware, a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  *See accord, Bellomy v. Union Concrete Pipe Co.*, 297 F. Supp. 261 (S.D.W. Va. 1969), *aff'd*, 420 F.2d 1382 (4th Cir.), *cert. denied*, 400 U.S. 904 (1970); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Summary judgment is appropriate where, as here, there is no dispute as to the facts and no dispute as to the conclusions or inferences which may reasonably be drawn therefrom.  *Pauley v. Combustion Eng'g, Inc.*, 528 F. Supp. 759 (S.D.W. Va. 1981); *Prete v. Royal Globe Ins. Co.*, 533 F. Supp. 332 (N.D.W. Va. 1982).

## ARGUMENT

The parties agree that West Virginia's "Flat-Rate Statute," W.Va. Code § 22-6-8, governs the payment of the royalties at issue in this case.  In pertinent part, this statute provides:

> … [T]he owner of the working interest in the well … shall tender to the owner of the oil or gas in place *not less than one eighth of the total amount paid to or received by or allowed to the owner of the working interest **at the wellhead** for the oil or gas so extracted, produced or marketed before deducting the amount to

---

[1] Plaintiffs' claims for Breach of Fiduciary Duty and violation of the West Virginia Consumer Credit and Protection Act were previously dismissed. (ECF 108).

> be paid to or set aside for the owner of the oil or gas in place, on all such oil or gas to be extracted, produced or marketed from the well.

W.Va. Code § 22-6-8(e) (emphasis added).

Pursuant to this statute, EQT Production is required to pay – and has paid – Plaintiffs a royalty of "not less than one eighth of the total amount paid to or received by" it "at the wellhead for the oil or gas so extracted, produced or marketed …" for each well drilled or reworked after the enactment of W.Va. Code § 22-6-8.  *Id.*  Plaintiffs nonetheless claim that EQT Production has wrongfully "take[n] deductions, reduce[d] plaintiffs' royalty payments, overcharge[d] plaintiffs for the deductions that they do charge plaintiffs, and otherwise reduce[d] plaintiffs' royalty … by taking unauthorized deductions."  *See* Complaint, ¶ 30.  In particular, Plaintiffs claim that EQT Production has improperly charged Plaintiffs with downstream expenses against their royalties.[2]

Plaintiffs' claim is entirely dependent on the mistaken belief that the holding and reasoning of *Tawney v. Columbia Natural Resources*, LLC, 219 W. Va. 266, 633 S.E.2d 22 (2006), applies to their claims relating to the payment of royalty pursuant to W. Va. Code § 22-6-8.  As discussed below, *Tawney's* interpretation of contract terms is not at all applicable to interpretation of West Virginia's Flat-Rate Statute, nor is the court's analysis in *Tawney* useful

---

[2] To be clear, EQT Production's costs of production relating to exploration, drilling, and bringing the gas to the surface are not shared with the Plaintiff lessors. Plaintiffs make no claims related to those costs. Rather, Plaintiffs' contention is that EQT Production has allegedly taken unauthorized deductions for "post-production" costs it incurs after production for, *inter alia*, gathering and transporting the gas downstream beyond the wellhead.  EQT Production actually shares only a portion of those gathering and transportation costs with Plaintiff lessors: depreciation and return on investment are not shared.  EQT Production absorbs those costs itself. While it shows the downstream costs on its check stubs to royalty owners as "deductions," pursuant to its sales agreement with EQT Energy, the downstream costs are worked out of the price received in the form of work-back pricing intended to achieve the objective wellhead value. EQT Production continues to show the downstream costs taken into account in the pricing methodology on check stubs in an effort to ensure transparency in its payment calculations and to avoid the claims of fraud like those that were filed against producers like CNR in the early 2000's.

here.  Unlike the lease/contract terms in *Tawney*, the provisions of W. Va. Code § 22-6-8 are not ambiguous, therefore providing no basis for construing the statute's provisions strictly against the lessee:  EQT Production.  Rather, the statute's terms, which were drafted well before the *Tawney* or *Wellman*, *infra*, decisions, must be applied according to their recognized meaning and intent and the statute construed to give effect to the intent of the Legislature at the time of enactment.  Doing so mandates judgment for EQT Production with respect to all Plaintiffs' claims in this case.  Further, irrespective of consideration of the Flat-Rate Statute, Plaintiffs' claims against EQT Production fail as a matter of law because Plaintiffs have waived and released their claims and ratified EQT Production's conduct, including that regarding its payment of royalties.  Plaintiffs have also failed to establish any fraudulent concealment, negligent misrepresentation, or other conduct by EQT Production that would warrant an award of punitive damages.

A.    ***TAWNEY'S*** **CONTRACT LAW ANAYLSIS IS NOT APPLICABLE TO THE ROYALTIES AT ISSUE HERE, WHICH ARE ESTABLISHED BY STATUTE.**

1.    ***Tawney*** **Involved Ambiguous Lease Language That Was Construed Against The Drafter Pursuant To Rules Of Contract Construction**

Plaintiffs erroneously rely upon the Supreme Court of Appeals of West Virginia's decision in *Tawney v. Columbia Natural Resources*, LLC, 219 W. Va. 266, 633 S.E.2d 22 (2006), to support their claim that their royalties have been underpaid by EQT Production. There, the court held that the lease language at issue did not permit the defendant oil and gas lessee to "deduct post-production expenses from the lessors' royalty payments." *Id*.  However, the *Tawney* decision is not – nor does it profess to be – applicable to anything other than the interpretation of oil and gas leases.

The *Tawney* Court was careful to frame each of its new syllabus points to make clear that its holdings deal with only with the interpretation of a contract:

10. Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.

11. Language in an oil and gas lease that provides that the lessor's 1/8 royalty (as in this case) is to be calculated "at the well," "at the wellhead," or similar language, or that the royalty is "an amount equal to 1/8 of the price, net all costs beyond the wellhead," or "less all taxes, assessments, and adjustments" is ambiguous and, accordingly, is not effective to permit the lessee to deduct from the lessor's 1/8 royalty any portion of the costs incurred between the wellhead and the point of sale.

*Id.* at Syl. pts. 10 and 11.

These syllabus points were the result of analysis based on the notion that, where there is no express language to the contrary <u>in an oil and gas lease</u>, the producer should assume all downstream costs as matter of strict contractual construction.  More particularly, *Tawney* found that the phrase "at the wellhead" as used in the leases at issue in that case was ambiguous where the gas was not actually sold at the well.  *Id.* at 273, 633 S.E.2d at 29.  Applying rules of contract interpretation, the court found that the term should be strictly construed against the drafter as not altering the implied covenant to market.[3] *Id.* at 271, 633 S.E.2d at 27.  In so holding, the court noted in particular both the general rule that "oil and gas leases … will generally be liberally construed in favor of the lessor, and strictly as against the lessee" and the traditional rule of contract construction that "[u]ncertainties in an intricate and involved contract should be resolved against the party who prepared it."  *Id.* at 273, 633 S.E.2d at 29 (citation omitted).

Those principles of contract construction are wholly inapplicable here, where the matter to be decided involves the interpretation of a statute enacted by the Legislature.  In fact, there

---

[3] An implied covenant has no application to leases of the type at issue in this case, as is discussed in more detail below.

simply is no precedent for holding that an implied contractual covenant applies here or supersedes express statutory language. The Legislature, not a lessee, expressly identified the point of calculation for royalty paid pursuant to W.Va. Code §22-6-8:  at the wellhead, not downstream. Thus, Plaintiffs' argument that the price upon which their royalty is calculated is determined somewhere else, such as a downstream point of sale by a non-party to the Lease, is expressly contradicted by the Legislature's use of the phrase "at the wellhead." Had the Legislature intended that the lessee bear the burden of paying all downstream expenses once the gas is severed from underground and captured at the wellhead, it would have and could have said so, in derogation of the common law at the time the Flat-Rate Statute was enacted.  And it has not done so since enactment.

### 2.    The Provisions Of W.Va. Code § 22-6-8 Cannot Be Strictly Construed Against The Lessee And The Statute's Terms Must Be Applied As Stated

The general rules of liberally construing an oil and gas lease in favor of the lessor and construing uncertain lease terms against the party who prepared the lease are inapplicable here, where the interpretation of a statute is at issue rather than a contract.  Accordingly, unlike the lease/contract terms in *Tawney*, the provisions of W.Va. Code § 22-6-8 cannot be strictly construed against the lessee.  Rather, the statute's terms must be construed to give effect to the intent of the Legislature.  *See, e.g., Adkins v. Consolidation Coal Co*., 856 F. Supp.2d 817, 823 (S.D.W. Va. 2012); Syl. pt. 2, *Cmty. Antenna Serv., Inc. v. Charter Commc'ns. VI, LLC,* 227 W. Va. 595, 712 S.E.2d 504, 508 (2011).

