IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING

PATRICK D. LEGGETT;
KATHERINE F. LEGGETT;
GEORGE D. MCKAIN, by his
attorney in fact, ANITA
KATHRYN MCKAIN GREER;
and ADELE S. MCDOUGAL,

        Plaintiffs,

v.                                                              Civil Action No. 1:13-cv-0004 FPS
                                                                Honorable Frederick P. Stamp, Jr.
EQT PRODUCTION COMPANY,
a Pennsylvania corporation;
EQT CORPORATION,
a Pennsylvania corporation;
EQT ENERGY, LLC, a
Delaware limited liability company;
EQT INVESTMENTS HOLDINGS, LLC, a
Delaware limited liability company;
EQT GATHERING, LLC, a
Delaware limited liability company; and
EQT MIDSTREAM PARTNERS, LP,
a Delaware limited partnership,

        Defendants.


**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS', EQT
CORPORATION, EQT ENERGY, LLC, EQT INVESTMENT HOLDINGS, LLC AND
<u>EQT MIDSTREAM PARTNERS, LP'S MOTION FOR SUMMARY JUDGMENT</u>**

<u>**And**</u>

<u>**DEFENDANTS' MOTION RE:  EQT PRODUCTION ON FRAUD,
MISREPRESENTATION AND PUNITIVE DAMAGES**</u>

<u>**INTRODUCTION**</u>

Defendants, EQT Corporation, EQT Energy, LLC, EQT Investment Holdings, LLC and

EQT Midstream Partners, LP, move for summary judgment on behalf of all EQT defendants

1

(except for EQT Production,) claiming that since there is no contract between these defendants, that they cannot be liable to plaintiffs. Due to the necessity of repetition otherwise, plaintiffs will respond herein to the defendants' motion for summary judgment with respect to plaintiffs' claims that EQT Production was guilty of fraud, intentional breach of contract and misrepresentation and is liable for punitive damages. Defendants acknowledge that plaintiffs allege that EQT Corporation is the alter ego of all of these defendants which would nullify most of its arguments, if true. Plaintiffs also allege that defendants were engaged in a conspiracy and joint venture and that the subsidiaries were acting as agents, servants and employees of EQT Corporation. Plaintiffs contend that the defendants set about on a plan to wrongfully retain a significant portion of plaintiffs' 1/8 royalty by various means, all fraudulent.

Plaintiffs own and are lessors of natural gas interests which are held by EQT, as lessee.[1] A previous class action[2] preceded this civil action which resolved by a class action settlement, for the period up until December 8, 2008. All participants of the previous settlement entered into releases, resolving said claims which relieved EQT from any further liability prior to December 8, 2008, only until that date. This action is brought for damages, including punitive damages, which occurred after December 8, 2008, pursuant to causes of action based upon breach of contract, intentional breach of contract, constructive and actual fraud and claims for punitive damages. Plaintiffs also claim that EQT Corporation is the alter ego of the other defendants which are all wholly owned subsidiaries of EQT Corporation.

---

[1] Plaintiffs contend that all defendants are responsible for the conduct complained of herein, as explained below. All defendants are referred to as EQT defendants. EQT Production claims to be the lessee of said leases.
[2] The Kay Company, LLC, et al. v. Equitable Production Company, et al.; United States District Court, Southern District of West Virginia; Civil Action No. 2:06-cv-00612.

C.    **DEFENDANTS**

1.    EQT Corporation is a publicly traded corporation which, among other endeavors, directly or indirectly, through subsidiaries, joint venturers and partners, leases and acquires leases by assignment or otherwise, of certain natural gas rights within boundaries of the State of West Virginia and elsewhere and produces, gathers, transports and sells the same at "points of sale" on interstate natural gas pipelines.

All other EQT defendants are solely owned subsidiaries of EQT Corporation.  As set out below, EQT Corporation operates its natural gas business through various subsidiaries, including the other EQT defendants which are mere departments, divisions and business segments of EQT Corporation.

2.    EQT Production is the designated lessee of plaintiffs and the putative class.  It owns the leases, drills the wells and claims to sell the gas to another subsidiary, EQT Energy. EQT Energy purchases all of Production's natural gas and sells it at "first liquid trading point and interstate pipeline," such as the TCO index price, for the published trading price for that day.

3.    EQT Energy, however, does not pay Production the price it receives, but Energy deducts the price that a different wholly-owned subsidiary, EQT Gathering, charges for taking the gas from the wellhead to the point of sale.  Energy then claims that it buys the gas at the wellhead and Production claims it sells the gas at the wellhead.

4.    EQT Gathering is responsible for transporting the gas from well to market.

5.    EQT Midstream Partners is part of the gathering group.  It is a publicly traded, limited partnership which, along with EQT Gathering, gathers the gas from West Virginia wells and delivers it to the "point of sale" and charges plaintiffs part of gathering charges.

6.     <u>EQT Investment Holdings, LLC</u>, among other duties, handles loans among and between EQT Corporation and subsidiaries and assists in managing and financing the subsidiaries for and on behalf of EQT Corporation.

Defendants, along with numerous other EQT Corporation subsidiaries, operate through business groups or segments which cross company boundaries and together work to accomplish EQT Corporation's natural gas business.

## Facts

Plaintiffs are the owners of the natural gas underlying certain lands in Doddridge County, West Virginia.[3]  It is not disputed that all of the plaintiffs' leases are what have been referred to as flat rate leases.  All plaintiffs claim their interest by virtue of two leases, owned by all of the plaintiffs, jointly.  (See **Exhibit 1**.)  Mr. and Mrs. Leggett also own an interest in a third lease.  (See **Exhibit 2**.)  The right to the leases were acquired by EQT defendants.  They also were converted by virtue of *W. Va. Code,* Chap. 22, Art. 6, Sec. 8, to a 1/8 royalty.

