IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

PATRICK D. LEGGETT,
KATHERINE F. LEGGETT,
GEORGE D. McKAIN,
by his attorney in fact,
ANITA KATHRYN McKAIN GREER,
and ADELE S. McDOUGAL,

      Plaintiffs,

v.                             Civil Action No. 1:13CV4
                                     (STAMP)

EQT PRODUCTION COMPANY,
a Pennsylvania corporation,
EQT CORPORATION,
a Pennsylvania corporation,
EQT ENERGY, LLC,
a Delaware limited liability company,
EQT INVESTMENTS HOLDINGS, LLC,
a Delaware limited liability company,
EQT GATHERING, LLC,
a Delaware limited liability company
and EQT MIDSTREAM PARTNERS, LP,
a Delaware limited partnership,

      Defendants.


## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART DEFENDANT EQT PRODUCTION COMPANY'S
## MOTION FOR SUMMARY JUDGMENT,
## GRANTING REMAINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
## AND DEFERRING A RULING AS TO THE BREACH OF CONTRACT CLAIM
## AGAINST DEFENDANT EQT PRODUCTION COMPANY

### I.  Procedural History

The defendants removed this action from the Circuit Court of

Doddridge County, West Virginia. In their complaint, the

plaintiffs assert that the defendants failed to pay the plaintiffs

the full amount of royalties due to them under the terms of an oil

and gas lease. Pursuant to their lease, the plaintiffs allege that

the defendants have done the following: (1) improperly calculated the owed royalties; (2) taken unauthorized deductions for post-production costs from the plaintiffs' royalties; (3) reduced the volume and price of their oil and gas operations as they affect the royalties; and (4) misrepresented the accounting of the royalties. As a result of those actions, the plaintiffs initially asserted four claims in their complaint. Those claims are for breach of contract, breach of fiduciary duties, fraud, and punitive damages, respectively. The plaintiffs also sought relief under the West Virginia Consumer Credit Protection Act ("WVCCPA"). Later, the plaintiffs filed an unopposed motion to amend the complaint, which this Court granted. ECF No. 50.[1]

EQT Production Company ("EQT") then filed a partial motion to dismiss regarding the plaintiffs' claims for breach of fiduciary duties, fraud, and a claim under the WVCCPA. ECF No. 68. Defendants EQT Corporation, EQT Energy, LLC, EQT Gathering LLC, EQT Investment Holdings, LLC, and EQT Midstream Partners, LP[2] ("non-lessee defendants") also filed a motion to dismiss as to all the claims asserted against them. ECF No. 70. Regarding their claim

_____

[1]Prior to ruling on the plaintiffs' motion to amend the complaint, the defendants filed motions to dismiss. Upon granting the plaintiffs' motion, this Court subsequently denied the defendants' previous motions to dismiss as moot.

[2]The parties stipulated to, and this Court accepted, the dismissal without prejudice of EQT Midstream Partners, LP. ECF No. 82.

under the WVCCPA, the plaintiffs responded that they did not intend to seek claims under the WVCCPA. This Court granted in part and denied in part the defendants' motions to dismiss. ECF No. 108. As a result of that order, the following claims remain against defendant EQT: (1) breach of contract and (2) fraud and/or misrepresentation. Regarding the non-lessee defendants, the following claims remain: (1) breach of contract[3] and (2) fraud and/or misrepresentation. Further, this Court did not dismiss the plaintiffs' claim for punitive damages against the defendants.

At issue now are EQT and the non-lessee defendants' motions for summary judgment. ECF Nos. 152 and 150, respectively. For the reasons set forth below, EQT's motion for summary judgment is GRANTED IN PART and the non-lessee defendants' motion for summary judgment is GRANTED IN ITS ENTIRETY. Further, a ruling as to the breach of contract claim against EQT is DEFERRED.

## II. Facts

The plaintiffs own undivided interests in oil and gas mineral deposits located in Doddridge County, West Virginia. EQT conducts its business through certain entities, which includes the non-lessee defendants. EQT is a wholly-owned subsidiary of defendant EQT Investments Holdings, LLC, and a subsidiary of defendant EQT

---

[3]It should be noted that the plaintiffs appear to also assert an agency and conspiracy theory of recovery under the breach of contract and fraud claims as to the non-lessee defendants. This Court will address those theories later in this opinion.

Corporation.  Defendants EQT Energy, LLC and EQT Gathering, LLC are distinct entities associated with EQT that purchase, transport, gather, and market natural gas.  The facts show the following as to the defendants: (1) defendant EQT Corporation consolidates the financial statements for the subsidiaries as to their public filings; (2) EQT and several of the non-lessee defendants are located in the same office complex; (3) some of the subsidiary businesses share common officers; and (4) inter-company communications and financial activities occur among them.  ECF Nos. 163 and 165.

The plaintiffs leased the rights to produce, market, and sell their oil and gas from those mineral deposits.  More specifically, the lease agreement was originally entered into on October 31, 1906 ("1906 lease") between lessors Jackson Leeson, Avaline A. Leeson, Ann J. Smith and T.B. Smith and Philadelphia Company of West Virginia.  The 1906 lease has since been amended by four "Amendment and Ratification of Oil and Gas Lease" agreements ("amendment agreements").  Those four amendment agreements represent one for each plaintiff as captioned in this civil action.  The amendment agreements are dated from January 2009 to April 2011.  Further, each amendment agreement identifies EQT as the lessee, and EQT signed each amendment agreement.  Each amendment agreement states that the lessor and lessee "desire to ratify the [1906 lease] as

being in full force and effect and to amend and modify certain provisions of the same." ECF No. 152 Ex. K.

The 1906 lease states the following:

> And it is agreed, that the lessee shall pay to the lessor for each and every well drill upon said land which produces Natural Gas, in a quantity sufficient to convey to market, a money royalty computed at the rate of Three Hundred Dollars ($300.00) per annum[.]

