IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING

KATHERINE F. LEGGETT, individually
and as Executrix of the Estate of Patrick
D. Leggett; GEORGE D. MCKAIN, by his
attorney in fact, ANITA
KATHRYN MCKAIN GREER;
and ADELE S. MCDOUGAL,

              Plaintiffs,

v.                                              Civil Action No. 1:13-cv-0004 FPS
                                              Honorable Frederick P. Stamp, Jr.

EQT PRODUCTION COMPANY,
a Pennsylvania corporation;
EQT CORPORATION,
a Pennsylvania corporation;
EQT ENERGY, LLC, a
Delaware limited liability company;
EQT INVESTMENTS HOLDINGS, LLC, a
Delaware limited liability company;
EQT GATHERING, LLC, a
Delaware limited liability company; and
EQT MIDSTREAM PARTNERS, LP,
a Delaware limited partnership,

              Defendants.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT RE:  DEDUCTIONS AND ROYALTY**

**INTRODUCTION**

This memorandum is filed in support of Plaintiffs' Motion for Summary Judgment Re:

Royalty and Deductions, filed contemporaneously herewith.  Plaintiffs move this Court pursuant

to F.R.C.P. 56 to grant plaintiffs' summary judgment in this litigation as to the right of EQT

defendants[1] to assess and credit themselves with part of the royalty which the plaintiffs otherwise

---

[1] The defendants in this case will be referred to as EQT defendants for purposes only of brevity.  It
includes all EQT defendants named in this lawsuit.

would be entitled pursuant to their leases and pursuant to the law in the State of West Virginia. The EQT defendants, individually and/or collectively, have certain duties and responsibilities as lessees in the State of West Virginia that are required to be met before they may reduce a royalty owner's (lessor's) oil or gas royalty percentage of moneys which EQT obtained from the sale of plaintiffs' oil or gas.  Defendants' duties include but are not limited to the following:

1.      A deduction from royalty may only be taken "to the extent that they were actually incurred and they were reasonable."  *Wellman v. Energy Resources, Inc.,* 210 W.Va. 200, Syl. 5, 557 S.E.2d 254 (2001) and *Estate of Tawney v. Columbia Natural Resources, LLC,* 219 W.Va. 266 Syl. 2 and 10, 633 S.E.2d 22 (2006).

2.      Before being entitled to such credit, however, the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable." *Id.*

3.      In addition, before being entitled to deduct same, the subject lease must expressly provide (a) "that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale," (b) "identify with particularity the specific deductions to be taken" and (c) "indicate the method of calculating the amount to be deducted from the royalty for the post production expenses." *Id.*

In addition, with respect to flat rate leases, the West Virginia Supreme Court held that, regardless, that deductions may be allowed for flat rate leases, the lease must comply with the above rules.  The *Leggett* Court stated that the *Wellman* Court:

> "recognized and explicitly held that where costs are properly allocated or deducted, "the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable."
>
> Syl. Pt. 5, in part.

In the case at bar, plaintiffs have submitted numerous discovery requests, interrogatories and taken depositions in order to determine the proof and evidence which defendant EQT defendants have in their possession and control or can provide or will provide and to interrogate that evidence, if any, to support the requirements stated above as prerequisites to EQT defendants taking any deductions from royalty.  Defendants have produced data, documents and witnesses in order to purportedly prove their entitlement to the deductions from royalty of the lessors.  Plaintiffs supplied their expert disclosures to defendants' counsel as of September 14, 2018.  This date was pushed back from the scheduling order's requirements of a due date of June 1, 2018,[2] in order to allow defendants more time and to extend the time.  This effort has been long and diligent on plaintiffs' part as set forth herein.  As set forth in more detail below, there have been a multitude of discovery issues in the case which required the Court to order discovery to be produced to plaintiffs.  The *Wellman* case, *supra*, was decided in 2001; the *Tawney* case was decided in 2006.  The class period began in December 2008, therefore, EQT had substantial time prior to 2008, and thereafter to adopt accounting procedures and keep and maintain accurate books and records in order to reasonably and promptly produce the evidence of its "reasonable and actual" deductions from royalty.  EQT has been requested to produce records, has been under the requirements of the federal discovery rules to produce records, has been ordered to produce records and EQT has agreed to produce records and is required by West Virginia law (*Wellman, supra* and *Tawney, supra*) to produce the evidence they were required to keep, maintain and produce to plaintiffs.  But EQT defendants have failed, apparently intentionally, to produce documents and data which amounts to "evidence" as required by *Wellman* and *Tawney,*

---

[2] Order, Doc. Id. 507.