In construing W. Va. Code § 22-6-8, this Court must give meaning and effect to all of the words in the statute.  As recognized by the Supreme Court of Appeals of West Virginia, a "cardinal rule of statutory construction is that significance and effect must, if possible, be given to every section, clause, word or part of the statute."  Syl. pt. 1, *Feroleto Steel Co., Inc. v.*

*Oughton*, 230 W. Va. 5, 736 S.E.2d 5 (2012) (citation omitted).   *See, accord*, *Adkins v. Consolidated Coal Co.*, 856 F. Supp.2d 817, 823 (2012).   The term "at the wellhead" means something.   It cannot be ignored here, and must be read in the context of the entire statute. Doing so reveals that the meaning and effect of the language of W.Va. Code § 22-6-8 is clear: the wellhead is the place at which the value of royalties is to be set under the statute.   This fact is confirmed by the plain words of the statute as well as the recognized meaning of the term "at the well" which must be applied in this case.

### a.   The Plain Language Of W. Va. Code § 22-6-8 Directs That The Wellhead Price Fixes The Amount Upon Which Royalties Are To Be Paid

Originally enacted in 1982, West Virginia's Flat-Rate Statute, now W. Va. Code § 22-6-8, provides that, when an oil and gas lease directs that royalty shall be paid on a flat well royalty basis, no permit may be issued for, *inter alia*, "the drilling of a new oil or gas well, or for the redrilling, deepening, fracturing, stimulating, pressuring, converting, combining or physically changing" of an existing well unless the lessee shall pay to the lessor royalty in an amount equal to "not less than one eighth of the total amount *paid to or received by* or allowed to the owner of the working interest *at the wellhead* for the oil or gas so extracted, produced or marketed before deducting the amount to be paid to or set aside for the owner of the oil or gas in place, on all such oil or gas to be extracted, produced or marketed from the well …"   W. Va. Code § 22-6-8(e) (emphasis added).   Stated simply, the statute provides that, for those wells subject to the statute, the landowner shall receive no less than one-eighth of the amount paid to or received by the producer *at the wellhead* for natural gas extracted from the leased premises.

Where, as here, the meaning and intent of the statute are plainly discernible from its text, the plain language of the statute must be applied.   It is well-settled that, under rules of statutory construction, "[a] statutory provision which is clear and unambiguous and plainly expresses the

legislative intent will not be interpreted by the courts but will be given full force and effect." *Syl. pt. 2, State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951). *See also, Syl. pt. 2, King v. West Virginia's Choice, Inc.*, 234 W. Va. 440, 766 S.E.2d 387, 388 (2014) (recognizing that, "[w]here the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation"); *Hurlbert v. Matkovich*, 760 S.E.2d 152, 161 (W. Va. 2014) (a "finding of ambiguity must be made prior to any attempt to interpret a statute").

Although Plaintiffs may argue that the *Tawney* court found the phrase "at the wellhead" ambiguous, importantly, it did so because in the leases at issue in that case <u>the gas was not actually sold at the well</u>.[4] *Id.* at 273, 633 S.E.2d at 29. Here, no such facts exist. The Base Contracts for Sale and Purchase of Natural Gas set the sales point at the wellhead. *See* Exh. B and C. Unlike *Tawney*, the issue before this Court is not whether EQT may take deductions, but whether the royalty paid is truly reflective of the market value at the wellhead, in light of the fact that the sale of gas occurs at the wellhead. In other words, the holding in *Tawney*, which assumed a downstream sale by the lessee, is inapplicable to the sales at issue here because these sales occur at the wellhead. Indeed, the basis for the ambiguity found in *Tawney* does not exist here, as EQT Production sells the gas from wells on the Lease in question at the wellhead.

W. Va. Code § 22-6-8 plainly directs that the point at which *royalty for gas* "extracted, produced or marketed" from the leased premises *is to be calculated "at the wellhead*." W. Va. Code § 22-6-8(e) (emphasis added). This plain language is unambiguous. As such, the clear terms of the statute should be applied as stated. *See e.g. Syl pt. 2, Epperly*, 135 W. Va. 877, 65 S.E.2d 488; *Syl. pt. 2, King*, 234 W. Va. 440, 766 S.E.2d 387.

---

[4] In fact, the Court accepted that the "at the wellhead" language "contemplates the actual sale of gas at the physical location at the wellhead." *Id.*

### b.    The Term "At The Well" Has A Definite Meaning

Even if ambiguous, he meaning of the term "at the well" or "at the wellhead" has long been established.  In the early 1980s, when the Flat-Rate Statute was enacted, it was well recognized in the oil and gas industry and by legal scholars that "[t]he term 'at the well' when used with reference to oil and gas royalty valuation, [was] commonly understood to mean that the oil and gas is to be valued in its unprocessed state as it comes to the surface at the mouth of the well."  *See* Williams & Meyers, *Manual of Oil and Gas Terms* 1157 (*citing Molter v. Lewis*, 134 P.2d 404 (Kan. 1943)).  Prior to the statute's enactment, it was commonly recognized that the phrase "at the well" or "at the wellhead" meant that oil and gas is to be valued in its unprocessed state as it comes to the surface at the mouth of the well and, that any costs incurred by a lessee after the production reaches the wellhead, whether to improve the quality of the production or to transport it to a market where it may be sold, may be shared proportionally between the lessee and lessor.  *See, e.g.,* Poitevent, II, E., *Post-Production Deductions From Royalty*, 44 S. Tex. L. Rev. 709, 716 (Summer 2003).

At the time of the Flat-Rate Statute's enactment in 1982, there would have been no reason for the West Virginia Legislature to understand the phrase/term "at the wellhead" to mean anything other than the point at which gas comes to the surface and at which a landowner's royalty is to be calculated.  Indeed, as discussed more fully below, the West Virginia Legislature purposefully added the phrase/term "at the wellhead" to the House Bill (after prior versions of the bill had neglected to include that important phrase) that was ultimately passed by the Legislature.  This phrase/term had a definite meaning at the time of the Flat-Rate Statute's enactment and, in compliance with rules of statutory construction, that phrase/term must be

applied according to that recognized meaning and intent.  *See, e.g., Syl pt. 2, Epperly*, 135 W. Va. 877, 65 S.E.2d 488; *Syl. pt. 2, King*, 234 W. Va. 440, 766 S.E.2d 387.

In fact, the Supreme Court of Appeals of West Virginia has long recognized that a wellhead price is different than the price received for the sale of gas at other locations. In *Cotiga Development Co. v. United Fuel Gas Co*., 147 W.Va. 484, 128 S.E.2d 626 (1962), the court found that a downstream price was appropriate *in the absence of wellhead language* in the lease, stating that, "if the parties had desired to do so, they could so easily have said that royalties were to be computed on the basis of the wellhead price.  It is obvious from this case that such is not an unusual provision in gas leases."  *Id*. at 493, 128 S.E.2d at 693.  The court's recognition of the important distinction between a wellhead price as opposed to one calculated on the basis of the price received for gas when sold (which may occur at any point beyond the wellhead) is consistent with the clear practice and understanding of the industry that a "wellhead price" (as opposed to one somewhere downstream) means a price determined at the location of the wellhead when the gas comes to the surface at the mouth of the well.

Further, at the time of enactment, the Legislature would have had the benefit of existing cases addressing the issue of the point at which to value gas for tax purposes which also recognized the import of a wellhead price.  In *Soto v. Hope Natural Gas Co*., 142 W.Va. 373, 95 S.E.2d 769 (1956), for example, the court found that the measure of the tax on any natural resource product under the Business and Occupation Tax Act is the value of product at the point where production ends and not the value at the point where it is sold.  <u>Critically, the court further held that the production of natural gas ends when it is brought from the ground *at the well*.</u>  *Id*. at 386, 95 S.E.2d at 776.  Similarly, in *United Fuel Gas Co. v. Battle*, 167 S.E.2d 890, 896-97, 153 W.Va. 222, 231 (1969), the court recognized that the value of gas produced is its value when

production ends which is at the well. *Accord*, *Hope Natural Gas Co. v. Hall*, 102 W.Va. 272, 135 S.E. 582 (1926), *aff'd*, 274 U.S. 284, 287 (1927) (wherein the Supreme Court of the United States found that the tax must be "computed upon the value of the gas at the well, and not otherwise").

At the time of the enactment of the Flat-Rate Statute, the Legislature would have certainly been aware of these rulings and the common industry language when drafting the statute. Indeed, decisions from other jurisdictions rendered prior to the enactment of the Flat-Rate Statute demonstrate that, when the statute was adopted in 1982, *the majority view was that, where the royalty was to be calculated at the wellhead, the lessor properly shared in the expenses downstream of the wellhead*.

For instance, in *Freeland v. Sun Oil Co.*, 277 F.2d 154 (5th Cir. 1960), the U.S. Court of Appeals for the Fifth Circuit addressed a case in which the lease provided for royalty based upon a share of "the market value at the well" of gas sold off the lease and a share of "the amount realized" from gas sold at the well. Relying on *Wall v. United Gas Public Service Co.*, 152 So. 561 (La. 1934), the court held that reasonable processing costs incurred by the lessee were chargeable against the lessor when the gas was either worthless, or worth little, in its raw state at the well. *Freeland*, 277 at 158-159. The court noted that the Louisiana approach to determine the proper royalties to be paid by the lessee was to try to determine a market value at the well by using a work-back method to reconstruct the market price at the well. *Id*.