A.     <u>Equitable Corporation Is The Alter Ego Of Equitable Production Company</u>

EQT Corporation is the alter ego of EQT Production and the remaining subsidiary defendants.  Therefore, contrary to defendants' argument, EQT Corporation is the real party in interest and it is deemed just as responsible as Production for breach of contract, fraud and for punitive damages.  Since all defendants were involved in a joint effort to take and use plaintiffs' royalty for its operating expenditures, then all are liable under theories of conspiracy, joint venture and agency.

When a parent corporation or shareholder dominates and controls a corporation, the parent may be deemed under the law to be an alter ego of the subsidiary.  <u>See</u> *Laya v. Erin*

---

[3] Mr. and Mrs. Leggett own one tract in Ritchie County.

*Homes, Inc.*, 352 S.E.2d 93, 97-98 (W.Va. 1986).  The West Virginia Supreme Court of Appeals has set forth non-exhaustive lists of factors relevant to determining whether such an "alter ego" relationship exists so as to justify piercing the corporate veil.  *Norfolk Southern Ry. Co. v. Maynard*, 437 S.E.2d 277, 282 (W.Va. 1993)(discussing relevant factors between parent and subsidiary corporations); *Laya v. Erin Homes, Inc.*, 352 S.E.2d at 98-99 (discussing 19 relevant factors between shareholder and corporation); *Southern Electrical Supply Co. v. Raleigh County National Bank*, 320 S.E.2d 515, 523 (W.Va. 1984) (setting forth relevant factors to consider); *Southern States Cooperative, Inc. v. Dailey*, 280 S.E.2d 821, 827 (W.Va. 1981) (discussing relevant factors).

The list of factors most relevant to the relationship between parent and subsidiary corporations is set forth in *Norfolk Southern Ry. Co. v. Maynard*, *Id.*, wherein the Court set forth the following factors:

"(1)   Whether the parent corporation owns all or most of the capital stock of the subsidiary;

"(2)   Whether the parent and subsidiary corporations have common directors and officers;

"(3)   Whether the parent corporation finances the subsidiary;

"(4)   Whether the parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation;

"(5)   Whether the subsidiary has grossly inadequate capital;

"(6)   Whether the parent corporation pays the salaries and other expenses or losses of the subsidiary;

"(7)   Whether the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;

"(8)   Whether in the papers of the parent corporation or in the statement of its officers, the subsidiary is described as a department or division of the

5

parent corporation, or its business or financial responsibility is referred to as the parent corporation's own;

"(9)    Whether the parent corporation uses the property of the subsidiary as its own;

"(10)   Whether the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest; and

"(11)   Whether the formal legal requirements of the subsidiary are not observed.

[Citation omitted.]"

*Maynard*, 437 S.E.2d at 282 (quoting *Bielicki v. Empire Stevedoring Co., Ltd.*, 741 F. Supp. 758, 761-62 (D.Minn. 1990,))  Also, in *Laya v. Erin Homes, Inc.*, S.E.2d p. 98-99 the West Virginia Supreme Court held:

"that the propriety of piercing the corporate veil should rarely be determined upon a motion for summary judgment. Instead, the propriety of piercing the corporate veil usually involves numerous questions of fact for the trier of the facts to determine upon all of the evidence."

*Laya, at 98-99.*

EQT Corporation, Inc. is a publicly traded Pennsylvania Corporation.  Attached are corporate subsidiary organizational charts for EQT Corporation.  **Exhibit 3** is the last one produced by defendants for 2014.  **Exhibit 4** includes all organizational charts from 2009 to 2014.  As can be seen, EQT Corporation changes the subsidiary organization frequently, but its method of operating has remained essentially the same.  It has a corporate or limited liability company to perform most every function, yet controls its operations through its own officers and board of directors.  In other words, its subsidiaries are merely departments or divisions of EQT Corporation, all of which report to it.

Defendants offered Jimmy Sue Smith as a F.R.C.P. 30(b)(6) witness to testify about the intercompany (subsidiary) arrangements between EQT Corporation and its subsidiaries and

6

among all subsidiaries and EQT Corporation.  (**Exhibit 5,** Deposition of Smith.)  Ms. Smith

testified that she was Vice President and Controller of Midstream and Commercial companies.

*Id.* at 11.  She is also responsible for Midstream Partners which is a publicly traded entity.  She

is also responsible for EQT Corporate Accounting which then would include all of EQT.  *Id.* at

12.  All of EQT Corporation's and subsidiary's financial statements are consolidated as was the

tax returns.  *Id.* 13-14.  The offices for all of Corporate and subsidiaries are located in one office

complex in Pittsburgh, except for EQT Investments and a few other small subsidiaries.  *Id.* at 14.

"Each business has at least one floor" in this building.  *Id.* at 14.  Ms. Smith attended the

subsidiary audit committee meetings and board of directors meetings of EQM (Midstream) and

EQT.  *Id.* at 15.

Ms. Smith circled on her deposition exhibit 3B how the business was operated by

"groups" of subsidiaries.  Those subsidiaries circled with an "A" inside are EQM businesses.

"O" is EQT Energy.  EQT Energy businesses are circled as a "B."  The pipeline business,

Mountain Valley Pipeline, is circled as "C" inside.  The entities Ms. Smith had responsibility for

are circled on her deposition exhibit 3A, which is all except a couple of outliers.  *Id.* pp. 151-153;

See Exhibit 5, Smith deposition.