ECF No. 163 Ex. A. The amendment agreements do not appear to affect the royalty provision quoted above. Rather, the amendment agreements primarily address utilization and pooling, which are not relevant to the issues in this civil action.

Previously, a class action involving the parties of this civil action was settled in 2008. That settlement relieved EQT from any liability as to any claims preceding December 8, 2008. The settlement agreement for the 2008 class action state the following, in relevant part:

> The undersigned Class Member hereby RELEASES Equitable Production Company, Inc., and Equitable Resources, Inc. . . . and their predecessors, successors, and past and present subsidiaries . . . . from any and all claims, causes of action, damages, or demands of whatsoever kind and character . . . for improper royalty payments, improper deductions, improper measurement, improper accounting . . . breach of lease agreements, breach of fiduciary duty, fraud, violation of the [WVCCPA], violation of the flat rate statute (W. Va. Code § 22-6-8), and punitive damages all related to the failure to pay proper royalty. **It is understood that the Release shall only be applicable to the claims and for the time period which the Released Parties have paid the full and just consideration provided for under this Agreement**.

ECF No. 152 Ex. J.  The settlement agreement states that it pertains to royalty payments paid or due between February 1, 2000 and December 8, 2008.  Id.  Therefore, the current civil action is brought for damages "which occurred after December 8, 2008."  ECF No. 163.  Following that settlement, three of the amendment agreements contain the following identical provision:

> Lessor and Lessee hereby (i) ratify and agree that the Lease is valid and in effect, (ii) **agree that Lessee is not in violation of any terms or provisions of the Lease, including any royalty or rental payment terms thereof**, (iii) ratify and affirm all of the terms and provisions of the Lease to the extent that they are not changed, altered or amended by this Amendment.

ECF No. 152 Ex. K (emphasis added) ("non-violation provision").  It should be noted that the amendment agreement regarding plaintiffs Patrick D. Leggett and Katherine F. Leggett does not contain the provision stating that EQT "is not in violation of any terms or provisions of the Lease, including any royalty or rental payment terms thereof."  Other than that, the amended agreements appear to contain the same material terms.

Generally speaking, the plaintiffs allege in this civil action that EQT and the non-lessee defendants operated by "selling [EQT's] gas and charging off to lessors the expenses" that the non-lessee defendants incurred through EQT's post-extraction operations.  ECF No. 52.  As a result of the defendants' actions, the plaintiffs assert that they received lower royalty payments, thereby breaching the terms of the lease.

6

At issue in this civil action is West Virginia Code § 22-6-8, which is more commonly referred to as "the flat rate statute." The statute states in relevant part that the "owner of the oil or gas in place" (the plaintiffs) are to receive the following:

> [N]ot less than one eighth of the **total amount** paid to or received by or allowed to the owner of the working interest **at the wellhead for the oil or gas so extracted**, produced or marketed before deducting the amount to be paid to or set aside for the owner of the oil or gas in place, on all such oil or gas to be extracted, produced or marketed from the well.

W. Va. Code § 22-6-8(e)(2016) (emphasis added). As will be discussed below, the primary dispute between EQT and the plaintiffs concerns what "at the wellhead" means in relation to when or if certain costs may be deducted from the royalties.

For the reasons set forth below, EQT's motion for summary judgment is GRANTED IN PART, and the non-lessee defendants' motion for summary judgment is GRANTED IN ITS ENTIRETY. As to the breach of contract claim against EQT, a ruling as to that claim is DEFERRED.

## III. <u>Applicable Law</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure,

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991), cert. denied, 502 U.S. 1095 (1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). However, as the United States Supreme Court noted in Anderson, "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Id. at 256. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250; see also Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979) (Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." (citing Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir. 1950))).

8

In Celotex, the Supreme Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. Discussion

At issue now are (1) the non-lessee defendants' motion for summary judgment, and (2) EQT's motion for summary judgment. ECF Nos. 150 and 152. Those motions are discussed in the order presented.

### A. Non-Lessee Defendants' Motion for Summary Judgment

In their motion for summary judgment, the non-lessee defendants first argue that the plaintiffs' breach of contract claim is barred by the statute of frauds. Those defendants point out that they are not signatories to the 1906 lease or amendment agreements at issue, and that the West Virginia statute of frauds (W. Va. Code § 36-1-3) bars the plaintiffs' claim. The non-lessee defendants alternatively argue that no privity of contract exists between them and the plaintiffs. Although EQT is a subsidiary of

9

the non-lessee defendants, they assert that they are all separate entities for privity purposes. As to the plaintiffs' alter ego argument, the non-lessee defendants assert that the plaintiffs offer insufficient evidence. Next, the non-lessee defendants contend that the plaintiffs offer insufficient evidence to establish their fraud and misrepresentation claim, as well as their request for punitive damages.

The plaintiffs respond by first arguing that the non-lessee defendants are alter egos of EQT. Among other factors, the plaintiffs point to the calculation of royalty deductions and the alleged commingling of funds and activities among the entities. All of the defendants allegedly used the same deduction policy, which the plaintiffs believe supports recovery under an alter ego theory. The plaintiffs also rely on theories of agency, joint venture, and conspiracy to prove that EQT and the non-lessee defendants are equally liable under the breach of contract claim. Second, as to the fraud, misrepresentation, and punitive damages claims, the plaintiffs cite to several cases to show that those claims should proceed.