3

"normally developed in legal proceedings requiring an accounting" which proves in detail that lessee actually incurred such costs and that they were reasonable.

**RELEVANT FACTS**

Plaintiffs have requested accounting documents from EQT, as well as interrogatory answers and depositions of defendants, since filing of this case. Since discovery in this case was consolidated with *The Kay Co., et al. v. EQT Production Company, et al.* class action case, Civil Action. No. 13-C-151, (Honorable John Bailey,) reference is made to the record of discovery and the Court rulings in that case, all of which relate to the discovery in this single case. In an attempt to finalize the discovery of the defendants' royalty payments and credits which defendants had retained for themselves from plaintiffs' royalty, plaintiffs served additional discovery requests on defendants in September and October 2017, which related primarily to the defendants' burden to the lessor to "prove, by evidence of the type normally developed in legal proceedings requiring, that he, the lessee, actually incurred and that they were reasonable." *Wellman*, Syl. 5. After serving this discovery, the parties entered into a stipulation regarding outstanding discovery issues, Doc. Id. 424, with respect to the discovery requests. The Stipulation was as follows:

> b.     Defendants will respond to the four interrogatories, including their subparts, numbered 1-4 and contained on pages 13-16 of Plaintiffs' September 15, 2017, "Interrogatories and Requests for Production of Documents to All Defendants."
> c.     Defendants will also respond to the "Previous Interrogatories and Requests for Documents" contained on pages 8-13 of Plaintiffs' "Interrogatories and Requests for Production of Documents to All Defendants" served on September 15, 2017.
> d.     Defendants will respond to "Plaintiffs' Requests for Production of Document to All Defendants" Plaintiffs served on August 18, 2017 [ECF 393].
> e.     Defendants will serve their responses to the pending discovery on or before October 27, 2017.
> f.     In the interests of efficiency and to expedite discovery, Defendants will provide initial responses to the pending discovery to Plaintiffs as quickly as possible in advance of the October 27, 2017, deadline. Counsel for the Parties will then meet and confer to determine whether the initial responses are satisfactory; whether and to what extent

4

additional responses are necessary; and, if so, what the nature and extent of those additional responses should be.

"Plaintiffs' Interrogatories and Requests for Production" filed on September 17, 2017, requested defendants to supplement previous court ordered interrogatories and requests for documents.  (**Exh. 1**, pp. 8-13.)  This discovery (Doc. Id. 69) was ordered to be answered "in full" by Court Order dated July 31, 2015.  (Doc. Id. 117.)

In addition to the "previous" discovery section in **Exh. 1**, plaintiffs also requested defendants to provide additional details of the costs and expenses.  (**Exh. 1**, pp. 13-16.) Plaintiffs also served requests for documents to all defendants on August 18, 2017.  (**Exh. 2**.) This set of discovery required defendants to produce detailed documents to plaintiffs which, along with all the other previous discovery, would allow plaintiffs' experts to review and determine whether the requirements of *Wellman* and *Tawney* were met.  These requests were based upon information which was previously provided by defendants through responses and depositions which demonstrated the need for the additional detailed information.

Defendants stipulated that they would answer them by October 27, 2017.   After significant discovery and depositions, defendants admitted that the detailed information which was needed to do an audit or review of the charges and expenses resided in the J.D. Edwards database.   J.D. Edwards is a well-known and often used accounting system which stores invoices, request for services or products and keeps and maintains most of the information which was needed in this case to determine the accuracy of defendants' charges, the relevance of the charge to gathering, processing and transportation of plaintiffs' gas.

Plaintiffs tried to work with defendants for months in their production of various spreadsheets and data, but determined ultimately, that defendants had not provided the J.D. Edwards database with necessary information and data to do a detailed analysis.  Included in

plaintiffs' attempts to obtain the relevant data needed was **Exh. 3**, letter dated January 25, 2018. In that letter, plaintiffs pointed out the numerous items that had not been either produced or updated. Included in that letter is the following in which plaintiffs made clear that they needed the J.D. Edwards database.