Similarly, in *Le Cuno Oil Co. v. Smith*, 306 S.W.2d 190, 193 (Tex.Civ.App. 1957), the issue involved a royalty clause which contained the phrase "at the well." The royalty owners claimed that the lessee was not entitled to deduct from royalty the costs of "dehydrating, gathering, transporting and processing" the gas. *Id*. at 193. The Court found that such costs

13

were properly deductible where there was no market for the gas at the wells and the gas division orders at issue constituted "a contract by the royalty owners to sell the royalty gas to LeCuno as the same is produced for the price received for it by LeCuno *at the well* and do not constitute a sale of the gas in place." *Id*.

The Fifth Circuit's decision in *Phillips Petroleum Co. v. Johnson*, 155 F.2d 185 (5th Cir. 1946), is also instructive in revisiting the meaning and application of the phrase/term "at the well" prior to the enactment of West Virginia's Flat-Rate Statute.  There, the lease provided that the "lessor shall be paid at the rate of one-eighth of the net proceeds derived from sale of gas at the mouth of the well."  *Id*. at 188.  Applying Texas law, the court stated that,

> … we think the stipulation for a share of the 'net proceeds derived' ought to be enforced, effect being given to the words 'net at the mouth of the well' by allowing as expense the cost of transporting, separating and marketing ...

*Id*. at 189.

Additionally, in *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620 (1944), the court expressly recognized that, in determining a gas royalty payable "at the well," Louisiana law provided for a proportionate deduction of the costs of gathering and delivering the gas to a pipeline.  Likewise, in *Warfield Natural Gas Co. v. Allen*, 261 Ky. 840 (KY 1935), the court held that, where an oil and gas lease provided for royalty of 1/8 of proceeds received from each well while gas was marketed, but did not contain provision as to where lessee was to find market; the lessee properly paid lessor market value at the well, although lessee sold gas elsewhere at a more favorable market.  Similarly, in *Clear Creek Oil & Gas Co. v. Bushmaier*, 165 Ark. 303 (AR 1924), the court ruled that, if there be no market value at the place of delivery, the value of the goods or other product should be determined at the nearest place where they have a market value, deducting the extra expense of delivering them there."

Moreover, this well-settled understanding and application of the term/phrase "at the well" at the time of the Flat-Rate Statute's enactment is further confirmed in a myriad of cases decided shortly after the statute's adoption. *Martin v. Glass*, 571 F. Supp.1406, 1413 (N.D. Tex. 1983), provides a good summary of the majority view on this issue. There, the court specifically recognized that, **"[i]t is well settled that the phrase "at the well received," or similar terminology, establishes the 'point' at *the mouth of the well*.**" *Id*. at 1411 (emphasis added). Based on this recognition, the court found that "royalty is based on the value of all gas produced at the mouth of the well" and that "costs incurred subsequent to production … are to be borne on a pro rata basis between operating and non operating interests." *Id*. at 1411-12.

In *Piney Woods Country Life School v. Shell Oil Co*., 726 F.2d 225, 231 (5th Cir. 1984), the Fifth Circuit also examined "at the well" language contained in the royalty provision of oil and gas leases from Mississippi.  There, the court held that the term "at the well" determined the quality as well as the location of the gas at the time it was to be valued for royalty purposes. *Id*. at 231. On royalties to be measured "at the well," the court found that the value should be calculated after deducting any expenses incurred to increase the value of the gas, including reasonable expenses for processing, transportation, and marketing. *Id.  See accord*, *Merritt v. Southwestern Electric Power Co.*, 499 So.2d 210 (La. 1986) (holding that compression costs incurred subsequent to the production of gas could be proportionately deducted from royalty payments where the lease provided for royalty based upon "the *market value at the well* of one-eighth of the gas so sold or used").  These authorities demonstrate that when the Flat-Rate Statute was adopted in 1982, the majority view was that, where the royalty was to be calculated at the wellhead, the lessor properly shared in the expenses downstream of the wellhead.

c.     The History Of The Flat-Rate Statute Confirms The Legislature's Intent That The 1/8th Minimum Royalty Is To Be Calculated At The Wellhead

West Virginia's Flat-Rate Statute, W.Va. Code § 22-6-8, directs that, for wells subject to the statute, the owner shall receive no less than one-eighth of the amount paid to or received by the producer *at the wellhead* for natural gas extracted from the leased premises.  *See* W. Va. Code § 22-6-8(e).  The critical phrase used in this statute relative to calculating the owner's royalty is "at the wellhead."  The language and intent of this statute are clearly stated and the statute's plain language should be applied.  *See, e.g., Syl. pt. 2, King*, 234 W. Va. 440, 766 S.E.2d 387.  Nonetheless, even were this Court to find that the language of W. Va. Code § 22-6-8 that governs the point of valuation upon which royalty is to be calculated is ambiguous, there is still no genuine issue of material fact regarding Plaintiffs' royalty claims sufficient to deny EQT Production's Motion.

It is well-settled that, if any ambiguity with respect to W. Va. Code § 22-6-8 exists, this Court must interpret and apply the statute by determining the West Virginia Legislature's intent in enacting it.  *See, e.g., State ex rel. Tucker County Solid Waste Authority v. West Virginia Div. of Labor*, 222 W. Va. 588, 595, 668 S.E.2d 217, 224 (2008) ("As with any matter involving the interpretation and application of statutes, we first must determine the Legislature's intent in promulgating the statutory law at issue").  *See accord*, Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r,* 159 W. Va. 108, 219 S.E.2d 361 (1975); *Meadows v. Wal-Mart Stores, Inc.*, 530 S.E.2d 676, 687 (W. Va. 1999); *Adkins v. Consolidation Coal Co.*, 856 F. Supp.2d 817, 823 (S.D.W. Va. 2012).  Ascertaining the Legislature's intent in enacting a particular statute "involves consideration of the subject matter of the legislation, its purposes, objects and effects," as well as consideration of the statute's express terms.  *State ex rel. Holbert v. Robinson*, 134 W. Va. 524, 531, 59 S.E.2d 884, 888 (1950) (citations omitted).

Importantly, the circumstances of and intent underlying a statute must be considered as of the time the Legislature enacted the statute. *See, e.g., State ex rel. Cohen v. Manchin*, 175 W. Va. 525, 533, 336 S.E.2d 171, 180 (1984).  As directed by the West Virginia Supreme Court of Appeals,

> The basic and cardinal principle, governing the interpretation and application of a statute, is that the Court should ascertain the intent of the Legislature at the time the statute was enacted, and in the light of the circumstances prevailing at the time of the enactment.

*Id.* at 533, 336 S.E.2d at 180, *quoting*, Syl. pt. 1, *Pond Creek Pocahontas Co. v. Alexander*, 137 W. Va. 864, 74 S.E.2d 590, *appeal dismissed*, 346 U.S. 803 (1953).  *See accord, Abramski v. U.S.*, _____ U.S. _____, 134 S. Ct. 2259, 2267, 189 L. Ed.2d 262 (2014) (recognizing that, when interpreting a statute, a court must "interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose').   In determining the Legislature's intent, the Supreme Court of Appeals of West Virginia has recognized that,

> [a] statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith.

Syl. pt. 5, *State v. Snyder,* 64 W. Va. 659, 63 S.E. 385 (1908).  The legislative history of West Virginia's Flat-Rate Statute shows that language was included to ensure that royalties will be calculated at the wellhead.

West Virginia's Flat-Rate Statute -- now W. Va. Code § 22-6-8 -- had its origin in 1982. On January 19, 1982, Delegates Martin (30th District) and Harman (32nd District) introduced H.B. 1254, whose purpose was to require "oil and gas royalties to provide a minimum payment of one eighth of the gross proceeds of any oil or natural gas produced."  *See* Exh. D, copy of

H.B. 1254, p. 2.  The bill's intent was to add a new section, 22-4-1l, to the existing code which would limit future oil and gas operations under flat-rate or flat well royalty leases.

Originally, H.B. 1254 prohibited the issuance of a permit to drill a new oil or natural gas well or for any re-drilling or other work to an existing oil or gas well "unless the lease by which such well is to be drilled shall provide for a royalty payment to the mineral owner of at least one eighth of the gross proceeds of any oil or natural gas produced pursuant to such lease…."  *Id*. Critically, the term "at the wellhead" was not included in the original bill but was purposely added after the bill was referred to the House Judiciary Committee.  *See* Exh. E, copy of the Committee Substitute for H.B. 1254.  There, the Judiciary Committee added language to the original bill which directed that, to undertake new development, **the "owner of the working interest … shall tender to the owner of the oil or gas in place not less than one-eighth of the total amount paid to or received by or allowed to the owner of the working interest <u>at the wellhead</u> for the oil or gas so extracted, produced or marketed** before deducing the amount to be paid to or set aside for the owner of the oil or gas in place, on all such oil or gas to be extracted, produced or marketed from the well, or the amount provided in such lease … whichever is greater." *See* Exh. E, pp. 2-6 (emphasis added).  The House of Delegates passed the Committee Substitute for H.B. 1254 on February 4, 1982.  The Senate amended the Committee Substitute for H.B. 1254 and passed it on March 13, 1982.  The amended bill passed by the Senate also provided that no permit could be issued for the drilling of a new well or "for the redrilling, deepening, fracturing" of an existing well where the lease provided for a flat well royalty.  *See* Exh. F, copy of amended and enacted House Bill 1254, subsection (d), pp. 4-5. The amended bill further affirmed that this permit prohibition may be avoided where the permit applicant "tender[s] to the owner of the oil or gas in place not less than one-eighth of the total

amount paid to or received by or allowed to the owner of the working interest **at the wellhead** for the oil or gas so extracted, produced or marketed before deducting the amount to be paid to or set aside for the owner of the oil or gas in place, on all such oil or gas to be extracted, produced or marketed from the well." *Id*. at subsection (e), p. 5 (emphasis added).