EQT Investment (EQTI) finances the intercompany loans.  *Id.* at 19.  "We paper the loans

for like large amounts of money."  *Id.* at 19.  If a subsidiary needed operating cash, EQTI would

provide them money.  These loans would be "eliminated when you get to the consolidated level."

*Id.* at 19-22.  Mr. Bergonzi was another F.R.C.P. 30(b)(6) witness.  When asked how EQT

Corporation gets its money, he testified that:

> A.     Well, the subsidiaries pay – can pay dividends to the corporation.  The
> corporation is actually the entity that borrows money from the public, so if
> there is a bond issue, that money comes into EQT Corporation and is
> passed down through inter-company loans.  So it is just like any other set

of companies accounted for.  Separately, there's receivables and payables.
There's interest bearing loans.  There's dividends paid.  There's payment
for expenses and fees.

(**Exhibit 6**, Deposition of Bergonzi, pp. 121-122.)

EQT subsidiary officers were common to several or all of the subsidiaries.  They reported to EQT Corporation's officers.  For example, EQT Gathering's president was Randy Crawford.  Randy Crawford, above, was also senior vice president of EQT Corporation.  (**Exhibit 5,** Smith Deposition, pp. 94-95.)  Mr. Crawford was also president of EQT Energy and he reported directly to Dave Porges, who was president and CEO of EQT Corporation.  (**Exhibit 5**, Deposition of Smith, p. 66.)  He was also president of Midstream and Commercial organizations and the Distribution organizations, essentially all subsidiaries except Midstream Partners.  *Id*. 92.  Ms. Smith, as another example, was vice president and controller of Midstream, Commercial and Distribution.  Basically, she was vice present and controller of all subsidiaries except for EQT Midstream Partners.  *Id*. 69.   Dan Greenblatt was the treasurer of essentially all of the subsidiaries.  *Id*. 92.  Nicole King was secretary of essentially all of the subsidiaries.  (**Exhibit 7**, Deposition of King, p. 6.)  Even the publicly traded EQM Partners was controlled by EQT Corporation.  Its employees ran the partnership and four of the seven directors were EQT Corporation employees or officers.  *Id*. 155-156.

Not only does EQT Corporation operate through departments or divisions and by limited liability companies, including defendants, but, it operates also through business segments or "groups" which cross corporate and subsidiary boundaries.  *Id.* 159-160.  Ms. Smith testified that she knew employees responsible for the groups.  For example, Paul Kress was responsible for EQT Energy and Commercial until Natalie Jeffries took over responsibility.  On the gathering side, it is David Gray, all of which are in the same building in Pittsburgh as Ms. Smith.  *Id.* 159.  Mr. Bergonzi testified:

> Q.      You mentioned a Gas Measurement group, and, you know, in reading and taking the depositions of others, there are -- there is this group and that group and the other group, various groups that are given the responsibility to do various things in this company, EQT Corporation, and then the subsidiaries, and then, like I said, there are groups that do certain things that are utilized throughout all the different subsidiaries. Is that fair to say?
>
> A.      Yes, that is fair to say.

(**Exhibit 6**, Bergonzi Deposition, p. 182, ln. 20 – p. 183, ln. 5.)

The above factors in the Maynard case fit this case.  EQT Corporation owns all of the stock of all the subsidiaries.  They have more than merely common directors and officers.  The officers of the subsidiaries actually report to the CEO and President of EQT Corporation.  The subsidiary defendants are financed by loans from EQT Corporation and the taxes and financial statements are consolidated.  EQT Corporation caused the incorporation of the subsidiaries and the subsidiaries even depend on EQT Corporation for approval of even their budgets and business plans.  They are required to meet with other subsidiaries and bargain for what they can get the next year and what they can expend and then, every budget and business plan must be approved by EQT Corporation.  EQT Corporation obviously borrows money and passes it down as loans and there are inter-subsidiary loans and it is therefore liable ultimately for the subsidiaries' losses and pays the parent its dividends.  Essentially, all of defendants' business is with EQT Corporation or sister companies. EQT Corporation refers to its subsidiaries as "groups" and business segments.  They are in the same building as the parent.  A review of EQT Corporation's SEC 10K demonstrates that it refers to all subsidiary business as its own,  (see **Exhibit 8**, p. 3,) and subsidiary officers do not and cannot act independently of the parent and they actually report to the Corporate officer.

Therefore, plaintiffs have alleged and provided more than sufficient evidence that EQT Corporation is the alter ego of the subsidiary defendants and that EQT Corporation is liable for all acts of subsidiaries.

**(1)     The Deductions**

Mr. Piccirilli's group, Planning and Analysis, is regularly, on a yearly or monthly basis, provided information from various groups and from each of the three EQT districts in West Virginia for the purpose of preparing an "estimate," of next year's gathering rates.  Ultimately, therefore, what plaintiffs and the class are charged as deductions is admittedly an "estimate." Further, if the "estimate" is more than is actual, there is no refund or credit back to the plaintiffs or the class. As the Court is likely aware, in *Tawney v. CNR*, 219 W. Va. 266, 633 S.E.2d 22, in Syl.2, the West Virginia Supreme Court made clear that any cost deductions must be actually incurred by the lessee.  Further, the lessee bears the burden of proof.

> "If an oil and gas lease provides that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, the lessee shall be entitled to credit for those costs to the extent that they were <u>actually incurred and they were reasonable</u>. Before being entitled to such credit, however, the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable." Syllabus Point 5, <u>*Wellman v. Energy Resources, Inc.,*</u> 210 W.Va. 200, 557 S.E.2d 254 (2001).

> Further, the Court stated in Syllabus 10:

> "Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs."