1. <u>Breach of Contract</u>

The plaintiffs' breach of contract claim against the non-lessee defendants rests on several theories of recovery. However, their claim falls short because (1) the non-lessee defendants are not signatories to the 1906 lease and amendment agreements at

10

issue; (2) the plaintiffs' agency and conspiracy theories fail as a matter of law; and (3) the non-lessee defendants are not "alter-egos" of EQT.

a. <u>The Non-Lessee Defendants Are Not Signatories</u>

West Virginia law provides that "[o]ne not a party to a contract nor in privity with either of the parties thereto may not maintain a suit at law thereon, unless the promise or undertaking relied upon is made for his sole benefit." Syl., <u>Petty v. Warren</u>, 110 S.E. 826 (W. Va. 1922). Phrased as a more general rule, a "non-signatory to a contract cannot be named as a defendant in a breach of contract action[.]" <u>TransformaCon, Inc. v. Vista Equity Partners, Inc.</u>, 2015 WL 4461769, at *3 (S.D.N.Y. July 21, 2015); <u>accord</u> <u>Abraham Zion Corp. v. Lebow</u>, 761 F.2d 93, 103 (2d Cir. 1985). Regarding oil and gas leases, such a lease is both a conveyance and a contract. <u>Bryan v. Big Two Mile Gas Co.</u>, 577 S.E.2d 258, 265 (W. Va. 2001); <u>Jolynne Corp. v. Michels</u>, 446 S.E.2d 494, 499-500 (W. Va. 1994). Because of the contractual nature of oil and gas leases, principles of contract law generally govern their interpretation. <u>See</u> <u>id.</u>; <u>Chesapeake Appalachia, L.L.C. v. Hickman</u>, 2015 WL 7366450, --- S.E.2d --- (W. Va. Nov. 18, 2015); <u>Iafolla v. Douglas Pocahontas Coal Corp.</u>, 250 S.E.2d 128 (W. Va. 1978) (applying contract principles to an oil and gas lease). Moreover, the West Virginia Statute of Frauds ("statute of frauds") states the following:

No contract for the sale of land, or the lease thereof
for more than one year, shall be enforceable unless the
contract or some note or memorandum thereof be in writing
and **signed by the party to be charged thereby, or by his
agent**.  But the consideration need not be set forth or
expressed in the writing, and it may be proved by other
evidence.

W. Va. Code § 36-1-3 (2016) (emphasis added).

The facts show that the non-lessee defendants are not signatories to either the 1906 lease or the amendment agreements at issue.  Rather, the only parties to the 1906 lease and amendment agreements are EQT and the plaintiffs.  The non-lessee defendants correctly point out that the 1906 lease and amendment agreements at issue are considered contracts for the lease of land that extend beyond one year in duration.  The statute of frauds clearly applies to the 1906 lease and amendment agreements at issue.  Moreover, the non-lessee defendants, as the alleged "party to be charged," are neither signatories to the 1906 lease and amendment agreements nor even mentioned in them.  Therefore, the plaintiffs alleged contract between the non-lessee defendants does not comply with the statute of frauds.  Thus, the breach of contract claim against the non-lessee defendants fails on that ground alone.

The statute of frauds does, however, allow the agent of the party to be charged to sign a contract.  The next issue, as discussed below, becomes whether the non-lessee defendants are agents of EQT.

b. <u>An Agency Relationship Is Not Present</u>

Generally speaking, "it is the general rule that a parent corporation and its subsidiary will be treated as separate legal entities." <u>Rodriguez v. JP Morgan Chase & Co.</u> 809 F. Supp. 2d 1291, 1299 (S.D. Cal. 2011). However, "just as one corporation can hire another to act as its agent, a parent can commission its subsidiary to do the same." <u>In re South African Apartheid Litigation</u>, 633 F. Supp. 2d 117, 121 (S.D.N.Y. 2009); <u>see</u> Restatement (Second) of Agency § 14M (2015) ("a subsidiary may become an agent for the corporation which controls it, or the corporation may become the agent of the subsidiary."). As stated by the United States Court of Appeals for the District of Columbia, the "relationship of principal and agent" does not exist unless, at a minimum:

> the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.

<u>Transamerica Leasing, Inc. v. La Republica de Venezuela</u>, 200 F.3d 843, 849-50 (D.C. Cir. 2000). "Circumstantial evidence of a principal-agent relationship includes" the following: (1) "the exclusive dedication of a subsidiary to assisting the parent company;" (2) "payment of the subsidiary's expenses by the parent company;" and (3) "requests for approval of the parent company for

13

important decisions by the subsidiary." <u>In re South African Apartheid Litigation</u>, 633 F. Supp. 2d at 121 (citing <u>Wiwa v. Royal Dutch Petroleum Co.</u>, 226 F.3d 88, 95-96 (2d Cir. 2000); <u>In re Parmalat Secs. Litig.</u>, 375 F. Supp. 2d 278, 295 (S.D.N.Y. 2005)).

The facts do not show that EQT intended for the non-lessee defendants to act on behalf of EQT, or vice versa. The plaintiffs point out that EQT and the non-lessee defendants communicated between each other. Specifically, the plaintiffs point out that many officers were common among the non-lessee defendants, that EQT owns a significant amount of the stock of the non-lessee defendants, and that the defendants often operate in accord with one another. However, those facts do not indicate that EQT had the intent to make the non-lessee defendants its agent, or vice versa. Moreover, the general rule is to treat a parent corporation and its subsidiary as separate entities. Simply maintaining connections, both working and financial, between a corporation and its subsidiaries does not, in and of itself, indicate an agency relationship. Here, the plaintiffs have not brought forward any material facts that such a relationship was intended or formed among the defendants. Therefore, neither EQT can bind the non-lessee defendants as their agent nor can the non-lessee defendants do the same to EQT.

c. <u>The Non-Lessee Defendants Are Not Alter Egos of EQT</u>

The plaintiffs next contend that the non-lessee defendants are alter egos of EQT, and thus are bound by the 1906 lease and amendment agreements. Although the theories of agency and alter ego adhere to similar principles of law, they maintain slightly different analyses. West Virginia law recognizes that "separately incorporated business are separate entities and that corporations are separate from their shareholders." Syl. Pt. 3, <u>Southern Elec. Supply Co. v. Raleigh County Nat'l Bank</u>, 320 S.E.2d 515 (W. Va. 1984). Instances can exist, however, where the corporate form of separate entities may be ignored. In particular, West Virginia law states that "'[j]ustice may require that courts look beyond the bare legal relationship of the parties to prevent the corporate form from being used to perpetrate justice, defeat public convenience or justify wrong. However, the corporate form will **never be disregarded lightly**.'" <u>Laya v. Erin Homes, Inc.</u>, 352 S.E.2d 93, 97 (W. Va. 1986) (quoting <u>Southern States Cooperative, Inc. v. Dailey</u>, 280 S.E.2d 821, 827 (W. Va. 1981)) (emphasis added). In cases alleging breach of contract, contractual liability may apply to the allegedly separate corporate entities. As the court stated in <u>Dailey</u>:

> The mere showing that one corporation is owned by another or that they share common officers is not a sufficient justification for a court to disregard their separate corporate structure. (internal citation omitted). Nor is mutuality of interest, without the countermingling of funds or property interests, or prejudice to creditors,

15

> sufficient. (internal citation omitted). Rather, it must
> be shown that the corporation is so organized and
> controlled to be a mere adjunct or instrumentality of the
> other.

280 S.E.2d at 827. When determining whether to ignore the

corporate form, however, "it is not easily proved and the burden of

proof is on a party soliciting a court to disregard a corporate

structure." Raleigh County Nat'l Bank, 320 S.E.2d at 522. If that

corporate form, or veil, is "pierced," then that corporation "may

be liable for behavior of another corporation within its total

control." Id. When analyzing whether to pierce the corporate

form, West Virginia requires courts to engage in a case-by-case

analysis, "with particular attention to factual details." Id. at

523. In particular, the following factors are used when

determining whether to pierce the corporate veil:

> Decisions to "pierce" involve multifarious
> considerations, including inadequacy of capital
> structures, whether personal and corporate funds have
> been commingled without regard to corporate form by a
> sole shareholder, whether two corporations have
> commingled their funds so that their accounts are
> interchangeable; whether they have failed to follow
> corporate formalities, siphoning funds from one
> corporation to another without regard to harm caused
> either entity, or failed to keep separate records. Other
> reasons to disregard the structure are: total control and
> dominance of one corporation by another or a shareholder;
> existence of a dummy corporation with no business
> activity or purpose; violation of law or public policy;
> a unity of interest and ownership that causes one party
> or entity to be indistinguishable from another; common
> shareholders, common officers and employees, and common
> facilities.

Id. Finally, when analyzing the above factors, evidence related to them must be "analyzed in conjunction with evidence that a corporation attempted to use its corporate structure to perpetrate a fraud or do grave injustice on an innocent third party seeking to 'pierce the veil.'" Id. (internal citations omitted). As stated by the United States Court of Appeals for the Fourth Circuit, "[i]t is well settled that courts will not be blinded by corporate forms nor permit them to be used to defeat public convenience, justify wrong or perpetrate fraud, but will look through the forms and behind the corporate entities involved to deal with the situation as justice may require." Stone v. Eacho, 127 F.2d 284, 288 (4th Cir. 1942) (citing United States v. Reading Co., 253 U.S. 26, 63 (1920)).

The material facts in this civil action show that the non-lessee defendants are not alter egos of EQT. The plaintiffs have offered insufficient evidence to show that the non-lessee defendants have, for example, ignored corporate formalities, commingled funds, or operated as "dummy" entities. Rather, the facts show that the non-lessee defendants each have officers and maintain their own business activities. Although those activities, communications, and purposes may relate to EQT, the plaintiffs do not demonstrate the type of fraudulent or improper conduct that warrants piercing the veil. The fact that one corporation is "owned by another" or shares "common officers," or even maintain a

"mutuality of interests," does not automatically warrant a disregard of the corporate structure. <u>Dailey</u>, 280 S.E.2d at 827. From the outset, it must be remembered that piercing the corporate veil "is not easily proved and the burden of proof is on a party soliciting a court to disregard a corporate structure." <u>Raleigh County Nat'l Bank</u>, 320 S.E.2d at 522. Here, the plaintiffs bear that burden, and they have not met it. Therefore, the non-lessee defendants are not alter egos of EQT, and thus, fail to be bound by the 1906 lease and amendment agreements.

2. <u>The Fraud/Misrepresentation Claim Is Not Satisfied</u>

West Virginia law provides the following essential elements in a fraud claim: "(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; (3) that plaintiff relied on it and was justified under the circumstances in relying upon it; and (4) that he was damaged because he relied on it." Syl. Pt. 5, <u>Folio v. City of Clarksburg</u>, 655 S.E.2d 143 (W. Va. 2007) (internal citations omitted). Further, West Virginia law recognizes that as a "general principle[,] [] an action for fraud can arise by the concealment of truth." <u>Teter v. Old Colony Co.</u>, 441 S.E.2d 728, 734 (W. Va. 1994) (quoting <u>Thacker v. Tyree</u>, 297 S.E.2d 885, 888 (W. Va. 1982)).

The plaintiffs have not satisfied the elements to establish their fraud claim. The plaintiffs assert that the non-lessee defendants "set about with the specific intent to retain moneys

belonging to plaintiffs by trickery." ECF No. 163. The plaintiffs then cite to case law establishing the standard for fraud, and quote significant portions of their amended complaint. That is the extent of the plaintiffs' argument. Other than simply asserting that the non-lessee defendants fraudulently deducted post-production costs, they do not satisfy the necessary elements to establish their claim. At the very least, they do not indicate what specific act the non-lessee defendants engaged in so as to amount to fraud, or what fraudulent act the plaintiffs relied on due to the alleged fraud. The plaintiffs have not established the necessary elements of their fraud claim. More importantly, they have not demonstrated any genuine issue of material fact as to that claim, and therefore, the non-lessee defendants' motion for summary judgment is granted as to that claim.