> ¶2(c)  The JD Edwards database as [sic] the general ledger. Plaintiffs request the database and also all other data which provides the source of the expenses incurred, the purpose for which the expense or cost was requested and the person and entity which paid for the expense and cost.
>
> The JD Edwards database and spreadsheets as the general ledger for EQT is absolutely necessary. As I indicated in the very beginning, we must have the source data for all expenses, the purpose, etc., as set forth in 2(c) and referred to in 2(d). It is now January 24, 2018, and we must have all of JD Edwards' data and information. Your suggestion that the data produced already is sufficient is incorrect. Basically, that information is limited to numbers as opposed to the actual source, information and follow up with who authorized it and who paid it. The work books are a necessary part, but only a part of the information we need.
>
> ¶2(d)  The JD Edwards' database and spreadsheets as the general ledgers for the EQT – EQM costs and expenses and resultant record of actual and projected costs and expenses and the resultant rates. However, he stated that the relationship between the "allocated" amount to each entity or subsidiary was not contained in the data. He indicated that there was data, however, which described and explained the allocated costs and expenses for each of the groups and subsidiaries and EQM Partnership. We need and request that information, formula and data and spreadsheets be produced which will demonstrate the allocations and reasons for the allocations as to each of the costs and expenses and the reason for the allocation.
>
> We believe the other data referenced by Mr. Piccirilli in 2(d) with respect to "allocated" may not be in the JD Edwards' spreadsheets, but in other data and records. We absolutely need their data. This may, in part, be included in the Enertia database. We, therefore, request the Enertia database to be produced. We need the formulae for allocations which demonstrate the method used for determining the allocation of any expense from each unit, subsidiary, group and parent. EQT must have this information and we need it now.
>
> Your letter was dated December 27, 2017, and said "we will attempt…to

6

isolate entries related to relevant costs. …"  It is now three weeks later. Please forward the JD Edwards' database and the allocated cost databases, along with the e-mails and correspondence rules, protocols and instructions or rules related to all EQT defendants' costs and expenses that are charged or allocated in any way to plaintiffs and the class.

There was other correspondence, both before and after the above January 25, 2018, letter. On November 21, 2017, plaintiffs wrote that "[w]e no longer have the luxury of extending dates for production of documents."  (**Exh. 4**.)  On September 15, 2017, plaintiffs wrote "since this is one of the primary damage issues, then you have the burden to provide the information and I must obtain the documents necessary for the plaintiffs' experts to review and examine the reasonableness and whether they were actual costs."  (**Exh. 5**.)  On March 7, 2018, plaintiffs' wrote "we do not see the accounting and cost of service information for all districts."  (**Exh. 6**.)

Plaintiffs previously provided the experts with the data and documents, as well as depositions of defendants' F.R.C.P. 30(b)(6) witnesses to review in order to calculate damages. One of the important parts of the damage calculations is determining whether the defendants' accounting books and records provided a basis for determining whether the credits or deductions were reasonable and actual.  Plaintiffs' experts received the data provided piece meal over three years and determined that EQT had failed to provide evidence of the type normally developed in a legal proceedings requiring an accounting that defendants' credits to themselves were reasonable and actual.

Dan Selby is a Certified Public Accountant (CPA) under the accountancy laws of the State of West Virginia. He is a Certified Valuation Analyst (CVA) as certified by the National Association of Certified Valuators and Analysts (NAVCA). He is also certified in Financial Forensics (CFF) as certified by the American Institute of Certified Public Accountants (AICPA). He holds a Master's degree in Business Administration (MBA) issued from West Virginia

University and a B.A. in Business Administration issued by Otterbein College; now called Otterbein University. He has approximately thirty (30) years of experience in forensic accounting and providing expert opinions presented in Federal and State courts.

As shown in the *Wellman* Order, "If an oil and gas lease provides that a lessor shall bear some part of the costs incurred between the wellhead and the point of sale, the lessee shall be entitled to a credit for the costs to the extent that they were actually incurred and they were reasonable. **Before being entitled to a credit, however, the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting**, that he, the lessee, actually incurred such costs and that they were reasonable."

An adequate accounting of the type normally developed in a legal proceeding would include the following:

- Detailed description of each expense to be included; not by a mere classification of expense;

- From what entity and division or what subsidiary division the cost originates;

- The period in which the cost was incurred;

- The costs should be tied to a verifiable invoice or expense ledger entry accumulation in an account. There must be a paper-trail documenting the sources of the accumulation of costs embedded in the cost of service. The documentation should take the form of a formula that ultimately equals a cost of service as a unit cost in the same medium as the payment unit.

- The cost must be a direct cost of gathering and treatment of the gas.

- No expenses that play a supporting role to the direct activities of gathering and treatment.

Given the standards, the lessors should be provided with the following:

- A detailed description of the costs to be embedded in the cost of service;

- The cost source company or subsidiary should be noted.