The House of Delegates concurred with the Senate amendments and passed the amended Committee Substitute for H.B. 1254. The Governor subsequently approved the bill, and it became effective on or about June 13, 1982. Through a series of reorganizations of the West Virginia Code, none of which significantly modified or expanded H.B. 1254, this bill is now designated as W.Va. Code § 22-6-8 and commonly referred to as the Flat-Rate Statute.

The "at the wellhead" language inserted into the Flat-Rate Statute as it moved through the legislative process cannot be deemed mere surplusage, but was added to set a specific point of valuation for calculating the royalty paid pursuant to the statute. There is no mystery about the Legislature's intent or directive. In fact, in enacting the Flat-Rate Statute, the Legislature did not intend to change any aspect of the law or terms of a lease other than to eliminate the payment of a flat well royalty on newly drilled or re-drilled wells. This fact is confirmed by both Delegates Martin and Harman, who introduced the original bill. At his deposition taken in this matter, Mr. Martin agreed that there was no intent to alter any other terms of a lease relationship between a landowner as the lessor and an oil and gas company as the lessee. *See* Exh. G, excerpts of the Transcript of the Deposition of Joseph E. Martin, III, p. 30. Similarly, House Bill 1254's co-sponsor Marc Harman also testified that he could recall no discussions about, affecting, or changing in any way the relationship between royalty owners and oil and gas lessees with respect to expenses or deductions. *See* Exh. H, excerpts of the Transcript of the Deposition of Marc Harman, p. 39.

19

H.B. 1254, as passed by the Legislature and affirmed by the Governor, sought only to secure the payment of royalty that was directly related to the volume of oil and gas "extracted, produced and marketed" and "the total amount paid to or received by or allowed to the owner of the working interest" for such gas rather than tied to the simple existence of a producing well. *See* Exh. D-F, and W. Va. Code § 22-6-8(e).  Critically, the history of this legislation also shows that language was deliberately added to this bill to ensure that royalties are calculated <u>at the wellhead</u> specifically rather than based upon "the gross proceeds of the oil or natural gas" as provided in the original bill.  *See* Exh. D-F.

Nothing about the legislative history of the Flat-Rate Statute, including the stated legislative findings and declarations stated therein, suggest or support a finding that the legislature intended that the point at which royalty is to be calculated is anywhere other than at the wellhead.  That intent is not only expressly stated in the statute but, as discussed herein, was the practice of producers at the time of the statute's enactment.  Nothing in the Legislative history of the Flat-Rate Statute supports a finding that the Legislature intended to alter the terms by which a wellhead price is calculated.  *See e.g.* Exh. D-H.  Both the explicit language of the current Flat-Rate Statue and the statute's history make it clear that the point at which royalty for gas produced from wells to which it applies is to be calculated is "at the wellhead."  W. Va. Code § 22-6-8(e).

### 3.    The Implied Covenant To Market Is Inapplicable To Plaintiffs' Claim For Royalty Based Upon The Flat-Rate Statute

As previously discussed, the court in *Tawney* found that the lease terms at issue in that case should be strictly construed against the drafter so as not to alter the implied covenant to market. *Tawney*, 219 W. Va. at 271, 633 S.E.2d at 27.  This implied covenant to market oil or gas was recognized in *Wellman v. Energy Resources, Inc.,* 210 W. Va. 200, 209, 557 S.E.2d 254,

263 (2001).  The lease at issue there required the lessee to pay to the lessor " '1/8th of the proceeds from the sale of gas as such at the mouth of the well where gas, condensate, distillate, or other gaseous substance is found' when the gas produced was sold as natural gas."  *Id.* at 263, 210 S.E.2d at 209 (citation omitted).  In construing this lease, the court held that, "[i]f an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale."  Syl. pt. 4, *Wellman*, 210 W. Va. 200, 557 S.E.2d 254.  This holding was based upon the finding that, where a lease provides for a royalty based upon proceeds received for the sale of gas, the lessee has a right to produce oil or gas but "also has a duty, either express, or under an implied covenant, to market the oil or gas produced."  *Id.* at 209-210, 557 S.E.2d at 263-264.  The court in *Wellman* was attempting to determine the intent of the parties with respect to the subject lease terms.  Here, in contrast, the intent of the parties' Lease was never to do anything other than provide a flat-rate or fixed annual payment for producing wells drilled on the Lease property.

Critically, no basis exists upon which to impose the implied covenant to market gas in a lease – like the Lease in this case – that provides for a flat well royalty.  In fact, West Virginia recognizes no duty on the part of a lessee of a flat well royalty lease to even produce gas, much less market it.  It is an even further stretch to suggest that an implied covenant that never had any application to the existing lease carried with it an obligation to bear all costs incurred after production is achieved at the wellhead, as Plaintiffs here seek.

For example, in *Bruen v. Columbia Gas Transmission Corp.,* 188 W. Va. 730, 426 S.E.2d 522 (1992), the successors-in-interest to an oil and gas lease brought an action seeking to have the lease declared terminated on the ground that the lessee and successors-in-interest failed to

produce oil or gas in paying quantities.  The lease in that case required a $200 annual rent for

each gas well.  *Id.* at 731, 426 S.E.2d at 523.  The jury returned a verdict for the plaintiffs;

however, on appeal, the Supreme Court of Appeals of West Virginia concluded that the trial

court erred in instructing the jury that "produced" means "produced in paying quantities,"

because the quantity of production regarding the disputed lease was immaterial.  *Id.* at 735, 426

S.E.2d at 527.  The court recognized the long-established distinction between "flat-rate" and

"production" mineral leases, explaining as follows:

> In *McGraw Oil Co. v. Kennedy,* 65 W. Va. 595, 64 S.E. 1027 (1909), this Court
> spoke to the nature of a flat-rate lease for oil and gas:
>
> This lease *does not limit its term by requiring that oil or gas shall be found in
> paying quantity,* as leases usually do. It says that the lease shall endure 'five years
> from this date and as long thereafter as oil and gas, or either of them, is produced
> therefrom by the party of the second part.' So, this lease contains nothing in terms
> allowing the lessor to end it because oil or gas is not found in paying quantity.
>
> 65 W. Va. at 598, 64 S.E. at 1028 (emphasis supplied) …
>
> Similarly, in *Bassell v. West Virginia Central Gas Co.,* 86 W. Va. 198, 103 S.E.
> 116 (1920), the Court again addressed a lease involving an annual rental per well:
>
> *The rental bears no relation to the quantity of gas contemplated or actually
> produced.* It was compensation fixed in advance of production and without any
> definite knowledge as to what the production would be. Hence, *the rental
> reserved was the same for wells of light production and wells of heavy
> production.*
>
> 86 W. Va. at 202, 103 S.E. at 117 (emphasis supplied).
>
> In *McCutcheon v. Enon Oil & Gas Co.,* 102 W. Va. 345, 135 S.E. 238 (1926), the
> Court said of flat-rate oil and gas leases:
>
> [T]he lease *does not in terms say the well must produce gas in 'paying quantities'*
> and be marketed. Having no market, the lessee had the right to shut the gas in and
> pay the stipulated price. It would be of little concern to lessor what was done with
> the gas, if he gets his payments.
>
> 102 W. Va. at 354, 135 S.E. at 241 (emphasis supplied). And in *Ketchum v.
> Chartiers Oil Co.,* 121 W. Va. 503, 506, 5 S.E.2d 414, 416 (1939), the Court
> distinguished a flat-rate lease from the 'usual' lease: 'Unlike the usual oil and gas

lease, production of oil and gas in *paying quantities* is not expressly required for the extension of the instant lease beyond the fixed term.' (emphasis in original).

*Bruen*, 188 W. Va. at 732-733, 426 S.E.2d at 524-525.  *Accord*, *Wellman v. Bobcat Oil & Gas, Inc.*, 524 Fed. Appx. 26 (4th Cir. 2013) (applying West Virginia law, and holding that, because the lease at issue provided for the payment of a flat-rate rental, "the quantity of production—whether high, low, or zero—[was] utterly irrelevant for determining whether the secondary term of the Lease *expired* … assuming the [rental] payments" were made).