Mr. Piccirilli stated that his group calculates revenue for <u>all</u> gathering and cost of service rates for EQT.  (**Exhibit 9**, Deposition of Joe Piccirilli, p. 85.)  Mr. Piccirillo also described how he accumulates the data he uses in totaling the costs for each of the districts, "[c]osts can come from a variety of sources.  We have operating costs, direct operating costs which come from our operations team."  *Id*. 25.  Operations are the pipeline and compressor operators, people in the field operating the defendants' assets.  *Id*.  EQT also has indirect costs and what he referred to as "S G & A," which is Selling, General, and Administration costs.  *Id*. 33.

EQT Production provides the production volume used as a denominator to calculate a rate per district.  But the costs come from many different sources.  *Id*. 32.  It is not therefore, merely the amount of deductions which is an issue in this case.  The accuracy of the number is also a principal issue.  Besides the issue of whether they are allowed to deduct any amount, there are two areas of inquiry that pertain to whether EQT has been taking proper deductions:  (1) are they including categories of cost which are not permitted since only "actual" costs are allowed; and (2) are they inflating the costs which they are charging?  As stated above, defendants have the burden on that issue.  This should apply to any circumstance where one party has control of the accounting and money for another party.

Plaintiffs have deposed defendants' 30(b)(6) witnesses on these issues, two of which are Mr. Piccirilli and Mr. Bergonzi.  Mr. Piccirilli described the overall mechanical methodology that he uses in determining the gathering rate or cost of service rate.  Mr. Piccirilli explained that his group receives financial and detail cost information from each district and from a "laundry list" of costs which he then incorporates into a proposed gathering rate or cost of service rate and he then forwards that proposal to EQT Production who may change it and then proposes to the

11

Board of Directors and EQT Corporation the charges to be deducted from the royalty owners' (lessors') royalty checks. *Id*. 36-37.

Mr. Piccirilli stated that he maintains files, "support files," data source files that help support the calculation of the gathering and cost of service rates. *Id*. 20. The manner of calculating the rates have not changed since he undertook the position. *Id*. 20-21. "[T]he overall type of costs that have gone into that calculation (of royalty gathering rate charges) have not changed." *Id*. 21. For the royalty interest, "there is generally a specific calculation instructions that we will make sure we provide that calculates rate, it is understood that here is how that rate was calculated, here is what was included." *Id*. 23. "Generally, you would call it a gathering rate cost of service." *Id*. 23.

S G & A costs come from Midstream or "our corporate function or shared service groups." *Id*. 33. In addition, there is "O & M," Operation & Maintenance. *Id*. 35. As Mr. Piccirilli explained, "…there could be a laundry list of specific costs that would go into that O & M line item." *Id*. 36. Those specific costs that would roll up into the total would be determined with my team working with our operations group and with different groups within Midstream. *Id*. 37. And what would be provided would be unique to those individual departments." *Id*. 37. And, there exists a list of departments and divisions and "various sources" that provide Mr. Piccirilli with "cost data" and "cost information." *Id*. 33-34.

Importantly, Mr. Piccirilli and his department or group prepares a document that describes the gathering and costs of services "estimated" rate for EQT Production. *Id*. 39. It is also important to note that Mr. Piccirilli's testimony only refers to "gathering," not processing fees, transportation fees or other charges. *Id*. 46. Equitable determines those rates, subject to EQT Corporation's final approval.

When Mr. Piccirilli was asked how many different groups or departments provide information to him for inclusion in the gathering rate, his answer was, "it would be a lot." *Id*. p. 54, ln. 19.  What items are included many run from "O & M" expenses to a "cell phone." *Id*. 54-56.  This information may include "consultants."  Obviously, plaintiffs should be provided this information.  Otherwise, plaintiffs cannot evaluate what is being included in the deductions.

Mr. Piccirilli identified Mr. Bergonzi as the person most knowledgeable concerning what EQT Production does with the information that Mr. Piccirilli provides them. *Id*. 53-54.  "Within Production, …there is a revenue accounting group,…that group would be knowledgeable about how that information is taken and what they use on a month-to-month basis in terms of what is being billed back to royalty owners."  "[T]hat group…is the group that would handle that."

Mr. Bergonzi testified that the royalty owners paid royalty based upon what EQT Energy (wholly owned subsidiary of EQT Corporation) pays to EQT Production (another wholly owned subsidiary of EQT Corporation.)  EQT Energy pays EQT Production an amount which is purportedly only the price at "point of sale" on the interstate pipeline <u>minus the amount charged by EQT Gathering for delivering the gas to the interstate pipelines</u>.  (**Exhibit 6**, Deposition of John Bergonzi, pp. 46-47.)  Further, the defendants paid the plaintiffs royalty, not on the volume at the wellhead, but on the volume which was delivered to the interstate pipeline, which of course is less than the volume at the wellhead. *Id*. 52.  In addition, EQT stores gas in earthen rock formations where it stays until EQT Energy determines it can be sold for higher prices.

The "business plan" that Mr. Piccirilli described and plaintiffs requested is what ends up being presented to the Board of Directors of EQT Corporation.  Included in the business plan are the deduction charges and royalty issues which end up being the policies of EQT Corporation and all its subsidiaries.  Mr. Piccirilli stated that "if you are talking overhead or allocated costs,

13

then I would say our S G & A, most of those are going to be in our <u>corporate headquarters</u>," where EQT Corporation resides.  (Piccirilli deposition, p. 51.)  Mr. Piccirilli attended EQT board meetings to answer questions with respect to the budget which includes the gathering rates which are to be charged to royalty owners.  *Id.* 77-78.