It should be noted that the plaintiffs appear to alternatively argue that the non-lessee defendants engaged in a conspiracy to defraud the plaintiffs. West Virginia law makes it clear that a "civil conspiracy is not a <u>per se</u>, stand alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)." <u>Dunn v. Rockwell</u>, 689 S.E.2d 255, 269 (W. Va. 2009) (internal citations omitted). A civil conspiracy is more specifically defined as:

> [A] civil conspiracy is a combination of two or more
> persons by concerted action to accomplish an unlawful
> purpose or to accomplish some purpose, not in itself
> unlawful, by unlawful means. The cause of action is not
> created by the conspiracy but by the wrongful acts done
> by the defendants to the injury of the plaintiff.

Id. at 267 (quoting Dixon v. American Indus. Leasing Co., 253 S.E.2d 150, 152 (W. Va. 1979)). Therefore, in "order for civil conspiracy to be actionable it must be proved that the defendants have committed some wrongful act or have committed a lawful act in an unlawful manner to the injury of the plaintiff[.]" Dixon, 253 S.E.2d at syl. pt. 1.

The plaintiffs have failed to adequately assert their conspiracy argument, let alone connect it to their claim of fraud. The plaintiffs simply state that the non-lessee defendants "are all involved in a conspiracy or joint venture or they are acting as agents of one another to commit the civil fraudulent conduct." ECF No. 163. Similar to their fraud argument, that is where the plaintiffs' argument ends. They do not sufficiently demonstrate that the non-lessee defendants committed "some wrongful act" or a "lawful act in an unlawful manner to the injury" of the plaintiffs. They simply state that the non-lessee defendants conspired to commit fraud on the plaintiffs regarding their royalty payments, and end their argument there. That conclusory allegation, and nothing more, fails to either satisfy the standard under West Virginia law or demonstrate that a genuine issue of material fact exists.

### 3. The Claim for Punitive Damages Must Be Denied

West Virginia law clearly states that "a finding of compensatory damages by a jury is an indispensable predicate to a finding of exemplary or punitive damages[.]" LaPlaca v. Odeh, 428 S.E.2d 322, 324 (W. Va. 1993). Pursuant to the granting of summary judgment for the non-lessee defendants, the plaintiffs' claims have been denied in their entirety against the non-lessee defendants. That means that the opportunity for compensatory damages is eliminated. Accordingly, the plaintiffs' claim for punitive damages cannot proceed, and thus, the non-lessee's motion for summary judgment as to punitive damages is granted.

For the reasons set forth above, the non-lessee defendants' motion for summary judgment is GRANTED IN ITS ENTIRETY.

### B. EQT's Motion for Summary Judgment

In its motion for summary judgment, EQT and the plaintiffs' dispute primarily concerns one issue: the interpretation of "at the wellhead" under the flat rate statute. EQT points out that the statute identifies the "wellhead" as the point of distribution at which the royalty amount is calculated. That would mean the costs of production would be deducted from the royalty payment starting from the wellhead. The plaintiffs, however, state that "West Virginia is and has been among the states that adhere to the marketable-product rule." According to the plaintiffs, that means that the lessee (EQT) bears all costs in obtaining a marketable

product and disallows the deduction of post-production costs until a marketable product is obtained. The parties then turn to the legislative history of the flat rate statute, and then compare the flat rate statute to cases and statutes from other states.

The parties then discuss the interpretation of the holding from Estate of Tawney v. Columbia Natural Resources, LLC, 633 S.E.2d 22 (W. Va. 2006). Tawney involves the interpretation of the term "wellhead" found in a lease. EQT claims that this civil action does not involve an ambiguous lease, which was found to have been the case in Tawney. EQT then explains the term "well" or "wellhead" within the industry, and how that term maintains a definite meaning. The plaintiffs claim that "if at-the-wellhead-type language is ambiguous in a contractual lease as to its meaning, such language is also ambiguous when contained in a statute."

Alternatively, EQT argues that the plaintiffs disclaimed EQT from liability for the claims at issue. EQT first relies on the terms of the settlement agreement for the 2008 class action. See ECF No. 152 Ex. J. Next, EQT points to the non-violation provision found under the amendment agreements. As quoted earlier, the non-violation provision states the following:

> Lessor and Lessee hereby (i) ratify and agree that the Lease is valid and in effect, (ii) **agree that Lessee is not in violation of any terms or provisions of the Lease, including any royalty or rental payment terms thereof**, (iii) ratify and affirm all of the terms and provisions

22

> of the Lease to the extent that they are not changed,
> altered or amended by this Amendment.

ECF No. 152 Ex. K (emphasis added). The plaintiffs, however, point out that the release under the settlement agreement only applied to claims arising from February 1, 2000 to December 8, 2008. The claims in this case arose after that time period, and thus the plaintiffs argue that they are valid and should proceed. As to the fraud, misrepresentation, and punitive damages claims, EQT believes that the plaintiffs have provided insufficient evidence, and therefore, EQT seeks judgment as a matter of law.

    1. <u>Ambiguity Between the Flat Rate Statute and *Tawney*</u>

The flat rate statute states the following, in relevant part:

> To avoid the permit prohibition of subsection (d), the applicant may file with such application an affidavit which certifies that the affiant is authorized by the owner of the working interest in the well to state that it shall tender to the owner of the oil or gas in place not less than one eighth of the **total amount** paid to or received by or allowed to the owner of the working interest **at the wellhead for the oil or gas so extracted**, produced or marketed before deducting the amount to be paid to or set aside for the owner of the oil or gas in place, on all such oil or gas to be extracted, produced or marketed from the well.

W. Va. Code § 22-6-8(e) (2016) (emphasis added). To this Court's knowledge, the term "at the wellhead" in the context of the West Virginia flat rate statute has not been interpreted or defined. The term "at the wellhead" may bring about significant consequences

for determining when post-production costs[4] may be deducted from the royalty payments. Two general deduction rules may apply: the "at the well" rule or the "marketable product" rule. The "at the well" rule permits lessees, like EQT, to deduct essentially most of the post-production costs from the royalty payment. See, e.g., Piney Woods Country Life School v. Shell Oil Co., 726 F.2d 225, 240-41 (5th Cir. 1984).