- An expense must be a **direct** cost of gathering and treatment of the gas and not a supporting cost to the direct activities or the maintenance of the corporate infra-structure and selling capacities;

- A formula for how the cost of service is determined equaling a charge that is stated in the same unit function as the payment of royalties.

- Upon inquiry by an RI (royalty interest,) EQT should have the costs tied to a verifiable invoice or expense leger entry accumulation in an account. The expense account sources of the costs should be itemized and linked to the ultimate charge that is the subject of the inquiry.  There must be a paper-trail documenting the sources of the accumulation of costs embedded in the cost of service. The documentation should take the form of a formula that ultimately equals a unit cost of service in the same medium as the payment unit.

As shown by the following, EQT has not and did not show an adequate accounting of reasonable and actual expenses incurred that make up the cost of service charged to the RI.

- Mr. Piccirilli indicates, in deposition, that he draws from numerous sources in numerous divisions and business segments without documentation of the relative contribution to the budgeted "business plan" rates that he sends to EQT Production for further editing and inclusions or extractions. Mr. Piccirillli does not know or does not disclose what adjustments are made within EQT Production;

- The business plans are "budgeted" costs that are estimated by reference to prior period costs and further edited through undocumented manual methods.

- Estimated expenses covering direct and allocated indirect expenses from EQT corporate, EQT Gathering and EQT Midstream and EQT Energy are formulated into Business Plans that serve as a significant source of the estimated costs to be infused into a cost of service rate charged to the RI. Estimated costs are never reconciled to actual costs and "true-ups" are not accomplished so that the RI always is confronted with estimated costs and not actual costs.

- Given EQT-Gathering # 0024703, a January 2014 audit of the Land Administration showed that the Lease Monitoring System was not effectively utilized and was not accurate and complete. Lease payment obligations were not properly set up in the system Enertia. Lease statuses were not maintained accurately in Enertia.

- EQT audits showed unreconcilable and disconnected and undocumented practices of expense compilations of the cost of service charges.

- There is no demonstrable audit trail that can trace a cost of service unit charge, used as a unit deduction rate on the royalty remittance, to the expense accounts or invoices creating the expenses, as verification of the charged rate. There is no demonstrated linked accounts or collection of documented expense accounts, per books, or otherwise, that tie to the expenses that can be used to verify a unit cost of service charge for any year from 2008 through 2017.

- A discovered email show that Mr. Bergonzi could not disclose to his successor any methodology as to how costs were accumulated and converted between MCF units and Dth units. The disconnected and uncertain inputs of the costing process leading to the cost of service process demonstrates the uncertainty of the process and how proof of an accounting is not available. EQT Doc. # 0332415.

- PPA's are not documented in a manner to verify a process of reconcilement between RI deductions per unit and expense documentation sources. PPA's are Prior Period Adjustments.

Mr. Selby concluded that "a review of all the records and depositions provided my opinion is that EQT defendants, nor any of them: (1) met their duties and responsibility to "prove, by evidence of the type normally developed in legal proceedings requiring an accounting." (**Exh. 7**, p. 3.) Mr. Selby also found the following: "The cost of service charge to the RI is not an actual cost quote. The values are estimated based upon a review of prior period cost incurrence, along with a judgmental estimation on the part of Mr. Piccirilli, derived from business plans (not actual costs incurred), as well as input from personnel from operating division across the whole EQT corporate apparatus." *Id.*

Karen Balmer is a Certified Public Accountant and Certified Fraud Examiner. She has worked as an auditor for Ernest and Young. She was one of Union Carbide Corporation's accountants assigned to its international audit group and performed audits of domestic entities including fraud investigations including audits for assuring compliance with the Foreign Corrupt

10

Practices Act.  She also was a member of the Carbide mergers and acquisitions group involving international entity transfers and management deal disputes.  She is an independent consultant where over the last 25 years, she has conducted investigations involving banks and financial institutions and other organizations, Lehman Brothers, Fannie Mae, Madoff, the City of New York and others.  She has been consulted in matters involving the US Treasury and other governmental agencies, and she has acted as a receiver in some situations.

Her curriculum vitae is attached (**Exh. 8**.)  Ms. Balmer stated in her affidavit that:

"In the end, it was apparent from depositions and review of data provided that EQT had not calculated royalty payments in accordance with their actual books and records, nor had they provided the actual calculations used to generate the royalty checks so that we could see what they did use with particularity. I am familiar with JD Edwards and have utilized that system in my work in the past.  JD Edwards is a full functioning accounting system that records detailed transactions that a corporation makes during the course of its business cycles.