Moreover, an implied covenant cannot be read into a statute such as W. Va. Code § 22-6-8.  A covenant is, by definition, an agreement or promise; and an "implied covenant" is defined as a "covenant that can be inferred from the whole agreement and the conduct of the parties." *Black's Law Dictionary*, Covenant (10th ed. 2014).  Here, the implied covenant to market produced oil or gas relied upon by the court in reaching its decision in *Tawney* and *Wellman* is inapplicable.  There is no underlying agreement upon which to infer that EQT Production agreed to do anything other than to pay a rental for each producing well drilled on the leased property.  Like *Bruen* and the cases cited therein, the Lease here provides only for the payment of a flat-rate royalty of $300.00 per annum for each producing well drilled on the leased premises, and nothing more.  *See* Exh. A, Lease.

The Flat-Rate Statute, pursuant to which Plaintiffs claim royalties in this case and which "converted" Plaintiffs' flat payment royalty under the lease to a 1/8[th] share of the amount received by EQT Production at the wellhead, was imposed by the Legislature.  It provides no basis upon which to infer any agreement by the parties, much less that EQT Production, as lessee, agreed to market gas or to bear all costs incurred in marketing, gathering, or transporting the gas beyond the wellhead – the point that the Flat-Rate Statute expressly designates as the one at which to calculate any royalty paid pursuant to its terms.

23

EQT Production's obligation under the Flat-Rate Statute is to pay Plaintiffs "not less than **one eighth of the total amount paid to or received by** or allowed to the owner of the working interest **at the wellhead** for the oil or gas so extracted, produced or marketed before deducting the amount to be paid to or set aside for the owner of the oil or gas in place, on all such oil or gas to be extracted, produced or marketed from the well." W. Va. Code § 22-6-8.  The plain meaning and intent of this statute must be applied - royalty is to be calculated at the wellhead - and there is no valid basis upon which to impose any implied covenant or implied duties on the parties.

### 4.    A Similar Pennsylvania Statute Has Been Interpreted To Permit Shared Expenses Downstream Of The Wellhead

Upon information and belief, West Virginia is one of only 2 states to adopt a flat-rate statute similar to W. Va. Code § 22-6-8.  Approximately three years prior to the enactment of West Virginia's Flat-Rate Statute, Pennsylvania adopted a statute similar to W. Va. Code § 22-6-8.  While the Pennsylvania statute, 58 P.S. § 33, does not even have the clarifying valuation "at the wellhead" language, it has nonetheless *still* been interpreted to calculate royalties *at the wellhead* and to permit expenses for downstream costs to be shared between lessors and lessees in order to determine that wellhead price.  *See, Kilmer v. Elexco Land Services, Inc*., 990 A.2d 1147, 1157-1158 (Pa. 2010).  The West Virginia statute is much more express as to the point of valuation for calculating royalties than Pennsylvania's and should be given the same treatment.

Similar to this case, the issue before the court in *Kilmer* involved "the proper construction of the term "royalty" as it is used in the Guaranteed Minimum Royalty Act ('GMRA'), 58 P.S. §33, which governs, *inter alia,* leases between Pennsylvania landowners and gas companies seeking to drill natural gas wells into Pennsylvania's Marcellus Shale deposits."  *Id*. at 1149.  The *Kilmer* court affirmed the trial court's grant of summary judgment to the gas companies and held that "the GMRA should be read to permit the calculation of royalties at the wellhead, as

provided by the net-back method in the Lease …"   *Id*. at 1158.   The court's discussion of

industry practice and understanding with respect to royalty calculation at the time of the

enactment of both the Pennsylvania statute (in 1979) and West Virginia's Flat-Rate Statute (in

1982) is instructive here:

> As previously stated, the GMRA, in relevant part, requires leases to provide
> lessors **'at least one-eighth royalty of all oil, natural gas or gas of other
> designations removed or recovered from the subject real property.'** 58 P.S. §
> 33.
>
> … Although the plain language of the GMRA clearly provides that the lessor
> must receive a one-eighth royalty, **it is silent regarding the definition of royalty
> and the method for calculating the royalty. To the dismay of both
> Landowners and Gas Companies, the GMRA does not use any of the terms
> suggested by the parties, such as 'at the wellhead,'** 'post-production costs,' or
> 'point of sale.' The absence of such language is not surprising given the state of
> the industry at the time the GMRA was enacted, when virtually all royalties to
> landowners were based on the sale of unprocessed gas from the producer to the
> pipeline companies at the wellhead. In 1979, the legislature was not faced with a
> choice of whether the calculation should be made at the wellhead or the point of
> sale because they were one and the same. Therefore, we can assume that the
> General Assembly intended both parties' interpretation: that the royalty should be
> calculated at the wellhead and at the point of sale. *See* 1 Pa.C.S. § 1921(c)(2)
> (providing for consideration of the "circumstances under which [the statute] was
> enacted.").
>
> Given the current state of the industry where the wellhead and the point of sale
> are not the same, we are required to interpret which valuation point is most
> consistent with the language of the statute. This requires us to define royalty.
> Under the standard dictionary definitions cited by Landowners, royalty
> contemplates the proceeds of a sale, which would move the point of valuation
> from the wellhead to the point of sale. The Statutory Construction Act, however,
> counsels us to reject this common definition of 'royalty,' in favor of the definition
> it has acquired in the oil and gas industry …
>
> The term royalty has been defined in the oil and gas industry as '[t]he
> landowner's share of production, free of expenses of production.' … In the
> industry, as referenced above, the 'expenses of production" relate to the costs of
> drilling the well and getting the product to the surface, but do not encompass the
> costs of getting the product from the wellhead to the point of sale, as those costs
> are termed "post-production costs.' 'Although the royalty is not subject to costs of
> production, usually it is subject to costs incurred after production, e.g., production
> or gathering taxes, costs of treatment of the product to render it marketable, costs
> of transportation to market.' *Id.; see also* George A. Bibikos and Jeffrey C. King,

> *A Primer on Oil and Gas Law in the Marcellus Shale States,* 4 Tex. J. Oil, Gas, & Energy L. 155, 168–69 (2008–2009) (explaining post-production costs and noting that a majority of jurisdictions authorize the deduction of post-production costs in the calculation of royalties). Similarly, another treatise addressing gas, oil and mineral leases instructs that, '[w]hile a lease may make the amount of the royalty dependent on the proceeds, generally the royalty is not payable from gross profit but from the net amount remaining after deduction of certain production and development costs.' 17 *Williston on Contracts* § 50:60 (4th ed. 2009) (footnote omitted). Consistent with this definition, the lease at issue only provides for the lessor to share in the post-production costs, and charges the lessee with all the production costs.

*Id.* at 1157-1158 (emphasis added) (citation omitted).

Accordingly, while the Pennsylvania statute is silent regarding the point at which royalty is to be calculated, and does not specifically include the term "at the wellhead," given the general practice and understanding of the industry at the time (that "virtually all royalties to landowners were based on the sale of unprocessed gas from the producer to the pipeline companies at the wellhead"), the point for royalty calculation under the statute is at the wellhead and the lessor may share in post-production costs for, *inter alia*, gathering and transportation. *Id.*

*Kilmer* recognizes that downstream expenses increase the value of the gas after it leaves the wellhead and, in order to determine a wellhead price, downstream expenses must be proportionally shared between the lessee and lessor. *Accord*, *Martin*, 571 F. Supp.1406; *Piney Woods*, 726 F.2d 225, 231. That conclusion is consistent with the U.S. Court of Appeals' conclusion in *Imperial Colliery Co.*, 912 F.2d at 701, wherein the court found that, under West Virginia law, the fact that there is no available wellhead price does not preclude computation of the wellhead price by deducting compression and gathering costs from the downstream price received. The West Virginia Legislature was more thoughtful than the Pennsylvania legislature when it drafted the royalty provision of the Flat-Rate Statute to state specifically that the point at which royalty is to be calculated is "at the wellhead." W. Va. Code § 22-6-8. This statute

26

explicitly directs that the royalty owner is entitled to something less than the total sales price received downstream of the wellhead.

Indeed, the meaning of "at the wellhead" under West Virginia's Flat-Rate Statute becomes even clearer when considering the effect of prohibiting the deduction of downstream expenses. If royalty holders were to be relieved from an obligation to share proportionately in downstream expenses, the "at the wellhead" language would then be in contradiction with express terms of the statute. As a result, royalty owners would be entitled to 1/8 of proceeds *at some downstream point of sale*, which is patently inconsistent with the unambiguous terms of the statute which direct that royalty owners receive 1/8 of the proceeds "at the wellhead." *See* Exh. A.

Since "[t]he primary rule of statutory construction is to ascertain and give effect to the intention of the Legislature," *Syl. Pt.8, Vest v. Cobb,* 138 W. Va. 660, 76 S.E.2d 885 (W. Va. 1953), and the plain language of the Flat-Rate Statute evidences the West Virginia Legislature's intent that royalty owners should be paid on the amounts received by the operator at the wellhead and thereby share in the post-extraction costs, Plaintiffs' contentions to the contrary are without merit. Plaintiffs' claims in this action, all of which are grounded on their erroneous interpretation of the Flat-Rate Statute, fail and EQT Production is entitled to judgment as a matter of law.