Mr. Bergonzi explained that there are various categories of deductions that are taken from royalty owners besides "gathering" charges.  There are "compression" charges and "processing" charges, for example.  (Bergonzi deposition, p. 59.  Mr. Bergonzi confirmed that Mr. Piccirilli assembles the gathering charges into a service charge and provides it to EQT Production.  Then, Production provides it "to the Board as part of their overall business plan for the following year." *Id.* 59-60.

Mr. Bergonzi explained how EQT Corporation and its business segments and subsidiaries arrive at a cost of service and deductions:

A.      I have been in the board meetings and I have been in the prep meetings. I have been in both.

Q.      Okay. Describe for me what – what would go on in the prep meetings first.

A.      Well, each business unit would make a presentation, and the businesses would discuss whether they were happy or satisfied is probably a better word than happy.

(**Exhibit 6**, Deposition of John Bergonzi, p. 60, ln. 19 to p. 61, ln. 5.)

A.      We all want to be happy, but we rarely are -- whether they are satisfied. You almost have to go back even before that because these businesses are interdependent for their plans.   So the Gathering company has given the Marketing company and the Production company its numbers just to prepare a presentation to pass on to the next level. That business unit is going to have to sit down and look at that and make comments back to the other business unit even before it gets to the prep meetings.  So clearly that is where that first round of that cost is outrageous, we are not paying that, we are going to change how we plan our production and we are going to do this, we are going to do that to tweak those things. So the first cut at that will happen even before those pre-production meetings or pre-board meetings.  They will all be cleaning that up.  Then at the pre-board meeting, there will be presentations to try to present and justify the various plans that they have.  If the numbers still don't look like they are an

acceptable business plan, they will be sent back to make changes, to present things differently, to explain things better, and there will be a second round of pre-board meetings. Then when everybody is comfortable that they understand and find the plans acceptable, it will be whittled down to a level that is acceptable

for the corporation's board. That clearly is going to be at a much higher level and more refined than those pre-board meetings and, of course, the spreadsheets that are used to populate the pre-board meetings.

Q.     Okay, the pre-board meetings, who is involved in those? Who conducts those and who participates in them?

A.     Well, when I was there, all the corporate officers participated and the business unit heads for each of the business units, and then as each area was presented, the support team that was necessary to give support in case there were questions on that particular presentation, they would be there.

Q.     Okay, so as I understand, it would be--the business units would be Equitable Energy or EQT Energy, EQT Gathering, EQT Production. Would Midstream be present?

A.     Yeah -- yes. The company, as all organizations do, has changed its structure some over the years, but the financial statements of a corporation are done on something called segment reporting, and that can be a little different than how the business units are organized, but all of those groups would be represented.

Q.     So the officers of those subsidiaries would be present?

A.     Yes, the officers of the subsidiaries would be present, but, for instance, the Production company's numbers that are presented include certain activities that are done by EQT Energy.

*Id.* p. 61, ln. 5 to p. 63, ln. 19.

Q.     Well, the board has a right to approve the plan or not approve the plan?

A.     Yes, it does, yes.

*Id.* p. 66, ln. 21 to p. 67, ln. 16.

**3.     EQT Corporation and its Subsidiaries Were Involved in a Conspiracy and Fraud**

Defendants complained the plaintiffs had neither alleged a fraud or punitive damage

misconduct and had offered no proof of same. Plaintiffs alleged first of all that defendants were

15

acting as agents of the other, in a joint venture and conspiracy.  (Amended Complaint, Doc. Id.

52, ¶¶ 26, 27, 46, 47, 48.  Plaintiffs complained that:

> 30.    Contrary to their contractual, legal, statutory and common law duties and responsibilities, EQT, Production, and/or defendants' subsidiaries and/or defendants' other subsidiaries have and continue to take deductions, reduce plaintiffs' royalty payments, overcharge plaintiffs for the deductions that they do charge plaintiffs, and otherwise reduces plaintiffs' royalty on volume and/or price and/or by taking unauthorized deductions.

> 32.    EQT Corporation and/or EQT Production, the defendants' subsidiaries and other subsidiaries undertook a design and plan to continue to avoid payment to lessors, like plaintiffs, all of the royalty due them by establishing various subsidiaries for the purpose of selling its gas and charging off to lessors the expenses which the law of West Virginia does not allow unless the lease specifically provides for the same and then only when the amounts deducted are reasonable and actually incurred.

> 33.    EQT Corporation, EQT Production, contrary to their duty and responsibility, intentionally and in violation of West Virginia state law sold gas to EQT Energy, EQT Corporation and EQT Production, and directly or indirectly paid EQT Gathering Subsidiaries for gathering and other charges which were not permitted to be taken from plaintiffs' royalty, all for the purpose of not paying plaintiffs the true and exact royalty that the law of West Virginia provides that they are entitled to.

> 34.    Defendant EQT Gathering Subsidiaries and EQT Energy acted in concert and by plan and design charged EQT and Production and/or other subsidiaries of the latter for the deductions by charging back the costs for transporting the plaintiffs' gas to the point of sale, and EQT Energy purchased and sold plaintiffs' gas in order to reduce plaintiffs' royalty while it knew or should have known these charges were being deducted for and paid for by plaintiffs out of the amount defendants owed to plaintiffs for royalty. Therefore, EQT Gathering Subsidiaries and EQT Energy are liable to plaintiffs for the difference in the amount of royalty plaintiffs received and the amount plaintiffs were entitled to receive as a result of said subsidiaries' wrongful acts and omissions.

> 35.    Defendants have not paid to plaintiffs the royalties as required pursuant to said leases, and continue to not pay plaintiffs the royalty to which they are entitled.