The marketable product rule, on the other hand, limits the ability of lessees to deduct post-production costs. The rule is derived from the implied covenant to market. Pursuant to the implied covenant to market, which is recognized in West Virginia, "a lessee impliedly covenants that he will market oil or gas produced." Wellman v. Energy Resources, Inc., 557 S.E.2d 254, 265 (W. Va. 2001). That covenant generally requires that the lessee "should bear costs associated with marketing products produced under a lease." Id. To state it more simply, the marketable product rule essentially requires a lessee to bear the costs incurred for obtaining a marketable product. Thus, the marketable product rule and the at the well rule impose very different obligations on lessees. Moreover, determining the applicability of either rule in this case carries great significance not only to EQT, but to oil and gas lessees generally.

---

[4]It should be noted that the phrase "post-production costs" refers generally to costs incurred after the oil or gas is extracted and up to the point of sale of the product.

The case law in West Virginia is not explicitly clear as to which rule applies. As stated earlier, the phrase "at the wellhead" under the West Virginia flat rate statute has not been interpreted or defined. At first glance, it appears that West Virginia would be an "at the well" state based on the language of the statute. The Supreme of Appeals of West Virginia, however, casts some doubt over that conclusion based on its holding in Tawney. Before delving into Tawney, this Court acknowledges that the parties cite to legislative history about the flat rate statute set forth at the beginning of that statute. However, "[t]he text of the statute, and not the private intent of the legislators, is the law . . . . It is easy to announce intents and hard to enact laws; the Constitution gives force only to what is enacted. So the text is law and legislative intent a clue to the meaning of the text, rather than the text being a clue to legislative intent." Continental Can Co., Inc. v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Indep.) Pension Fund, 916 F.2d 1154, 1157-58 (7th Cir. 1990) (citing In re Sinclair, 870 F.2d 1340 (7th Cir. 1989)). With that in mind, this Court will rely on the flat rate statute and declarations of the legislature contained therein, as well as relevant case law. See W. Va. Code § 22-6-8(a)-(b) (2016).

The action in Tawney involved a class action brought by oil and gas lessors against a lessee. The gist of the plaintiffs' claim was that the defendant deducted post-production costs from

the royalties on a pro rata basis.  In support of those deductions,
the defendant pointed to provisions contained in the leases.  In
particular, the provisions almost uniformly referred to calculating
the royalty "'at the well,' 'at the wellhead,' 'net all costs
beyond the wellhead,' or 'less all taxes, assessments, and
adjustments.'"  Tawney, 633 S.E.2d at 25.  The issue was whether
the lease language, particularly "at the well" or "at the
wellhead," allowed the defendant to deduct the post-production
costs.  The defendant argued that the "at the wellhead" language
was clear and unambiguous, meaning that it permitted the defendant
to "deduct the post-production costs of gas from the lessors' 1/8
royalty payments."  Id. at 26.  The plaintiffs contended that the
"at the wellhead" language was ambiguous as to the allocation of
costs between the lessors and lessee.

The Supreme Court of Appeals of West Virginia held that the
"at the wellhead" language was not sufficient "to alter [the]
generally recognized rule [in West Virginia] that the lessee must
bear all costs of marketing and transporting the product to the
point of sale."  Id. at 28.  In reaching that holding, the Court
first found that the "at the wellhead" language in the lease was
ambiguous because it did not "indicate how or by what method the
royalty is to be calculated or the gas is to be valued."  Id.
(emphasis in original).  The Court next determined that "at the
wellhead" did not show that the parties intended to permit such

extensive post-production deductions.  Therefore, the Court held
that the "at the wellhead" language in the leases did not permit
the lessee to deduct "any portion of the costs incurred between the
wellhead and the point of sale."  Moreover, the Court also held
that leases which intend to allocate post-production costs between
the lessor and lessee must do the following: (1) "expressly
provide" for such an allocation; (2) "identify with particularity
the specific deductions the lessee intends to take from the
lessor's royalty"; and (3) set forth how to calculate the "amount
to be deducted from the royalty for such post-production costs."
Id. at 30.

Three key points can be gleaned from the holding of Tawney.
First, the general rule under West Virginia law is that the lessee
bears "all costs of marketing and transporting the product to the
point of sale."  Id. at 28.  Pursuant to that general rule, West
Virginia appears to apply the "marketable product" rule, albeit in
a modified and more extensive manner.  Second, the phrase "at the
wellhead" was found to be ambiguous in the context of a lease, not
in the context of the flat rate statute.  In fact, the Court in
Tawney never mentions the flat rate statute even though it had been
enacted a number of years before Tawney was considered.  Third, if
a lessee seeks to deduct post-production costs, it must do so
expressly, with particularity as to what deductions will be made

27

and how the resulting royalty will be calculated in light of those deductions.

The phrase "at the wellhead" under the flat rate statute is just as ambiguous as the language in the <u>Tawney</u> leases. The West Virginia flat rate statute clearly says "at the wellhead." Although a plain reading of the statute may initially lead one to conclude otherwise, the Supreme Court of Appeals of West Virginia determined that identical language did not authorize the deduction of post-production costs by the lessee. Further, the 1906 lease and amendment agreements at issue do not indicate an intent contrary to the general rule. Here, the 1906 lease and amendment agreements do not allocate the expenses, or indicate how any deductions should be calculated. Indeed, the 1906 lease even appears to state that the lessors should receive the royalty in "full equal one-eighth (1/8) part or share of the same, **delivered free of charge**." ECF No. 152 Ex. A (emphasis added).