> "After reviewing the first production of JD Edwards, I advised plaintiffs' counsel that it was merely a portion of the information in a spreadsheet but that the data provided was not useful in verifying the source of the charge or whether it should have been included in the cost of service rate.  Plaintiffs' counsel later produced what they were told by EQT was the JD Edwards data in a searchable format.  I reviewed that version and found it not to be a complete version that I could relate the invoices and costs to particular parts of the cost of service.  Therefore, my finding was and is that EQT did not provide evidence which supported its costs of service; nor did any company or governmental organization which did an audit (accounting) of charges, bills or expenses."

She concluded that:

> "Having reviewed the documents produced and deposition testimony, it is my opinion to a reasonable degree of certainty as an accountant, educated, trained and experienced in investigating books, records and testimony of witnesses, that as an accountant, EQT has not produced the documents and data and evidence of the type normally developed in legal proceedings requiring an accounting.  Further, it is my opinion, to a reasonable degree of certainty, that EQT did not pay lessors the actual costs any of them incurred.  It is also clear that EQT Production did not incur the costs itself since EQT has numerous subsidiaries and the parent which charged for their services to the lessors."

11

*Id.*

Therefore, defendants have not complied with the *Tawney*, *Wellman* or *Leggett* requirements as to either the accounting and proof requirements, nor of the "actual" cost incurred by the lease requirements.

LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of establishing both that no genuine issue exists as to any material fact and that it is entitled to judgment as a matter of law.  *Custer v. Pan American Life Insurance Co.*, 12 F.3d 410, 416 (4th Cir. 1993) (also noting district court's duty to "review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law").  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That is, once the movant has met its burden to

12

show absence of material fact, the party opposing summary judgment must then come forward

with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R.

Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323–25; *Anderson*, 477 U.S. at 248. "If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at

249 (citations omitted).

<u>ARGUMENT</u>

A.    Plaintiffs Are Entitled to Summary Judgment Based Upon Failure to Produce
       Required Evidence of Deductions

Defendants intentionally ignored the requirement of the West Virginia Supreme Court of

Appeals which held:

> If an oil and gas lease provides that the lessor shall bear some part of the
> costs incurred between the wellhead and the point of sale, the lessee shall be
> entitled to credit for those costs to the extent that *they were actually incurred and
> they were reasonable.* **Before being entitled to such credit, however, *the lessee
> must prove, by evidence of the type normally developed in legal proceedings
> requiring an accounting*, that he, the lessee, actually incurred such costs and that
> they were reasonable.**

Syl. Pt. 5, *Wellman v. Energy Resources, Inc.,* 210 W.Va. 200, 557 S.E.2d 254 (2001) (emphases

added).  *Accord* Syl. Pt. 2, *Estate of Tawney v. Columbia Natural Resources, LLC,* 219 W.Va.

266, 633 S.E.2d 22 (2006).  *See also Bryan v. Big Two Mile Gas Co.*, 213 W.Va. 110, 121-22,

577 S.E.2d 258, 269-70 (2001) (holding that an innocent trespasser is liable for the value of the

minerals taken less the cost of production and that the calculation of such damages must be based

on "evidence of the type normally developed in legal proceedings requiring an accounting").

While in none of the above decisions has the Court clarified or elaborated on what it

meant by the phrase "by evidence of the type normally developed in legal proceedings requiring

13

an accounting," an article published in 2007 by the Energy & Mineral Law Foundation[3] specifically addressed this issue.   J. Thomas Lane & Joel E. Symonds, "*Accounting for Cotenants, Trustees, Lessees, Trespassers and the Like*," 27 Energy & Min. L. Inst. ch. 8 (2007) (at § 8.01, at p. 273, "This chapter will attempt to provide that elaboration, and hopefully the larger context of cases where the remedy of a party is an 'accounting.'").   In their introduction to this issue, the authors explained:

> In a variety of contexts ranging from lease relationships to trespass to trusts to cotenancies, parties must "account" to one another, particularly when minerals are produced and money is owed. In a gross context this requirement "to account" seems to embody two primary concepts: first, *that one party must provide information to the other which is sufficient to establish and justify the amount of money owed,* and second, a requirement to pay.

> Inherent in these situations are two phenomena: first, *one party is armed with all the facts, and the other generally has none,* and second, the parties have established a relationship, either voluntary or involuntary. Thus, a lessee, cotenant, partner, trustee or even trespasser who produces and sells or converts minerals belonging in whole or part to another, *will generally possess all pertinent information ranging from the amount taken, the quality, the sale price, all costs and expenses of production,* and possibly, hidden damages to the residue of the property. While the relationship of the parties may vary, the general remedies are very much the same.