### 5.     Alternatively, If The Flat-Rate Statute Is In Derogation Of The Common Law, It Is To Be Strictly Construed, And Cannot Be Construed Against EQT Production

The principal allegation in Plaintiffs' Complaint - that EQT Production has wrongfully taken downstream expenses - is premised upon their mistaken belief that the rules of contractual interpretation used in *Tawney* also apply to construction of the Flat-Rate Statute. As previously discussed, the holding in *Tawney* was dependent on the conclusion that the lease language at issue in that case was ambiguous, and principles of contract interpretation dictate that, "[u]ncertainties in an

intricate and involved contract should be resolved against the party who prepared it." Syl. Pt. 8, *Tawney,* 219 W. Va. 266, 633 S.E.2d 22.  Importantly, the *Tawney* court's finding was not that the "at the wellhead" and similar language in the subject leases was silent but that it was ambiguous under the circumstances.  Here, the facts that made the lease language ambiguous in *Tawney* are not present and the phrase/term "at the wellhead" cannot be ignored but must be construed.  As discussed herein, principles of contract interpretation do not apply here where the issue is the application of a statute and not the interpretation of the terms of a contract. The analysis used in *Tawney* simply has no application here.

Moreover, assuming *arguendo* that some ambiguity in the formula fashioned by the Legislature for calculating royalty exists, the rules of statutory construction preclude construing the statute against EQT Production, as Plaintiffs suggest. The first rule of statutory construction is that statutes in derogation of the common law are strictly construed. Plaintiffs err by assuming that statutory ambiguities are to be construed against the gas producer. Longstanding West Virginia law refutes any such argument. "A statute is open to construction only where the language used requires interpretation because of ambiguity which renders it susceptible of two or more constructions or of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning." *Sizemore v. State Farm Gen. Ins. Co.,* 202 W. Va. 591, 596, 505 S.E.2d 654, 659 (W. Va. 1998) (quoting *Hereford v. Meek,* 132 W. Va. 373, 386, 52 S.E.2d 740, 747 (W. Va. 1949)). The Supreme Court of Appeals of West Virginia has discussed the rules of statutory construction:

> It is a long-standing maxim that "[s]tatutes in derogation of the common law are strictly construed." *Kellar v. James,* 63 W. Va. 139, 59 S.E. 939 (1907). As the leading commentator in statutory construction states:
>
> Statutes which impose duties or burdens or establish rights or provide benefits which were not recognized by the common law have frequently been held subject to strict, or restrictive, interpretation. **Where there is any doubt about their meaning or intent they are given the effect which makes the least rather than the most change in the common law.**

Norman J. Singer, 3 *Sutherland Statutory Construction* § 61:1 at 217 (6th Ed. 2001). This Court has similarly concluded that, when interpreting an ambiguous statute that is contrary to the common law, the statute must be given a narrow construction. As we stated in Syllabus Points 3 and 4 of *Bank of Weston v. Thomas,* 75 W. Va. 321, 83 S.E. 985 (1914):

3. Statutes in derogation of the common law are allowed effect only to the extent clearly indicated by the terms used. Nothing can be added otherwise than by necessary implication arising from such terms.

*Phillips v. Larry's Drive-In Pharmacy, Inc*., 220 W. Va. 484, 491, 647 S.E.2d 920, 927-28 (2007)

(emphasis added).

It is without question that the common law of West Virginia has recognized, and continues to recognize, the validity of flat-rate royalty leases. *See, e.g., Wellman*, 524 Fed. Appx. 26; *Bruen,* 426 S.E.2d 522. In *Bruen*, a case that post-dated the adoption of the Flat-Rate Statute, the West Virginia Supreme Court of Appeals upheld the continued validity of a flat-rate lease that had allegedly terminated. Thus, should this Court find that the Flat-Rate Statute is in derogation of the common law, it should be strictly construed. In doing so, given that the "at the wellhead" language in the statute has consistently been held to mean that the lessor is to share in downstream expenses, nothing less than a provision expressly and explicitly shifting those costs to the gas operator will relieve the lessor from bearing a portion of those costs. No such provision is contained in the statute, and one cannot be implied or read into the statute. The statute simply cannot be construed against EQT. Accordingly, summary judgment should be granted in favor of EQT as to Plaintiffs' claims.

**B.      W. VA. CODE § 22-6-8 DIRECTS THAT EQT PRODUCTION SHALL PAY ROYALTY BASED UPON THE VOLUME OF GAS FOR WHICH IT IS PAID**

Plaintiffs also erroneously contend that EQT Production has failed to pay them royalty on the correct volume of gas from the wells that are on the property covered by the subject Lease. EQT Production's gas purchase contract provides for a wellhead sale of gas at a price equal to the first of the month index price applicable to the interstate pipeline(s) into which the gas is ultimately delivered, less gathering-related charges, retainage, and any other agreed to charges.

29

*See* Exh. B and C.   Pursuant to this contract, EQT Production is paid for gas volumes that actually reach the interstate pipeline connection.   *Id.*   With respect to the volume of gas on which royalty must be paid pursuant to the Flat-Rate Statute, W. Va. Code § 22-6-8 is clear:

> … [T]he owner of the working interest in the well … shall tender to the owner of the oil or gas in place ***not less than one eighth of the total amount paid to or received by or allowed to the owner of the working interest*** *at the wellhead* for the oil or gas so extracted, produced or marketed …

W. Va. Code § 22-6-8(e) (emphasis added).

Stated simply, the clear and express provisions of W.Va. Code § 22-6-8 provide that the volume on which royalty must be paid is the volume for which the producer is paid.   The language of the statute is unambiguous in this regard.   Consequently, the terms of the statute should be applied as stated.   *See, e.g., Syl pt. 2, Epperly*, 135 W. Va. 877, 65 S.E.2d 488 ("[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect"); *Syl. pt. 2, King*, 234 W. Va. 440, 766 S.E.2d 387 (recognizing that, "[w]here the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation").

Indeed, Plaintiffs' demand that EQT Production pay royalties on unsold gas is illogical and inequitable, as was recently found by the court in the case styled: *W.W. McDonald Land Co. v. EQT Production Company, et al*., Civil Action No. 2:11-cv-00418, previously pending in the U.S. District Court for the Southern District of West Virginia.   In the Memorandum Opinion and Order dated November 21, 2013, the Honorable Joseph R. Goodwin ruled that the producer (EQT Production Company) was not required to pay royalty on volumes of gas that were never sold.   Specifically addressing the issue of whether EQT Production was required to pay royalties on lost and unaccounted for gas that is never sold, the court found that "lessees have no general

duty to pay for lost volumes." *See* Exh. I, Memorandum and Opinion Order, p. 15.  Imposing an obligation on EQT Production to pay royalty on volumes of gas that are lost and never sold is even more illogical here, because the Lease provides for a flat well royalty and the parties never valued gas volume. The Lease does not even impose an obligation to produce gas.   The Legislature's remedy to the flat well royalty was to impose a royalty equivalent to 1/8 of the sales price at the wellhead, not to mandate a payment of more than 1/8 of the price received, which would be the result if royalties were paid on higher volumes than those volumes for which the lessee actually received payment.

Here, there is no dispute that EQT Production has paid Plaintiffs a royalty of not less than 1/8 of the total amount paid to and received by EQT Production at the wellhead for the oil and gas extracted and sold from the wells covered by the subject Lease.  Having been paid royalty in the amount and based upon the volume plainly directed by the Flat-Rate Statute, Plaintiffs have been fully compensated for royalties owed, and EQT Production is entitled to judgment on all Plaintiffs' claims as a matter of law.

## C.   PLAINTIFFS HAVE WAIVED AND RELEASED THEIR CLAIMS AND RATIFIED DEFENDANTS' CONDUCT

Plaintiffs here have released any and all claims they have against Defendants.  They were each members of a class in an action styled, "*The Kay Company, et al. v. Equitable Production Company, et al.*", Civil Action No. 2:06-0612, in the United States District Court for the Southern District of West Virginia ("Kay Co.").  The action was commenced in late 2006, and a settlement was reached in January, 2009.  Pursuant to that settlement, each class member executed a document entitled, "Kay Co. v. Equitable Production Co., Settlement." *See, e.g.,* Exh. J, a copy of one such settlement document executed by Patrick Leggett.

The settlement agreement provides, in pertinent part:

> The undersigned Class Member hereby RELEASES Equitable Production Company, Inc., and Equitable Resources, Inc., (hereinafter collectively referred to as "Equitable") and their predecessors, successors, and past and present subsidiaries, parents, assigns, affiliates, officers, directors, agents, attorneys, insurers and employees from any and all claims, causes of action, damages, or demands of whatsoever kind and character, whether known or unknown, for improper royalty payments, improper deductions, improper measurement, improper accounting for natural gas liquids, improper sales prices, breach of lease agreements, breach of fiduciary duty, fraud, violation of the West Virginia Consumer Credit and Protection Act (W.Va. Code §46A-6-10T et. seq.), in violation of the flat-rate statute (W.Va. Code §22-6-8), and punitive damages all related to the failure to pay proper royalty. It is understood that the Release shall only be applicable to the claims and for the time period which the Released Parties have paid the full and just consideration provided for under this Agreement.