> 37.    While not having the right to charge plaintiffs with costs and unilaterally deducting same from their payments, defendants charged plaintiffs with costs and charges which were unreasonably excessive and unlawful and which amounted at times to as much as approximately 25% to 30% of the total amount of royalty due and owing to plaintiffs.

> 38.    Defendants had an affirmative duty to pay to plaintiffs the true and correct royalty due them, either by virtue of the lease agreement, by virtue of W. Va. Code Ann. § 22-6-8, and/or by virtue of the contractual duty of good faith and fair dealing in all contracts, and by virtue of the fiduciary duty and responsibility of the lessee in any oil and gas lease who assumes the duty of handling the sales and accounting functions of the parties.

> 39.    As part of the legal responsibilities of defendants, they agreed to and/or had the duty to account for all of the sales of gas from said wells and to accurately

account for said wells and to act as a fiduciary for plaintiffs' moneys owed to plaintiffs as a result of royalties due to plaintiffs.

      41.    Defendants intentionally violated their contractual duty to plaintiffs.

      42.    <u>Defendants concealed, suppressed, and omitted material facts with intent that plaintiffs would rely upon same in connection with the bases for charging plaintiffs for specific services</u> for marketing, transporting and processing and for other service charges associated with the calculation of plaintiffs' royalties and deductions therefrom.

      43.    <u>Plaintiffs relied upon defendants to truly, accurately, and properly carry out its contractual and fiduciary duties and responsibilities and to account to plaintiffs for payments due to plaintiffs</u> and for any material deductions or reductions in royalty.

      44.    As a result of the aforesaid conduct of defendants, plaintiffs were damaged in that they were deprived of and are owed royalty payments from defendants and are owed interest from said deficiencies in said royalty payments.

      45.    The acts and conduct of defendants were willful and wanton and in utter disregard of plaintiffs' rights.

Defendants set about with the specific intent to retain moneys belonging to plaintiffs by trickery. EQT Corporation set up a marketing company, EQT Energy, to falsely claim it is buying all of the EQT Production's gas at the wellhead for the purpose of avoiding the implication of *Tawney v. CNR*. In the U.S. District Court, Southern District of West Virginia in the McDonald v. EQT, case, (Exhibit I to defendants' motion for summary judgment, Doc. Id. 152-9) the Court stated:

> "Finally, the defendants argue that *Tawney* is inapplicable because EQT Production sells gas at the wellhead and, since 2005, has taken no monetary deductions from royalties. However, EQT Production sells the gas at the wellhead to EQT Energy, a sister company. The defendants cannot calculate royalties based on a sale between subsidiaries at the wellhead when the defendants later sell the gas in an open market at a higher price. Otherwise, gas producers could always reduce royalties by spinning off portions of their business and making nominal sales at the wellhead. I predict with confidence that, if confronted with this issue, the Supreme Court of Appeals would hold the same. *See Howell v. Texaco, Inc.*, 112 P.3d 1154 (Okla. 2004) ("an intra-company contract is not an arm's length transaction, [and] it is not a legal basis on which [a producer] can calculate royalty payments"); *Beer v. XTO Energy, Inc.*, CIV-07-798-L, 2010 WL 476715 (W.D. Okla. Feb. 5, 2010) (gas sale at wellhead between two controlled, affiliated companies not appropriate for royalty calculation)."

> "Further, in order to determine a wellhead price at which EQT Production sells gas to EQT Energy, defendants essentially admit they continue to deduct post-production expenses. To determine the wellhead price, the defendants use a

"work-back method" which "involves subtracting postproduction costs that enhance the value of the gas from the interstate connection price." (Mem. in Supp. of Defs.' Joint Mot. for Summ. J. [Docket 170], at 25). Absent lease language to the contrary, *Tawney* requires lessees to pay royalties free of these costs. The defendants cannot avoid *Tawney* by simply reorganizing their businesses and making intra-company wellhead sales. Accordingly, I **FIND** that *Tawney*'s specificity requirements apply to royalty payments made under the defendants' work-back method after 2005."

The essential elements in an action for fraud are:

(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it.' *Horton v. Tyree*, 104 W.Va. 238, 242, 139 S.E. 737 (1927)." Syl. Pt. 1, *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66 (1981).

Syl. Pt. 5, *Kidd v. Mull*, 215 W.Va. 151, 595 S.E.2d 308 (2004).

As to the scope and breadth of fraudulent acts and omissions, the West Virginia Supreme Court of Appeals has acknowledged:

"Fraud" is a generic term, encompassing many different and ever-innovative forms:

[W]hile it has often been said that fraud cannot or should not be precisely defined, the books contain many definitions, such as unfair dealing; malfeasance, a positive act resulting from a wilful intent to deceive; an artifice by which a person is deceived to his hurt; a wilful, malevolent act, directed to perpetrating a wrong to the rights of others; anything which is calculated to deceive, whether it is a single act or a combination of circumstances, or acts or words which amount to a suppression of the truth, or mere silence; deceitful practices in depriving or endeavoring to deprive another of his known right by means of some artful device or plan contrary to the plain rules of common honesty; the unlawful appropriation of another's property by design; and making one state of things appear to a person with whom dealings are had to be the true state of things, while acting on the knowledge of a different state of things. Fraud has also been said to consist of conduct that operates prejudicially on the rights of others and is so intended; a deceitful design to deprive another of some profit or advantage; or deception practiced to induce another to part with property or to surrender some legal right, which accomplishes the end desired. Fraud therefore, in its general

18

sense, is deemed to comprise anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence justly reposed, resulting in damage to another, or by which an undue and unconscientious advantage is taken of another. . . .