Five lingering issues, however, dissuade this Court from ruling on the breach of contract claim against EQT at this time. First, the context of the holding of <u>Tawney</u> and the context of the issues in this civil action are significantly different. The leases in <u>Tawney</u> contained the language "at the wellhead." In this civil action, however, the "at the wellhead" language appears in the flat rate statute. Second, as noted, despite the fact that the West Virginia flat rate statute existed for well over two decades

before its ruling, the Court in <u>Tawney</u> did not mention the flat rate statute, or indicate how its use of the "at the wellhead" language could impact existing leases. Third, in relation to the fact that the Court in <u>Tawney</u> did not mention the flat rate statute, it is unclear whether the flat rate statute particularly applies to whether deductions for post-production costs are permitted. Although the parties both rely on the flat rate statute in determining the issue, the statute does not expressly indicate that it should be used in that manner. Rather, the section of the statute at issue, when read in its entirety, appears to apply to the awarding of permits for oil and gas operations. For example, the flat rate statute begins with following phrase: "To avoid the permit prohibition of subsection (d), the applicant may file with such application an affidavit . . . ." W. Va. Code § 22-6-8(e) (2016). Although it uses the phrase "at the wellhead," the statute does not state that such provision or phrase generally applies to oil and gas royalties. Fourth, the legislative findings and declarations within the statute appear to permit the abrogation of leases containing a flat well royalty, which appears to be the case here. The flat rate statute states the following:

> In the light of the foregoing findings, the Legislature hereby declares that it is the policy of this state, to the extent possible, to prevent the extraction, production or marketing of oil or gas under a lease or leases or other continuing contract or contracts **providing a flat well royalty or any similar provisions for compensation to the owner of the oil and gas in place**, which is not inherently related to the volume of

29

> oil or gas produced or marketed, and toward these ends,
> the Legislature further declares that it is the
> **obligation of this state to prohibit the issuance of any**
> **permit** required by it for the development of oil or gas
> where the right to develop, extract, produce or market
> the same is **based upon such leases** or other continuing
> contractual agreements.

W. Va. Code § 22-6-8(b) (2016) (emphasis added). The above quoted

legislative declaration appears to permit the abrogation of flat

well rate leases. If that is the case, however, then the question

becomes: should the 1906 lease in this case, which is a flat well

royalty lease, be abrogated in favor of one that permits deductions

of post-production costs, or one that does not so provide?

Fifth, the legislative findings and declarations within the

statute also acknowledge that, despite the abrogation previously

discussed, currently existing lease obligations should remain

intact. The flat rate statute states the following:

> That while being **fully cognizant** that the provisions of
> section 10, article I of the United States Constitution
> and of section 4, article III of the Constitution of West
> Virginia, proscribe the enactment of any law **impairing**
> **the obligation of a contract**, the Legislature further
> finds that it is a valid exercise of the police powers of
> this state and in the interest of the state of West
> Virginia and in furtherance of the welfare of its
> citizens, to discourage as far as constitutionally
> possible the production and marketing of oil and gas
> located in this state under the type of leases or other
> continuing contracts described above.

W. Va. Code § 22-6-8(a)(4) (emphasis added). So, on the one hand,

the flat rate statute may be interpreted as abrogating lease

agreements. On the other hand, the statute indicates that existing

lease agreements and their obligations should be respected and not

impaired. That is arguably a hard situation to reconcile. The situation is represented to an extent in this civil action. If this Court seeks to enforce the policy acknowledging the abrogation of contracts, then the 1906 lease may be abrogated because it determines royalty payments under a flat well royalty. How then would that support the proposition of respecting the terms of the 1906 lease, which was created long before the enactment of the flat rate statute, as it currently exists?

It is the unsettled nature of the applicable law that, this Court believes, warrants certification to the Supreme Court of Appeals of West Virginia. Under the Uniform Certification of Law Act of West Virginia, the Supreme Court "may answer a question of law certified to it by any court of the United States . . . if the answer may be determinative of an issue in a pending cause in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state." W. Va. Code § 51-1A-3 (2016). Here, the determination of the applicability of the flat rate statute and the meaning of "at the wellhead" contained within it appears to be clearly determinative. Further, there appears to be no clearly controlling decision on the issue. Therefore, certification appears to be appropriate in this case. In a separate order following this memorandum opinion and order, this Court will set forth what action the parties and this Court will take as to the certification of the issues in this civil

action. Because this Court believes that certification is appropriate, a ruling on the plaintiffs' breach of contract claim as to EQT is DEFERRED at this time.

2. <u>Liability Was Not Disclaimed for Post-Settlement Claims</u>

EQT contends that the plaintiffs disclaimed it from liability. In support of its argument, EQT points to the settlement agreement for the 2008 class action, and the non-violation provision found under the amendment agreements. The terms of both the settlement and amendment agreements, however, do not support EQT's contention.

It is well understood that "[a] settlement agreement is a contract and as such, 'the construction and enforcement of settlement agreements are governed by principles of local law applicable to contracts generally.'" <u>Air Line Stewards and Stewardesses Assoc., Local 550, TWU, ALF-CIO v. Trans World Airlines, Inc.</u>, 713 F.2d 319, 321 (7th Cir. 1983) (quoting <u>Florida Educational Assoc. v. Atkinson</u>, 481 F.2d 662, 663 (5th Cir. 1973); <u>Dunkin' Donuts, Inc. v. Lavani</u>, 1996 WL 276990, at *2 (4th Cir. May 24, 1996) ("General contract formation principles apply, of course, to settlement agreements."). Accordingly, "[t]he language of a settlement agreement must be construed literally in a straightforward manner, and courts must give full force and effect to each and every provision contained in these court-approved agreements." <u>Trans World Airlines, Inc.</u>, 713 F.2d at 321-22 (citing <u>Robin v. Sun Oil Co.</u>, 548 F.2d 554, 557 (5th Cir. 1977)).

The settlement agreements make it clear that EQT is disclaimed from liability for the period spanning February 1, 2000 to December 8, 2008.  That is seen from the explicit language of the settlement agreement, which identifies the release as applying to claims arising "between February 1, 2000 and December 8, 2008."  ECF No. 152 Ex. J.  Based on the terms of that settlement agreement, EQT is correct by asserting that the plaintiffs disclaimed any liability against EQT for claims arising during that span of time.  The terms of that settlement agreement, however, do not address claims arising after December 8, 2008.