> This chapter will explore the concept of accounting and the use of that term as both a cause of action as well as a remedy. Thus, what is meant when the court says that damages must be ascertained "by evidence of a type normally developed in legal proceedings requiring an accounting," and to what parties and situations will these requirements pertain?

"*Accounting for Cotenants, Trustees, Lessees, Trespassers and the Like*," 27 Energy & Min. L. Inst. § 8.01, at p. 273 (emphases added).

In discussing the relationships in which an accounting may be required, the authors

---

[3] "The EMLF is a nonprofit educational organization that has become the premiere provider of continuing legal education for the energy and mineral industries in the Eastern United States."  27 Energy & Min. L. Inst., Preface (2007).

explained:

> While special obligations may exist in certain relationships, such as the fiduciary obligation of a trustee, the core obligations and the remedies in an accounting are essentially the same for cotenants, partners, trustees and beneficiaries, lessors and lessees, and bailors and bailees, and possibly even, innocent trespassers. So, when a cotenant or partner exercises dominion over the common property, or a trustee, bailee, or possibly even an innocent trespasser, exercises dominion over the property of another, a duty to account arises. For natural resources this dominion often involves taking the actual property, the minerals or timber of another.

> Significantly, the relationship created by the exercise of dominion over common property or the property of another is viewed by many courts as creating a trust with associated fiduciary obligations. In such cases the property is viewed as trust property, or the *cestui que* trust. Good faith is seen as the "essence" of this trust relationship with a recognition of *affirmative duties to notify of development of the common property, to fully disclose actions taken and money accumulated, to keep adequate record of all of the mineral taken, and where commingling occurs to track the mineral taken from the common property, to account for all proceeds and all expenses, and to promptly pay the other party its just share.*

"*Accounting for Cotenants, Trustees, Lessees, Trespassers and the Like*," 27 Energy & Min. L. Inst. § 8.05, at p. 283 (emphasis added; footnotes omitted) (citing *Conkling Mining Co. v. Silver King Coalition Mines Co.*, 230 F. 553 (8th Cir. 1916), *rev'd on other grounds*, 255 U.S. 151 (1921); *Silver King Coalition Mines Co. v. Silver King Consolidated Mining Co.*, 204 F. 166 (8th Cir. 1913); *Dangerfield v. Caldwell*, 151 F. 554 (4th Cir. 1907); *Pure Oil Co. v. Byrnes*, 57 N.E.2d 356 (Ill. 1944); *VanZandt v. VanZandt*, 86 So. 2d 466 (Miss. 1956); *Sommers v. Bennett*, 69 S.E. 690 (W. Va. 1910)).

Addressing the relationship of lessee and lessor, the authors explained:

> Duties of lessees are based on contract, and thus, in any case the express requirements of a contract will control. While most mineral and timber leases provide detail on how rent and royalty is to be calculated and paid, many do not explicitly require that records be kept containing the many details which may be necessary to account for proper payment to lessors. In the vacuum existing in

most lease documents, the information which must be produced for an "accounting" has fallen to the courts, and in some instances, legislatures to prescribe.

While statutory causes of action for an account may not identify the right in lessors, courts widely recognize that a lessor has an equitable right to bring an action to account against a lessee. As stated by one court: "if the rent is dependent on the amount of mineral taken a bill for an account will lie." [*Swearingen v. Steers*, 38 S.E. 510, 511 (W.Va. 1901). Ultimately, the inquiry for an "accounting" in a lease context will be similar to any other case, and the basic requirements and duties will be to provide information sufficient to establish proper payment of amounts which are due by the lease contract and to pay. [*Keller v. Model Coal Co.*, 97 S.E.2d 337 (W. Va. 1957); *Hays v. Bowser*, 158 S.E. 169 (W. Va. 1931); *Peterson v. McIntyre*, 119 S.E. 554 (W. Va. 1923); *Belcher v. Big Four Coal & Coke Co.*, 70 S.E. 712 (W. Va. 1910); *Swearingen*, 38 S.E. 510; 13A Michie's Jurisprudence, Mines and Minerals § 44 (2004); 1A Michie's Jurisprudence, Accounts and Accounting § 10 (2004).]