*Id*.

The release agreement that the Plaintiffs signed released any and all claims that Plaintiffs have through at least January 23, 2009. Plaintiffs concede as much in their Complaint wherein they seek damages only after the date of the settlement of the Kay Company litigation. *See* Complaint, ¶¶ 29-30. Thus, Plaintiffs do not seek, and cannot recover, damages for any claims within the ambit of the settlement agreement that they executed in connection with the Kay Co. action. Any claims in the time period before January 23, 2009, are barred.

Plaintiffs' claims that the Defendants have improperly continued to take deductions from their royalties after January 23, 2009, are also barred. After the Kay Co. litigation was settled, each of the Plaintiffs here separately executed an "Amendment and Ratification of Oil and Gas Lease." That amendment modified the Lease at issue to give EQT Production (or its predecessor in interest, Equitable Production Company) the right to pool the leased premises with adjoining properties. *See* Exh. K, Copies of lease amendment documents executed by Plaintiffs.

The lease amendments each contained the following provision:

**3. Ratification of Remaining Lease Provisions.** Lessor and Lessee hereby (i) ratify and agree that the Lease is valid and in effect, (ii) agree that Lessee is not in violation of any terms or provisions of the Lease, including the royalty or rental

> <u>payment terms thereof</u>, (iii) ratify and affirm all the terms and provisions of the Lease to the extent that they are not changed, altered or amended by this Amendment.

*See* Exh. K (Emphasis supplied).

This provision bars Plaintiffs' claims here. Certainly, the provision is binding. The lease amendment itself recites, in numbered Paragraph 4, that: "The provisions hereof shall be binding upon the parties, their heirs, legatees, devisees, personal representatives, successors, and assigns." *Id*. Further, the provision is not ambiguous, and must be enforced as written. *Orteza v. Monongalia County General Hospital*, 318 S.E.2d. 40 (W. Va. 1984); *Gulf Oil Corp. v. Chiodo*, 804 F.2d 284 (4th Cir. 1986) (a contract must be enforced according to its terms and without alteration). In addition, Plaintiffs cannot challenge the authenticity of lease amendment, as each Plaintiff signed it and their signature was duly acknowledged before a notary public and the document recorded in the Office of the Clerk of Doddridge County, West Virginia. Finally, Plaintiffs cannot claim ignorance of the provision's import, because "[a] person who fails to read a document to which he places his signature does so at his peril." *Reddy v. Cmty. Health Found. of Man*, 171 W. Va. 368, 373 (1982).

Plaintiffs' ratification of Defendants' conduct certainly encompasses the conduct about which Plaintiffs complain and for which they seek damages in their Complaint. They allege that Defendants are taking deductions from their royalty in violation of the terms of their leases and have refused to pay Plaintiffs all the royalty due them. *See* complaint, ¶¶ 29-30. That alleged misconduct certainly relates to the "terms or provisions of the lease" in question, particularly "the royalty or payment terms thereof," as stated in the Lease Amendment's ratification clause. Plaintiffs cannot claim otherwise.

Plaintiffs also cannot argue that Defendants engaged in some new or different conduct subsequent to their execution of the lease amendment that would allow them to evade the plain

language of its terms and pursue the instant action.  First, the gist of the Complaint is simply that Defendants, after settling the Kay Co. suit, continued improperly to take deductions from their royalty payments.  They do not allege any new or different conduct by Defendants after the Kay Co. settlement.  Indeed, when asked during his deposition whether any changes in Defendants' conduct had occurred after execution of the Kay Co. settlement agreement, Patrick Leggett, one of the Plaintiffs here, could not point to any.  *See* Exh. L, Leggett Deposition, p. 25, ll. 3-25; p. 26, ll. 1-4.  Plaintiffs likewise do not allege that Defendants engaged in some new or different conduct after the Lease Amendments were executed.  No changes in Defendants' conduct did, in fact, occur.  EQT Production advised Mr. Leggett, in a letter dated April 8, 2010, that deductions were permitted with respect to the lease at issue here, and that they would continue to take them. *See* Exh. M, correspondence dated Apr. 8, 2010.  Indeed, there were no changes in the way in which those deductions were calculated.  Joseph Piccirilli, Director of Midstream Planning, testified in his deposition, taken June 3, 2015, that he and his group calculate those deductions each year, and that the way in which they do so has not changed since before he took over that responsibility in 2008.  *See* Exh. N, Piccirilli deposition transcript, p. 19. line 11, to p. 22, line 3. Thus, both the taking of deductions and the way in which they calculated remained the same after the Kay Co. litigation was settled in early 2009, and remain the same today.

In short, the conduct for which Plaintiffs seek damages in their Complaint is exactly the same conduct that Plaintiffs agreed, in the lease amendment documents, "…is not in violation of any terms or provisions of the Lease, including any royalty or rental payment terms thereof."  No new or different conduct on the part of any of the Defendants is alleged; none occurred. Plaintiffs have each, therefore, agreed, with binding effect, that the taking of deductions from

their royalty payments is not in violation of the lease or improper in any way.  As a result, all their claims are barred.

## D.  PLAINTIFFS HAVE FAILED TO PRESENT EVIDENCE THAT EQT PRODUCTION ENGAGED IN FRAUDULENT CONDUCT OR MADE ANY NEGLIGENT MISREPRESENTATIONS

Count III of the Complaint alleges a claim for fraudulent or negligent misrepresentation with respect to EQT Production's payment of royalty to Plaintiffs.  Even if Plaintiffs are permitted to proceed with their claim for breach of contract in this action, their claim for fraud and/or misrepresentation in Count III of the Complaint fails because they cannot present evidence of fraudulent or negligent conduct by EQT Production.

To succeed on their fraud claim against EQT Production, Plaintiffs must prove each of the following elements by clear and convincing evidence:  (1) the act claimed to be fraudulent was the act of the EQT Production, or induced by it; (2) the act was material and false; (3) Plaintiffs relied upon it and were justified under the circumstances in relying upon it; and, (4) Plaintiffs were damaged because of this reliance.  *See, e.g.,* Syl. Pt. 5, *Folio v. City of Clarksburg*, 221 W. Va. 397, 655 S.E.2d 143 (2007); *Bowens v. Allied Warehousing Services, Inc.*, 229 W. Va. 523, 729 S.E.2d 845, 852 (2012); Syl. pt. 1, *Lengyel v. Lint,* 167 W. Va. 272, 280 S.E.2d 66 (1981).  Where, as here, fraudulent concealment is alleged, Plaintiffs must prove "concealment of facts by one with knowledge or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud."  *Pocahontas Mining Company Limited Partnership v. Oxy USA, Inc.,* 202 W. Va. 169, 503 S.E.2d 258 (1998).  *See also, Trafalgar House Construction, Inc. v. ZMM, Inc.* 211 W. Va. 578, 567 S.E.2d 294 (2002).

Plaintiffs cannot offer evidence to support their claim against EQT Production with respect to each of these elements.  In the Complaint, they contend that Defendants "misrepresented to plaintiffs that defendants were entitled to take deductions from plaintiffs'

royalty, take the amount of deductions they took, reduced plaintiffs' royalty payments, overcharged plaintiffs for services, and/or wrongfully claimed plaintiffs' royalty due was less than the amount actually due, thereby denying plaintiffs the rents and royalties to which they were due." *See* Complaint at ¶ 54.  First, Plaintiffs' fraud claim is invalid on its face.  Stating one's belief as to its legal rights does not constitute a fraud.  Certainly, it lacks the "intention to mislead or defraud" that is an essential element of a fraudulent concealment claim.  *Id.*

Further, the record is devoid of evidence that EQT Production made any false or fraudulent representations to Plaintiffs.  Plaintiffs have provided no evidence to identify the time, place, or content of any alleged false representations that EQT Production made as is required to establish their claim for fraudulent concealment.  It has long been held that fraud will "not be presumed from doubtful evidence, or circumstances of suspicion.  The presumption is always in favor of innocence and honesty." *Bowens*, 229 W. Va. 523, 729 S.E.2d at 851-52, *quoting*, Syl. Pt. 1, *Hunt v. Hunt,* 91 W. Va. 685, 114 S.E. 283 (1922).  Having failed to present clear and specific evidence of any alleged fraudulent conduct on the part of EQT Production, summary judgment with respect to Plaintiffs' claims for fraud in Count III of the Complaint should be granted.