. . . Fraud may be said to be an action of a more affirmative evil nature, such as proceeding or acting dishonestly, intentionally, and deliberately, with a wicked motive, to cheat or deceive one party to a transaction with respect to the situation or operations, or such as an action which results to his damage or loss and to the advantage or gain of the other party.  37 Am.Jur.2d, Fraud and Deceit § 1 (1968) (footnotes omitted).

*Wallace v. Wallace*, 170 W.Va. 146, 147-48, 291 S.E.2d 386, 387-88 (1982).  *See also Hale v. Hale*, 62 W.Va. 609, 59 S.E. 1056, 1061 (1907) ("Fraud assumes so many different hues and forms that courts are compelled to content themselves with comparatively a few general rules for its discovery and defeat, and allow the facts and circumstances peculiar to each case to bear heavily on the conscience and judgment of the court or jury in determining its presence or absence.").

As similarly noted more recently,

"Fraud" is an elusive and shadowy term.  With reference to the general significance of the term, there can be no all-embracing definition of "fraud," but each case must be considered upon its own peculiar facts.  The term "fraud" is a generic one that is used in various senses.  In addition, fraud assumes so many different degrees and forms that courts, compelled to content themselves with comparatively few general rules for its discovery and defeat, allow the facts and circumstances peculiar to each case to bear heavily on the conscience and judgment of the court or jury in determining its presence or absence.  **"Fraud," is not limited to misrepresentations and misleading omissions, embraces all of the multifarious means that human ingenuity can devise and that are resorted to by one individual to gain advantage over another by false suggestions or by suppression of truth.  In fact, the fertility of people's invention in devising new schemes of fraud is so great that courts have always declined to define the term, reserving to themselves the liberty to deal with fraud in whatever form it may present itself**.

37 Am.Jur.2d, *Fraud and Deceit* § 1 (2007) (emphases added; footnotes omitted).

19

> Generally speaking, "[f]raud has been defined as including all acts, omissions, and concealments which involve a breach of legal duty, trust or confidence justly reposed, and which are injurious to another, or by which undue and unconscientious advantage is taken of another." *Stanley v. Sewell Coal Co.*, 169 W.Va. 72, 76, 285 S.E.2d 679, 682 (1981) (citations omitted). *Accord Dickel v. Smith*, 38 W.Va. 635, 641, 18 S.E. 721, 723 (1893).

*Kessel v. Leavitt*, 204 W.Va. at 127, 511 S.E.2d at 752.

The West Virginia Supreme Court of Appeals has also held:

> "'**an action for fraud can arise by the concealment of truth**.'" *Teter [v. Old Colony Co.*, 190 W.Va. 711, 717, 441 S.E.2d 728, 734 (1994)] (quoting *Thacker v. Tyree*, 171 W.Va. 110, 113, 297 S.E.2d 885, 888 (1982)). Such a basis for a claim of fraud is possible because **"[f]raud is the concealment of the truth, just as much as it is the utterance of a falsehood**." *Frazier v. Brewer*, 52 W.Va. 306, 310, 43 S.E. 110, 111 (1902). . . .

*Kessel v. Leavitt*, 204 W.Va. at 127, 511 S.E.2d at 752 (emphases added).

As to claims of negligent misrepresentation, the West Virginia Supreme Court of Appeals has held:

> Fraud can be either in the inducement of a contract or in the execution of a contract. *Tolley v. Poteet*, 62 W.Va. 231, 57 S.E. 811 (1907). . . .

> **It is not essential that the defendant know for a fact that the statement or act alleged to be fraudulent is false**. An action for fraud may lie where the defendant either knows the statement to be false, **makes the statement without knowledge as to its truth or falsity, or makes it under circumstances such that he should have known of its falsity**. State v. Berkeley, 41 W.Va. 455, 23 S.E. 608 (1895).

> "(I)t is very uniformly held that if it is represented that a certain state of facts is true, and this representation is made for the purpose of inducing another to act thereon, or under such circumstances as that the party making it must know that the other is likely to act thereon, he will be entitled to recover the damages suffered by him, **notwithstanding the party making the representation had no actual knowledge of the real conditions at the time. He is under a duty to know that the things he represents as facts are in fact true at the time he makes the representation. It is no excuse for him to say that he did not know they were false**."

Osborne v. Holt, 92 W.Va. 410, 415-416, 114 S.E. 801 (1922).

*Lengyel v. Lint*, 167 W.Va. 272, 277, 280 S.E.2d 66, 69 (1981) (emphases added).

The fact that a party to an existing contract can commit acts or omissions of fraud and deceit during its performance that result not only in a breach of the contract but which constitute an independent tort sounding in fraud and which justifies an award of punitive damages is aptly demonstrated in *Grynberg v. Citation Oil and Gas Corp.*, 573 N.W.2d 493, 497-503 (S.D. 1997), and *Okland Oil Company v. Conoco Inc.*, 144 F.3d 1308, 1314-15 (10th Cir. 1998) (also finding that punitive damages were appropriate on claims of fraud and deceit despite the underlying dispute allegedly arising upon ambiguous language in a contract).

As to punitive damages, the West Virginia Supreme Court has held:

"[i]n actions of tort, where gross fraud, malice, oppression, or wanton, willful or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages. . . ."  Syllabus Point 4, in part, *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895).

Syl. Pt. 1, *Wells v. Smith*, 171 W.Va. 97, 297 S.E.2d 872 (1982), *overruled on other grounds*, *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991).  *Accord* Syl. Pt. 7, *Michael v. Sabado*, 192 W.Va. 585, 453 S.E.2d 419 (1994); *Wilt v. Buracker*, 191 W.Va. 39, 50-51, 443 S.E.2d 196, 207-08 (1993).  The Court has also acknowledged that punitive damages may be awarded for not only intentional or reckless misconduct, but also for misconduct involving gross or extreme negligence. *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 474, 419 S.E.2d 870, 887 (1992); *Hensley v. Erie Insurance Co.*, 168 W.Va. 172, 182-84, 283 S.E.2d 227, 233 (1981).