The plaintiffs point out that the claims in this civil action arise from acts occurring after December 8, 2008.  EQT believes that the non-violation provision under the amendment agreements bars the plaintiffs' current claims.  This Court has stated that oil and gas leases are both a conveyance and a contract.  <u>Bryan</u>, 577 S.E.2d at 265; <u>Michels</u>, 446 S.E.2d at 499-500.  Therefore, the principles of contract law generally govern their interpretation.  <u>See id.</u>; <u>Hickman</u>, 2015 WL 7366450, --- S.E.2d --- (W. Va. Nov. 18, 2015); <u>Iafolla</u>, 250 S.E.2d at 128 (applying contract principles to an oil and gas lease); <u>see also</u> <u>K&D Holdings, LLC v. Equitrans, L.P.</u>, 2015 WL 9461340, at *4 (4th Cir. Dec. 28, 2015) ("In general, West Virginia contract law principles apply equally to the interpretation of leases.") (citing <u>Energy Dev. Corp. v. Moss</u>, 591 S.E.2d 135, 143 (W. Va. 2003)).

Under West Virginia law, "[w]hen the language of a written instrument is plain and free from ambiguity, a court must give effect to the intent of the parties as expressed in the language employed and in such circumstances resort may not be had to rules of construction." Cotiga Development Co. v. United Fuel Gas Co., 128 S.E.2d 626, 631 (W. Va. 1962). In this case, the relevant portion of the non-violation provision states the following: "Lessor and Lessee hereby . . . agree that Lessee is not in violation of any terms or provisions of the Lease, including any royalty or rental payment terms thereof." ECF No. 152 Ex. K. It should be noted that the amendment agreement as to plaintiffs Patrick D. Leggett and Katherine F. Leggett does not contain that provision. Nonetheless, the plain language of the non-violation provision does not disclaim EQT from liability. Unlike the 2008 settlement agreement, it does not use terms such as "release," or other words that evidence an intent to disclaim or release EQT from liability. The non-violation provision does not indicate any intent to disclaim EQT from future claims. At most, the non-violation provision could amount to an admission. Therefore, based on the plain language of the non-violation provision, the plaintiffs did not release or disclaim EQT from liability for claims arising after December 8, 2008. Thus, neither the 2008 settlement agreement nor the non-violation provision, standing alone, bar the plaintiffs' claims in this civil action.

### 3. The Fraud Claim as a "Stand Alone" Tort Cannot Proceed

The plaintiffs also assert a claim of fraud against EQT. To the extent that the plaintiffs assert their claim of fraud as a separate tort, EQT's motion for summary judgment is granted. West Virginia law provides the following essential elements in a fraud claim: "(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; (3) that plaintiff relied on it and was justified under the circumstances in relying upon it; and (4) that he was damaged because he relied on it." Folio, 655 S.E.2d at syl. pt. 5 (internal citations omitted). As this Court found with regards to the non-lessee defendants, the plaintiffs provide insufficient evidence to prove their claim, or at least demonstrate that genuine issues of material fact exist. The plaintiffs assert that EQT, in conjunction with the non-lessee defendants, "set about with the specific intent to retain moneys belonging to plaintiffs by trickery." ECF No. 163. The plaintiffs then cite case law establishing the standard for fraud, and quote significant portions of their amended complaint. That is the extent of the plaintiffs' analysis of their fraud claim against EQT. The plaintiffs have not established the necessary elements of their fraud claim. Further, they have not demonstrated any genuine issue of material fact as to that claim, and therefore, the EQT's motion for summary judgment is granted as to that claim to the extent the fraud claim is asserted

35

as a "stand alone" tort claim. However, that ruling does not apply to the extent that the plaintiffs may assert fraudulent conduct by EQT in relation to the breach of contract if the breach of contract claim is found to be viable following certification to the Supreme Court of Appeals of West Virginia.

### 4. Punitive Damages Claim Cannot Proceed

West Virginia law is clear that "absent an independent, intentional tort committed by the defendant, punitive damages are not available in an action for breach of contract." Goodwin v. Thomas, 403 S.E.2d 13, 16 (W. Va. 1991) (quoting Berry v. Nationwide Mut. Fire Ins. Co., 381 S.E.2d 367, 374 (W. Va. 1989)). The plaintiffs' only remaining claim is for breach of contract. Therefore, under West Virginia law, their claim for punitive damages may not proceed. Accordingly, EQT's motion for summary judgment is granted as to the plaintiffs' claim for punitive damages. However, it should be noted that to the extent the plaintiffs allege fraudulent conduct connected to the breach of contract claim, punitive damages might be recoverable depending on the Supreme Court's decision as to certification. Thus, a claim for punitive damages to that extent is not disallowed at this time.

### V. Conclusion

For the reasons set forth above, defendants EQT Corporation, EQT Energy, LLC, EQT Gathering, LLC, and EQT Investments Holdings, LLC's motion for summary judgment (ECF No. 150) is GRANTED IN ITS

ENTIRETY. Defendant EQT Production Company's motion for summary judgment (ECF No. 152) is GRANTED IN PART.[5] However, a ruling as to the breach of contract claim against EQT Production Company is DEFERRED at this time. This Court will direct the parties by separate order as to what further action will be taken as to the certification of the issues in this civil action.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein.

DATED:     January 22, 2016


                    /s/ Frederick P. Stamp, Jr.
                    FREDERICK P. STAMP, JR.
                    UNITED STATES DISTRICT JUDGE

---

[5]As additional clarification for the parties, EQT Production Company's motion for summary judgment is granted as to the "stand alone" fraud claim. To the extent that the plaintiff alleges fraudulent conduct connected to the breach of contract claim, however, that allegation might proceed, depending on the ruling by the Supreme Court of Appeals of West Virginia's as to certification.