A fundamental aspect of any case for proper royalty payment will be similar to any other case where one party is the operator and will thereby be in control, or at least in the best position to know, all the relevant facts, including the volume of mineral produced, the quality, the sale price and all expenses attendant with production. It stands to reason then, that courts impose on lessees duties, similar to a cotenant, to keep records and accounts. Regarding lessees, the West Virginia Supreme Court of Appeals stated: "*it [is] their duty to keep and render a strict account of the output thereof [the wells], as the amount of royalty wholly depended thereon and was peculiarly within their knowledge, owing to the trust and confidence reposed in them by their partners in the royalty reserved*." [*Swearingen*, 38 S.E. at 511.]

The duty to account has been extended to assignees of lessees, so that the assignee assumes the same duties to a lessor. [*Plumb v. Fluid Pump Serv.*, 124 F.3d 849 (7th Cir. 1997); *Moutsopoulos v. Am. Mut. Ins. Co.*, 607 F.2d 1185, 1189 (7th Cir. 1979); *Smith v. Linden Oil Co.*, 71 S.E. 167 (W. Va. 1911)(extending the duty further).] . . .

\* \* \*

"*Accounting for Cotenants, Trustees, Lessees, Trespassers and the Like*," 27 Energy & Min. L. Inst. § 8.05, at p. 283 (emphasis added; footnotes omitted).

After addressing the history and evolution of "accounting" as both a remedy and a cause of action in a variety of contexts and relationships and in proceedings both in equity and at law, the authors turned their attention to the burden of proof of the parties:

A plaintiff in an accounting action as any other must bear the original burden of proof. In an accounting this burden is satisfied when a plaintiff shows simply that he is entitled to an accounting. [14A Michie's Jurisprudence, Partnership § 66 (2004).] This right is shown by proof that the plaintiff's minerals, timber or other property, or the proceeds of it, have been taken. Once established the burden shifts to the defendant to prove the amount taken, its proceeds or value, any expenses which can legitimately be deducted to arrive at a net value, and to account and pay therefore. *The logic in this burden lies in the fact that the party to whom the accounts are known will have the burden of proof.* The duty also stems from the fiduciary nature of the relationship imposed on the parties in accounting cases. The general rule is well stated in *Conkling Mining* [   ] as follows:

"In a suit of this nature the burden is upon the plaintiff to prove that the defendant took the plaintiff's ore, or the proceeds of it, and mingled it with the ore in which the plaintiff had no interest, and those facts were admitted or conclusively proved in this case. Then the burden of proof and the duty rested upon the defendant to prove the amount of the ore it took from Conkling [plaintiff] ground and its proceeds or value, and to account and pay therefor, and if by reason of the failure of the defendant to keep the Conkling ore separate from other ore, and to keep an account of the ore taken and of its proceeds or value, the proof of the amount, the proceeds or value, or of any other facts requisite to make such proof, remained at the close of the hearing evenly balanced, uncertain, or doubtful, *the doubt should have been and should now be so resolved, in accordance with the basic principle of the accounting of a negligent or reckless trustee or agent, that the latter shall receive no profits from his wrongful treatment of the property of his cestui que trust, and the latter shall receive the just value of his property and its income.* The King Company [defendant] should not profit in this case by its own wrong, and issues rendered uncertain or doubtful by reason of its failure to discharge its recited duties, or by its confusion of the ores from Conkling ground with those from other sources, must be resolved against it." [*Silver King Coalition Mines Co. v. Conkling Mining Co.*, 255 F. 740, 743 (8th Cir. 1919).]

In partnership, the law is clear that the managing partner, because he has the responsibility to keep the books, will have the burden of proving that the accounting is accurate. *A managing partner cannot defeat the right of co-partners*

*to an accounting because of the failure of his books to accurately disclose the rights of the respective partners*. The court, in such case, will resort to the best evidence obtainable, and if therefrom a reasonable basis can be established for a settlement, it will be adopted . . . *resolving all matters of doubt against the partner whose failure to perform his duty makes necessary the resort to such basis of settlement*.  [Syl. Pt. 9, *Benedetto v. Di Bacco*, 99 S.E. 170 (W.Va. 1919).]

*The burden of proof, therefore, will be upon the defendant, to establish and prove the appropriateness of costs or funds to be deducted as expenses*. When a managing partner or developing co-owner accounts to the others, he has the burden to show that he is entitled to any funds that he has taken from the partnership or venture, [*Hooper v. Musolino*, 364 S.E.2d 207 (Va. 1988); Syl. Pt. 2, *Gay v. Householder*, 76 S.E. 450 (W.Va. 1912),] and "*will be held to strict proof of the items in his account, with which he seeks to charge the partnership . . ." and if he cannot provide satisfactory evidence of those items, he will be denied credit for those items*. [*Gay*, 76 S.E. at 460.]