Plaintiffs' claim for negligent misrepresentation against EQT Production fails for the same reasons that their fraud claim failed.  The West Virginia Supreme Court of Appeals has long held that, "[o]ne under a duty to give information to another, who makes an erroneous statement when he has no knowledge on the subject, and thereby misleads the other to his injury, is as much liable in law as if he had intentionally stated a falsehood." *Folio v. City of Clarksburg*, 221 W. Va. 397, 405, 655 S.E. 2d 143, 151 (2007), *citing*, Syl. Pt. 1, *James v. Piggott,* 70 W. Va. 435, 74 S.E. 667 (1910).  Here, while Plaintiffs may claim that EQT

36

Production has, *inter alia*, wrongfully "take[n] deductions from plaintiffs' royalty …" (*See* Complaint, ¶ 54), the record is devoid of evidence that EQT Production made an erroneous statement to or misled Plaintiffs regarding the calculation of their royalty.  Rather, the total amount of monetary deductions for costs is identified in each of the royalty remittance statements provided to Plaintiffs along with other pertinent information relating to the gas sold by EQT Production and upon which Plaintiffs' royalty is paid.  Plaintiffs undoubtedly knew of the deductions; they were not concealed.  Absent any false or erroneous statement made to Plaintiffs by EQT Production regarding the payment of royalties with respect to the subject wells, Plaintiffs cannot satisfy the requirements for establishing a claim for negligent misrepresentation.  EQT Production is, therefore, entitled to summary judgment with respect to that aspect Count III of the Complaint.

**E.   EQT PRODUCTION IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES**

In Count IV of the Complaint, Plaintiffs seek an award of punitive damages.  *See* Complaint, ¶¶ 75-76.  Plaintiffs' request fails as a matter of law to the extent they seek punitive damages relating to their claim for breach of contract (Count I).  West Virginia law prohibits an award for punitive damages for breach of contract claims.  *See, e.g., Hayseeds, Inc. v. State Farm Fire & Cas.*, 177 W. Va. 323, 330, 352 S.E.2d 73, 80 (1986) ("Generally, punitive damages are unavailable in an action for breach of contract unless the conduct of the defendant constitutes an independent, intentional tort"); *Eagle Gas Co. v. Doran & Assoc., Inc*., 182 W. Va. 194, 198, 387 S.E.2d 99, 103 (1989) (recognizing that punitive damages are not available in an action for an accounting).  Moreover, with respect to the remainder of Plaintiffs' claims against Defendants, the record is devoid of any evidence to support an award of punitive damages against them.

The standards and purposes for permitting the imposition of punitive damages have long

been established in West Virginia:

> [T]o 'sustain a claim for punitive damages the wrongful act must have been done
> maliciously, wantonly, mischievously or with criminal indifference to civil
> obligations.'

*General Motors Acceptance Corp. v. D.C. Wrecker Service*, 220 W. Va. 425, 431, 647 S.E.2d

861, 867 (2007), *quoting*, Syl. pt. 3, *Jopling v. Bluefield Water Works & Improvement Co.,* 70

W. Va. 670, 74 S.E. 943 (1912).  Indeed, "under our law, '[p]unitive damage instructions are

legitimate *only* where there is evidence that a defendant acted with wanton, willful, or reckless

conduct or criminal indifference to civil obligations affecting the rights of others to appear or

where the legislature so authorizes.' " *Karpacs-Brown v. Murthy*, 224 W. Va. 516, 527, 686

S.E.2d 746, 757 (2009); *quoting*, Syl. pt. 7, *Michael v. Sabado*, 192 W. Va. 585, 453 S.E.2d 419

(1994) (emphasis added).  *Accord*, *Tri-State Asphalt Products, Inc. v. McDonough Co.*, 182 W.

Va. 757, 763, 391 S.E.2d 907, 913 (1990) ("to secure punitive damages, a defendant must be

shown to have engaged in a wilful, wanton, reckless, or malicious act"); *Kessel v. Leavitt*, 204

W. Va. 95, 191, 511 S.E.2d 720, 816 (1998) (a jury may allow punitive damages against a

defendant by way of punishment "for willfulness, wantonness, malice, or other like aggravation

of his wrong to the plaintiff").  Critically, even a "wrongful act done under a *bona fide* claim of

right and without malice in any form constitutes no basis for such damages." *General Motors*

*Acceptance Corp.*, 220 W. Va. at 431, 647 S.E.2d at 867, *quoting*, Syl. pt. 3, *Jopling,* 70 W. Va.

670, 74 S.E. 943.

Here, there is no evidence that would warrant an award of punitive damages. Plaintiffs

have not produced a material fact evidencing that Defendants, or any of them, acted

maliciously, wantonly, willfully, recklessly or with criminal indifference to civil obligations

affecting the Plaintiffs' rights.  In fact, the opposite is true.  The total amount of monetary

38

deductions for costs is identified in each of the royalty remittance statements that EQT Production provided to Plaintiffs, along with other pertinent information relating to the gas sold by EQT Production and upon which Plaintiffs' royalty is paid.  Plaintiffs undoubtedly knew of the deductions and they were not concealed.  Having failed to present evidence of conduct by Defendants that would warrant the imposition of punitive damages under West Virginia law, EQT Production is entitled to summary judgment as to Count IV of the Complaint.  *See* Fed. R. Civ. P. 56; *Bellomy v. Union Concrete Pipe Co.*, 297 F. Supp. 261 (S.D.W. Va. 1969), *aff'd*, 420 F.2d 1382 (4th Cir.), *cert. denied*, 400 U.S. 904 (1970) (summary judgment is appropriate where the court, "having examined the pleadings, affidavits, interrogatories, answers, and deposition, finds that no genuine issues of material fact are presented . . .").

## CONCLUSION

Plaintiffs' claims in this action are all based upon the erroneous contention that *Tawney* governs the payment of royalties made pursuant to West Virginia's Flat-Rate Statute, W. Va. Code § 22-6-8.  *Tawney's* reasoning and holding applied only to the interpretation of leases. Conversely, the issues here do not involve consideration of lease/contract terms, but the application and interpretation of a statute.  *Tawney's* application of contract law and finding of ambiguity in the leases, recognition and reliance on an implied covenant, and strict construction of lease terms against the lessee are, therefore, inapplicable to Plaintiffs' claims in this case, all of which relate to the payment of royalties imposed by statute.  The Flat-Rate Statute directs that EQT Production shall pay to Plaintiffs "one eighth of the total amount paid to or received by or allowed to the owner of the working interest at the wellhead for the oil or gas so extracted, produced or marketed ..."  W. Va. Code § 22-6-8.  The statute's terms must be applied according to their recognized meaning and intent – the wellhead price fixes the point at which royalty is to be calculated under W. Va. Code § 22-6-8.  That price is precisely the one upon

which Plaintiffs' royalty is paid and EQT Production is, therefore, fully in compliance with West Virginia law.  Judgment in EQT Production's favor on Plaintiffs' claims in this case is further warranted because Plaintiffs have previously released any and all claims they have against Defendants.  Finally, Plaintiffs have failed to establish any fraudulent conduct, negligent misrepresentation, or conduct to warrant punitive damages by EQT Production, entitling it to judgment in its favor as to Counts III (Fraud) and VI (Punitive Damages) of the Complaint as well.

Respectfully submitted,

**EQT PRODUCTION COMPANY,**

**By Counsel.**

 _/s/  David K. Hendrickson     11/20/2015_
David K. Hendrickson, Esquire (#1678)
**HENDRICKSON & LONG, P.L.L.C.**
214 Capitol Street (zip 25301)
P.O. Box 11070
Charleston, West Virginia 25339
(304) 346-5500
(304) 346-5515 (facsimile)
daveh@handl.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING**

**PATRICK D. LEGGETT,** *et al,*

        **Plaintiffs,**

**v.**                              **CIVIL ACTION NO. 1:13-cv-0004 FPS
Honorable Frederick P. Stamp, Jr.**

**EQT PRODUCTION COMPANY,
EQT CORPORATION, EQT ENERGY, LLC,
EQT INVESTMENTS HOLDINGS, LLC,
and EQT GATHERING, LLC,**

        **Defendants.**

## <u>CERTIFICATE OF SERVICE</u>

    I, David K. Hendrickson, counsel for Defendants, do hereby certify that I have this **20ᵗʰ day of November, 2015**, served the foregoing **"MEMORANDUM IN SUPPORT OF DEFENDANT EQT PRODUCTION COMPANY'S MOTION FOR SUMMARY JUDGMENT"** using the Court's CM/ECF system which will deliver true and exact copies to the following counsel of record:

| | |
|---|---|
| Michael W. Carey, Esquire | Marvin W. Masters, Esquire |
| Carey, Scott, Douglas & Kessler, PLLC | The Masters Law Firm, LC |
| Suite 901 | 181 Summers Street |
| 707 Virginia Street East | Charleston, West Virginia   25301 |
| Charleston, West Virginia   25301 | *Counsel for Plaintiffs* |
| *Counsel for Plaintiffs* | |

                                  */s/ David K. Hendrickson          11/20/2015*
                                  David K. Hendrickson, Esquire (#1678)
                                  **HENDRICKSON & LONG, PLLC**
                                  214 Capitol Street  (zip 25301)
                                  P.O. Box 11070
                                  Charleston, West Virginia 25339
                                  (304) 346-5500
                                  (304) 346-5515 (fax)
                                  daveh@handl.com