1.   **AGENCY**

As to the existence of an agency relationship, the West Virginia Supreme Court of Appeals has held in cases in which a dispute exists as to whether an individual was an agent or employee that "the determining factor to be considered . . . is whether the right of control or supervision over the work done existed in the person for whom the work was done, and not the use of such control and supervision." Spencer v. Travelers Ins. Co., 133 S.E.2d 735, 739 (W.Va. 1963). "[I]t is of no moment that an employer [or principal] does not actually exercise control. **The important consideration is whether he had the right to exercise such control and supervision**." Myers v. Workmen's Compensation Commissioner, 148 S.E.2d 664, 667 (W.Va. 1966). (Emphasis added)

2.   **JOINT VENTURE**

West Virginia recognizes the doctrine of joint venture and joint enterprise.  A joint venture exists when two or more persons or entities carry out a single business enterprise for profit, for which purposes they combine their property, money, effects, skill, and knowledge. Syl. Pt. 2, Price v. Halstead, 355 S.E.2d 380, 384 (W.Va. 1987); Syl. Pt. 4, Sipple v. Starr, 520 S.E.2d 884 (W.Va. 1999).  The Court also held that a joint venture "arises out of a contractual relationship between the parties."  The agreement may be oral or written.  Sipple. at Syl. 4. Importantly, the Supreme Court stated:

> We have noted that intrinsic to a joint venture is the concept of mutual efforts to promote the business, the success of which would accrue to the benefit of all. The contributions do not have to be equal or of the same character.

Id at Syl. Pt. 4. The negligence of one participant in a joint enterprise is imputed to all participants. Alban Tractor Co. v. Sheffield, 263 S.E.2d 67, 68 (Va. 1980).  The liability for one engaged in a joint enterprise, for the acts of his associates, is founded on the principles of

agency.  46 <u>Am. Jr.</u> § 57, Joint Ventures.  In accordance with the general rule that each member of a joint venture acts as both principal and agent of their co-venturers and for their benefit, it is held that each of several joint venturers has power to bind the others and to subject them to liability to third persons for injuries sustained as a result of the negligence of one of the co-venturers.  <u>Id.</u> at § 58.  Moreover, on principles similar to those by which one joint venturer is bound by the acts of another, knowledge of one co-venturer within the scope of the common enterprise is the knowledge of all.  <u>Id.</u> at § 57.  Again, unless reasonable minds could not differ, the question of whether a joint venture or enterprise relationship exist is one for the jury.

### 3.   CONSPIRACY

"A civil conspiracy requires an object to be accomplished, a meeting of minds on the object or course of action, one or more overt acts, and damages as the proximate result thereof." *Welding Fume Products Liability Litigation*, 526 F.Supp. 2d 775 (n>D. Ohio 2007.)

The business plan process described above and defendants' conduct demonstrates that EQT Corporation is the alter ego of the subsidiaries involved and secondly, they are all involved in a conspiracy or joint venture or they are acting as agents of one another to commit the civil fraudulent conduct alleged.  Plaintiffs were clearly damaged by defendants' conduct in that defendants still have their money from defendants' scheme to retain their royalty payments under false pretenses claiming that they were so entitled when clearly they were not.  Plaintiffs were damaged by defendants' acts.  (**Exhibit 10**, Affidavit of Dan Selby.)

### CONCLUSION

Plaintiffs therefore respectfully request that the Court deny defendants' motions for summary judgment as requested herein on all the grounds that defendants have asserted.

PATRICK D. LEGGETT;
KATHERINE F. LEGGETT;
GEORGE D. MCKAIN, by his
attorney in fact, ANITA
KATHRYN MCKAIN GREER;
and ADELE S. MCDOUGAL,

By Counsel

/s/ Marvin W.  Masters
West Virginia State Bar No. 2359
Richard A. Monahan
West Virginia State Bar No. 6489
The Masters Law Firm lc
181 Summers Street
Charleston, West Virginia  25301
304-342-3106

Michael W. Carey
West Virginia State Bar No. 635
Carey, Scott, Douglas & Kessler, PLLC
707 Virginia Street East, Suite 901
Charleston, West Virginia  25301
304-345-1234
Counsel for Plaintiffs
F:\5\864\b008.docx

## <u>CERTIFICATE OF SERVICE</u>

I, Marvin W. Masters, hereby certify that on December 15, 2015, I electronically filed "Plaintiffs' Response In Opposition To Defendants', EQT Corporation, EQT Energy, LLC, EQT Investment Holdings, LLC and EQT Midstream Partners, LP's, Motion For Summary Judgment" with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

> David K. Hendrickson
> Carl L. Fletcher, Jr.
> Hendrickson & Long PLLC
> 214 Capitol Street
> Post Office Box 11070
> Charleston, West Virginia  25339
> daveh@handl.com
> cfletcher@handl.com
> Counsel for Defendants

> Michael W. Carey
> Carey, Scott, Douglas & Kessler, PLLC
> 707 Virginia Street East, Suite 901
> Charleston, West Virginia  25301
> mwcarey@csdlawfirm.com
> Counsel for Adele S. McDougal

> /s/ Marvin W. Masters
> West Virginia State Bar No. 2359
> The Masters Law Firm lc
> 181 Summers Street
> Charleston, WV  25301
> 304-342-3106
> mwm@themasterslawfirm.com