*The party to whom the accounts are known will have the burden to account to the other party. Implicit in this is a requirement that the accounting be accurate and complete. Where costs or deductions are to be considered, the party requesting the deduction will bear the burden of proving that the deductions are actual and reasonable*.

"*Accounting for Cotenants, Trustees, Lessees, Trespassers and the Like*," 27 Energy & Min. L.

Inst. § 8.07, at pp. 305-07 (emphases added; footnotes omitted).

Upon completion of their analysis, the authors ultimately concluded:

Stemming from the basic notion that when the property--minerals--of another are developed and marketed the resulting proceeds belong to the original owner, the non-developing party, and from this, there is general recognition that the developing party assumes the position of a trustee. A unique attribute, therefore, of the duty to account and an accounting is the infusion of the special and unique obligations of a trust. The high standards applicable to trusts create special duties in the developing party, the "trustee," which are recognized in accounting cases. These include the *duties to notify the other owners of action taken with respect to their property; to keep and to provide all records necessary to "account," and that will include records of all receipts and expenses so that the non-developing owner has all information necessary to audit and satisfy itself of the proper amount owed; and finally, and perhaps most importantly, to pay*. In

18

cases of oil and gas lessees, some states have enacted statutory requirements for the provision of such information.

> Absent issues generated by fraudulent conduct, the goal of an accounting is to provide full value to the party whose property has been taken, and in cases where development has occurred, to provide such party with the full net profit from the operation, so that the non-developing party receives all profits attributable to its interest in the property and the developing party receives none of the profit for the interest of the other party.

"*Accounting for Cotenants, Trustees, Lessees, Trespassers and the Like*," 27 Energy & Min. L. Inst. § 8.09, at p. 309 (emphasis added).

The requirements are not whether defendants are satisfied that they have abundant records and data, but it is that they must present and produce the evidence as stated above – details sufficient that an accountant can review the record presented and follow, in detail, the source of incurring the cost, who requested the parts, equipment or services, was it needed for transporting gas from the wellhead to processing plant or for some other purpose unrelated to gathering, who paid for the service or product, etc.  Defendants did not produce that information.  And, that was the whole purpose of examining plaintiffs' costs was to get to the detail and determine whether they billed plaintiffs for things which were not reasonable and actual.

Plaintiffs are entitled to summary judgment.  Defendants made their choice.  For whatever reason, defendants chose to hide the ball.

> B.  Plaintiffs Are Entitled to Summary Judgment as a Result of Defendants' Deductions Being Estimates – Not Actual

Mr. Selby found that defendants are not deducting based upon actual costs.  This is opposite the requirements of *Tawney* and *Wellman*.  Therefore, plaintiffs are also entitled to summary judgment providing that plaintiffs are entitled to recover the deductions for that basis as well.

## Conclusion

Plaintiffs request the Court to grant plaintiffs summary judgment on both bases described above and for such other relief as the Court deems just and proper.

> KATHERINE F. LEGGETT, individually and as Executrix of the Estate of Patrick D. Leggett; GEORGE D. MCKAIN, by his attorney in fact, ANITA KATHRYN MCKAIN GREER; and ADELE S. MCDOUGAL,
>
> By Counsel

/s/ Marvin W.  Masters
West Virginia State Bar No. 2359
Richard A. Monahan
West Virginia State Bar No. 6489
The Masters Law Firm lc
181 Summers Street
Charleston, West Virginia  25301

Michael W. Carey
West Virginia State Bar No. 635
Carey, Scott, Douglas & Kessler, PLLC
707 Virginia Street East, Suite 901
Charleston, West Virginia  25301
Counsel for Plaintiffs
F:\5\864\b018.docx

## CERTIFICATE OF SERVICE

I, Marvin W. Masters, hereby certify that on September 14, 2018, I electronically filed "Plaintiffs' Memorandum in Support of Motion for Summary Judgment Re: Deductions and Royalty" with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

> David K. Hendrickson
> Carl L. Fletcher, Jr.
> Hendrickson & Long PLLC
> 214 Capitol Street
> Post Office Box 11070
> Charleston, West Virginia  25339
> daveh@handl.com
> cfletcher@handl.com
> Counsel for Defendants

> /s/ Marvin W. Masters
> West Virginia State Bar No. 2359
> The Masters Law Firm lc
> 181 Summers Street
> Charleston, WV  25301
> 304-342-3106
> mwm@themasterslawfirm.com